Nicholas Bowers (NB8145)
GARY TSIRELMAN, PC
129 Livingston Street
2nd Floor
Brooklyn, NY 11201
          *Counsel for Plaintiff*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

Capital 7 Funding,

                    *Plaintiff*

          - against -

Wingfield Capital Corporation, Prestige Investment
Associates, Inc., d/b/a Prestige Investments USA,
and First Choice Payment Systems, Inc., d/b/a 1st
Choice Payments
                    *Corporate Defendants*

          And

Burgis Sethna, a/k/a Seth Burgess, Heath
Wagenheim, Joseph Rabito, Damian Laljie a/k/a
Damian Laltie, and John Does 1 through 15,
                    *Individual Defendants*

-------------------------------------------------------------X

SECOND AMENDED
COMPLAINT
Docket No. 17-cv-2374

**Plaintiffs Demands a Trial
By Jury**

          By this pleading, Plaintiff, by and through its counsel Gary Tsirelman, PC, brings
claims against Defendants, seeking monetary damages for the following: (1) violations
of the Federal Racketeering Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C.
§ 1962(c); (2) violations of the Federal Racketeering Influenced and Corrupt
Organizations (RICO) Act, 18 U.S.C. § 1962 (d); (3) common law fraud; (4) aiding and
abetting fraud; (5) unjust enrichment; (6) breach of contract; and (7) conversion.

1

## I.  NATURE OF THE ACTION

1. Plaintiff seeks to recover more than $1,000,000.00 that the Defendants have stolen from Three Leaf Capital and Capital 7 Funding via a fraudulent scheme. Defendants carried out this scheme via an enterprise comprised of, among others, Burgis Sethna, a/k/a Seth Burgess (hereinafter "Sethna"), Wingfield Capital Corporation, Prestige Investment Associates, Inc., and First Choice Payment Systems, Inc., Heath Wagenheim, Joseph Rabito, and Damian Laljie, as well as a number of unknown individuals.

2. The Defendants' ultimate aims were to steal as much money from Plaintiffs as possible before disappearing and moving onto their next victim. To achieve this goal, Burgis Sethna and Wingfield Capital Corporation entered into an agreement with Plaintiff to set up a joint venture 3 Leaf Capital, LLC (hereinafter "3 Leaf").

3. The purpose of 3 Leaf was to offer short-term funding to retailers and other merchants in need. In reality, the Defendants intended to use 3 Leaf as a vehicle from which to siphon money for their personal use, using Plaintiff's initial investment in 3 Leaf as seed capital for their fraudulent scheme.

4. The Defendants orchestrated an ongoing shell game through which they identified a potential customer that, in reality, was simply an alter ego of Defendants or a co-conspirator, transferred money to the bogus customer, and then split the funding proceeds with the bogus customer without any intention of returning any proceeds to 3 Leaf.

5. In other cases, Defendants identified bona fide customers and siphoned any payments made by the customers to bank accounts under the control of the Defendants rather than to bank accounts under the control of 3 Leaf.

6. Sethna further defrauded Plaintiffs by writing checks from 3 Leaf's account to Wingfield to reimburse Wingfield for phony independent sales organization ("ISO") fees.

7. The Defendants' egregious behavior extended to retaliation when confronted with their fraud. When Plaintiff's officers and employees requested that Sethna return

the money he had stolen, Sethna repeatedly threatened to lock 3 Leaf's office and report Plaintiff's officers and employees to the police for trespassing.

8. Sethna also attempted to steal money from 3 Leaf's employees, threatening to hurt or kill several employees and/or their family members should those employees not return all or part of their 3 Leaf salaries to him and his co-conspirators.

9. Defendants' conduct violates Federal Racketeering Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C. §1961 *et seq*., with predicate acts of extortion, mail and wire fraud, and money laundering, among others. Defendants' conduct furthermore constitutes common law fraud, unjust enrichment, conversion, aiding and abetting fraud, and breach of contract, among others. As a result, Defendants' misconduct entitles Plaintiff to damages, court costs, and attorney fees.

## II.  THE PARTIES

### A.  Plaintiff

10. Plaintiff Capital 7 Funding is a New York corporation with a principal place of business in the county of New York.  Plaintiff is authorized to transact business in the State of New York.

### B.  Defendants

#### 1.  Corporate Defendants

11. Defendant Wingfield Capital Corporation, hereinafter "Wingfield", is a foreign corporation organized under the laws of the State of Nevada, with a principal place of business in New York, New York. Wingfield is managed and controlled by Defendant Burgis Sethna.

12. Defendant Prestige Investment Associates, Inc., d/b/a Prestige Investments USA, ("Prestige") is a foreign corporation organized under the laws of the State of Nevada, with a principal place of business in New York, New York.

13. Defendant First Choice Payment Systems, Inc., d/b/a 1st Choice Payments, ("First Choice") is a domestic corporation organized under the laws of the State of New York, with a principal place of business in New York, New York.

## 2. Individual Defendants

14. Defendant Burgis Sethna, a/k/a Seth Burgess is, upon information and belief, a citizen and resident of New York State. He is the true owner and CEO of Wingfield, Prestige and First Choice.

15. Defendant Heath Wagenheim resides in and is a citizen of New Jersey. He is the nominal Chief Technology Officer of Wingfield.

16. Defendant Joseph Rabito resides in and is a citizen of New York. Rabito is the nominal Chief Financial Officer of Wingfield.

17. Defendant Damian Laljie a/k/a Damian Laltie resides in and is a citizen of New York. He is the nominal Chief Operating Officer of Wingfield.

18. JOHN DOE Defendants 1-15 are, upon information and belief, persons or entities who worked with, conspired with, or otherwise participated in Defendants' scheme to defraud Plaintiff.

## III. JURISDICTION, VENUE AND STATUTE OF LIMITATIONS

19. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, due to the claims brought under 18 U.S.C. §§ 1961 through 1968 (the Racketeer Influenced and Corrupt Organizations ("RICO") Act) because they arise under the laws of the United States. In addition, this Court has supplemental jurisdiction over the subject matter of the state law claims asserted in this action pursuant to 28 U.S.C. § 1367.

20. Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

21. The causes of action detailed within this complaint fall within the pertinent statute of limitation requirements. Notably, the corrupt organization and fraudulent conduct as alleged below was discovered by Plaintiff less than one year prior to the date of this Complaint.

## IV. FACTUAL BASIS FOR CLAIMS

### 1. Background

22. This Complaint details how a group of supposed businesspeople, together with co-conspirators, have established a fraudulent scheme to steal money from Plaintiffs via the joint venture 3 Leaf and to direct any monies legitimately owed to 3 Leaf to accounts under Defendants' control.

### 2. The Incorporation of the 3 Leaf Joint Venture

23. Plaintiff and Wingfield agreed on November 25, 2015, to for 3 Leaf Capital as a limited liability company jointly owned equally by both parties. The agreement was made pursuant to the efforts of Defendant Sethna, who had spent significant time advocating such a joint venture to Plaintiff and its members. The joint venture agreement is attached hereto as **Exhibit A**.

24. Plaintiff and Wingfield agreed to make an initial capital contribution of $2,500,000.00 each. These funds were intended to serve as the initial operating capital for 3 Leaf from which employee salaries and funding to customers would be drawn.

25. In addition to the written agreement, Plaintiff and Wingfield agreed that the offices would be located at One Penn Plaza, Suite 2527 New York, New York 10119 ("Penn Plaza Office"). The Penn Plaza Office was leased by the owner to Wingfield and/or Prestige, to whom Plaintiff paid $78,750 in November of 2015 as prepayment for 3.5 months rent and 2 months security deposit.

### 3. The Intended Operation of 3 Leaf

26. Plaintiff and Defendants verbally agreed to operate 3 Leaf jointly, with Defendant Sethna. Wagenheim and Laljie managing day-to-day operations, including obtaining office equipment, business productivity software, and hiring and managing employees. Plaintiff and Defendants agreed that Defendant Sethna would have the ultimate responsibility of managing 3 Leaf's operations and sales activities.

5

27. The Parties agreed that 3 Leaf would operate as a funding company, focusing on purchasing future receivables from businesses in need of short-term funding of less than $500,000.00.

28. The Parties agreed that 3 Leaf would offer capital to potential customers via funding agreements in which 3 Lead agreed to buy a fixed amount of customers' future receivables in return for an immediate payment to the customers.

29. The Parties further agreed that 3 Leaf would collect on the future receivables by entering into agreements in which the customers would agree that a fixed amount of the customer's daily credit card and/or debit card sales revenue would be withdrawn daily by 3 Leaf from a designated account owned by the customer.

30. Defendant Sethna purported to contact potential customers for this arrangement and facilitate 3 Leaf's agreements with customers in arm's-length transactions.

31. In return for this service, Defendant Sethna charged Plaintiff a 6% management fee of all funding provided to customers in exchange for his expertise in running profitable funding companies.

32. The Parties also agreed that Wagenheim, Laljie, and Rabito would perform c-level executive work, including management of 3 Leaf's operations, finances, and technology.

33. In order to allow 3 Leaf to function smoothly, Plaintiffs and Defendants agreed that Plaintiff and Defendants would be co-signatories on any account in 3 Leaf's name.

34. In reality, Sethna and the other Individual Defendants intended from the beginning to use 3 Leaf to defraud Plaintiff and to siphon any monies invested into 3 Leaf by Plaintiff.

### 4.  An Overview of Defendants' Fraudulent Scheme

35. Defendants operated 3 Leaf for their own personal gain by continually defrauding Plaintiff via phony transactions with customers who were fictional, alter egos of Defendants, or Defendants' co-conspirators. Defendants also siphoned substantial amounts of money collected from 3 Leaf's bona fide customers.

36. Sethna directed the operation of the fraudulent scheme.

37. Wagenheim, Laljie and Rabito participated in the scheme by making misrepresentations and falsifying records about the day-to-day expenses at 3 Leaf, the amounts recouped from customers, the existence of bona fide third party customers, and the operations of 3 Leaf.

38. Defendants' core scheme was to illegally siphon money from Plaintiff and to steal the proceeds of any purchase agreement by depositing the proceeds from any funding agreement into Wingfield's accounts and refusing to transfer money owed to 3 Leaf.

39. In the event any payments were made by the customers into 3 Leaf's accounts, Defendants arranged that Sethna and Laljie were the only authorized signatories on 3 Leaf's bank accounts. This allowed them to shield their theft and money laundering from Plaintiff and its owners.

40. Sethna attempted to hide his role in the scheme from the outset by arranging with the other Individual Defendants to incorporate the Corporate Defendants in their names and to leave his name off of any agreements or articles of incorporation.

41. In fact, Sethna orchestrated the fraudulent scheme.

42. Although Defendants agreed to provide 3 Leaf with start-up capital, Defendants never transferred any money to 3 Leaf and relied solely on capital provided by Plaintiff.

43. Defendants used this capital to bootstrap their scheme.

44. The Defendants' plan was to recruit third parties to pose as bona fide customers willing to sell future receivables from their retail businesses in exchange for an immediate payment from 3 Leaf. Defendants would salt 3 Leaf's customer base with a handful of legitimate customers in order to conceal their scheme.

45. In exchange for kickbacks from Defendants, the sham customers would enter into agreements with 3 Leaf.

46. Defendants presented 3 Leaf with a number of such sham customers every month and convinced 3 Leaf to provide capital to make payments to the customers under the receivable purchase agreements.

47. In each and every instance, before 3 Leaf transferred funds to any putative customers, Sethna told Plaintiff or its representatives that:

a. The supposed customer was a legitimate business, when, in reality, many were sham businesses owned by Sethna's co-conspirators, including John Doe Defendants;

b. That Sethna had hired a legitimate ISO broker for a ten percent (10%) fee, when, in reality, Sethna had hired no such broker and instead pocketed any supposed fee; and

c. That Defendants would allow Plaintiff to access 3 Leaf's accounts to recoup on Plaintiff's investment in the joint venture.

48. The sham customers would then quickly default and stop payments to 3 Leaf, generally within months.

49. In reality, the bulk of any payment made to the sham customers would be directed by the sham customers and Defendants to Defendants.

50. Furthermore, although Defendants and Plaintiff agreed that any payments made by the customers would be deposited automatically into 3 Leaf's bank accounts; in many cases Defendants altered agreements with the customers so that payments would be automatically deposited into Wingfield's accounts.

51. Defendants would use a portion of the proceeds of the original sale of receivables to make piecemeal payments to 3 Leaf in order to conceal their fraud.

52. In many cases, Defendants misrepresented to Plaintiff that although the customer defaulted on the purchase agreement, Defendants had recovered all money due to 3 Leaf and would repay 3 Leaf.

53. Defendants then made a small number of repayments to 3 Leaf, claiming that the payments came from the defaulting customers. Defendants kept the bulk of the money due to 3 Leaf and Plaintiffs under the receivables purchase agreements.

54. Defendants also attempted to siphon money from 3 Leaf's employees. Defendants hired dozens of employees, virtually none of whom ever were able to close a sale or attract a customer. Defendants never intended these employees to make any sales but rather saw them as potential sources of income.

55. Sethna repeatedly threatened and extorted money from 3 Leaf's employees, threatening to hurt or kill the employees or their families if the employees did not surrender a portion of their paycheck to him.

56. Sethna accomplished these threats against 3 Leaf employees by claiming that he had connections to organized crime and could essentially order criminals to harm or kill his enemies, including 3 Leaf's employees and Defendants.

57. Eventually, Sethna made the same boasts to Plaintiff's owners and representatives in order to frighten Plaintiff's owners into allowing Defendants' scheme to continue.

58. Defendants' final move in October of 2016 was to remove Plaintiff and its representative's as co-signatories on 3 Leaf's accounts, effectively seizing 3 Leaf's assets as Defendants' own.

59. Defendants stole $91,000.00 from 3 Leaf's Empire State Bank account, $25,800.00 from 3 Leaf's Astoria bank account, and $500.00 from 3 Leaf's Bank of America account in this manner.

### 5. Defendants' Violations of the RICO Act

*Structure of the 3 Leaf Enterprise*

60. Defendants thoroughly infiltrated 3 Leaf and controlled it as a RICO enterprise designed to siphon money from Plaintiff via recruitment of sham customers and, in a handful of cases, to siphon money from legitimate customers.

61. Defendants thus operated 3 Leaf in violation of 18 U.S.C. § 1962(c).

62. Defendant Sethna directed the scheme and organized the agreement between Plaintiff and Defendant Wingfield.

63. Although Defendant Sethna was not named as an owner of Defendant Wingfield or 3 Leaf, he operated as the de facto owner. Sethna hired and fired 3 Leaf employees, supervised the work of Defendants Laljie, Rabito, and Wagenheim, and provided the scheme with its sham customer base. Sethna also organized the scheme and operated as its greatest facilitator and ringleader, including recruiting the other Defendants, directing the other participants' activities in furtherance of the scheme, and making repeated misrepresentations to Plaintiff's representatives about the nature of 3 Leaf's sham customer base, the payments made by

customers under the individual customer agreements, 3 Leaf's day-to-day operational costs, and the falsified costs for ISO

64. Defendants Rabito, Laljie, and Wagenheim participated in the operation of the scheme by concealing Sethna's activities, by falsifying records to conceal the scheme from Plaintiff, by falsifying records, including expense reports, to inflate the day-to-day costs of running 3 Leaf to conceal siphoned money, by making misrepresentations to Plaintiff and its representatives regarding the amounts recouped from 3 Leaf's supposed customers, and by generally bolstering Sethna's assurances at meetings with Defendants and Plaintiff's representatives regarding 3 Leaf that 3 Leaf's business was operating smoothly.

65. Furthermore, Defendants Laljie, Rabito, and Wagenheim leased office space to 3 Leaf to further siphon money from Plaintiff.

66. Individual Defendants also participated in regular meetings and discussions with Plaintiff's representatives regarding the business of 3 Leaf. At such meetings, Defendants presented a unified front and concealed Defendants' redirection of funds from 3 Leaf to Defendants.

67.

*Defendants' Violation of the Federal Wire Fraud Statute 18 U.S.C. §1343*

68. Defendants, in order to accomplish the above-detailed scheme, routinely utilized their telephones, including cellular phones, to contact Plaintiffs' representatives to describe the nature of the supposed transaction and to provide fraudulent reports on the progress of the transactions.

69. Furthermore, the Defendants routinely used the wires in furtherance of the scheme via the daily electronic transfers from the customers into either 3 Leaf's account or into other bank accounts controlled by Defendants. As detailed above, 3 Leaf's business model was predicated on daily automatic electronic transfer of monies from the customers' accounts or directly from the customers' credit card point of sale service provider.

70. The Defendants redirected the automatic payments into accounts controlled by Defendants. The dates on which such transfers were made are detailed in Section 6 below.

71. The Defendants made repeated misrepresentations to Plaintiff regarding each new customer, the dates and content of such misrepresentations are listed in detail in Section 6 below.

72. Furthermore, Plaintiff and its representatives regularly contacted Defendants, in particular Sethna, via the telephone to discuss the progress of the transactions and, once the Defendants had illegally taken over 3 Leaf's bank accounts, to discuss.

73. Defendants regularly made misrepresentations to Plaintiff's representatives over the telephone. Such misrepresentations included:

    a. That Defendants paid ISO fees to third parties when, in fact, Defendants merely siphoned money from 3 Leaf's accounts;

    b. That Defendants had identified bona-fide customers when, in reality, no such customers existed or, if the customers did exist, they colluded with Defendants to split the monies obtained from Plaintiff and 3 Leaf when they never had any intent to pay 3 Leaf the full amount owed under the receivables purchase agreements;

    c. That Defendants actually transferred money from 3 Leaf to customers when, in reality, Defendants kept the lion's share of any amounts obtained from Plaintiff;

    d. That payments made to Plaintiff and/or 3 Leaf under the alleged contracts to buy receivables were actually made by bona fide customers when, in reality, Defendants merely transferred back a portion of money they had stolen from 3 Leaf, generally using money just received to buy receivables from a new supposed customer;  and

    e. That Defendants required money from Plaintiff to fund the day-to-day operations of 3 Leaf when, in reality, Defendants siphoned part or all of any payments from Plaintiff.

74. The telephone calls between Defendants and Plaintiff's representatives routinely crossed state lines and involved calls between phones with area codes in different states.

75. Defendant's misrepresentations concealed their fraudulent scheme and induced Plaintiff to continue to invest in 3 Leaf, causing the damages asserted in this suit.

76. Defendants thus regularly used the wires to further their scheme to defraud Plaintiff and siphon money from 3 Leaf.

*Defendants' Violation of the Federal Money Laundering Statute 18 U.S.C. §1956*

77. Once they had stolen the money from Plaintiff and 3 Leaf, Defendants violated 18 U.S.C. §1956 by using the proceeds from their wire fraud to further finance their illegal scheme to defraud Plaintiff.

78. Specifically, Defendants would set up sham deals for 3 Leaf to buy a company's receivables and then request that Plaintiff would provide 3 Leaf the money for the purchase. Defendants would then siphon all or the majority of the supposed purchase price to themselves, in some instances paying kickbacks to the supposed customer.

79. In many cases, the customer would never see the majority of the purchase price. In some cases, the sham customer colluded with Defendants to perpetrate the fraudulent transaction.

80. The Defendants would, in some cases, make sham payments and transfers into 3 Leaf's bank account from their own accounts and claim such payments were from the supposed customers. In reality, Defendants made the payments out of the proceeds of their fraudulent scheme in order to conceal the extent of their scheme. Defendants had no intention of paying the full amount owed 3 Leaf on any transaction.

81. In other cases, Defendants would arrange it so that the customer would make the daily automatic money transfers into 3 Leaf's account for a short while and then redirect the automatic payments to a different account under Defendants' control.

82. Defendants intended the transfer of monies to not only conceal their scheme from Plaintiff but to induce Plaintiff into continuing to believe that 3 Leaf was carrying on legitimate business.

83. Defendants employed a variety of strategies to siphon money from customers, 3 Leaf, and Plaintiff in order to conceal their scheme from Plaintiff.

84. Defendants thus used the money it had obtained unlawfully from Plaintiff to both conceal the nature of their fraudulent scheme and to fund further sham transactions with which to defraud Plaintiff.

*The Effect of Defendants' Scheme on Interstate Commerce*

85. Defendants' scheme effects interstate commerce most directly by involving entities and persons from different states. As set forth below in Section 6, the supposed customers of 3 Leaf were companies doing business in other states.

86. Furthermore, the scheme involved electronic transfers of money across state lines from customers' accounts and the accounts of credit card processors into accounts controlled by Defendants.

## 6.  Defendants' Specific Sham Transactions and Pattern of Racketeering Activity

*Defendants' Theft of Monies Related to Wingfield's Agreement with Carillo Trucking*

87. In November of 2015, 3 Leaf agreed to fund Wingfield's purchase $280,000.00 worth of receivables from Carillo Trucking, a business located in Hereford, Texas, in exchange for an immediate cash payment of $200,000.00 to Carillo Trucking. Carillo agreed to pay Wingfield daily out of its receivables.

88. Defendants agreed to pay the entire $280,000.00 into 3 Leaf's account in order to provide capital to 3 Leaf.

89. Carillo Trucking agreed deposit the payments into Wingfield's account. Wingfield agreed to promptly transfer the money to 3 Leaf's accounts.

90. Sethna and the other individual Defendants brokered the deal.

91. On or about November 15, 2015, Defendant Sethna made the following misrepresentations to Plaintiff:

    a.  That 3 Leaf would have to pay an ISO fee of $20,000.00 to a third party when, in reality, Defendants intended to pocket the payment;

    b.  That Defendants would reimburse Plaintiff for the $200,000.00 it paid into 3 Leaf's account for the purchase of Carillo Trucking's receivables; and

     c.  That Wingfield would transfer the proceeds of its agreement with Carillo Trucking into 3 Leaf's account as Wingfield received them.

92. Plaintiff, relying on Defendants' misrepresentations, transferred $200,000.00 to Wingfield, which Defendants claimed they transferred to Carillo Trucking in December, 2015, pursuant to the agreement.

93. In November of 2015, Sethna wrote a check out of 3 Leaf's account for $20,000.00 payable to Defendant Wingfield.

94. Defendant Sethna claimed to Plaintiff's representatives that the check was meant to reimburse a third-party broker for an ISO fee. Sethna refused to disclose the identity of the broker to Plaintiff's representatives. Sethna also refused to provide proof that Wingfield paid any third party for any costs related to the transaction with Carillo Trucking.

95. In fact, Sethna fabricated the third-party broker and directed the $20,000.00 to Defendants.

96. Between December 14, 2015 and October 4, 2016, Carillo Trucking made regular automatic payments into Wingfield's account.

97. Defendants consistently failed to transfer the proceeds to 3 Leaf's accounts on time, delaying payment by four to six weeks.

98. In September 2016, Wingfield ceased to transfer any additional proceeds to 3 Leaf. Defendants provided no explanation for this failure.

99. Defendants instead diverted the daily payments to accounts under their control, beginning on or about September 1, 2016.

100. Of the $280,000.00 owed to 3 Leaf, 3 Leaf only collected $177,000.00. Defendants stole the remaining $103,000.00, in addition to the fraudulent charge for an ISO broker.

101. Defendants repeated this pattern of deceit over the next year.

*Defendants' Theft of Monies Related to 3 Leaf's Agreement with Two Paper Dolls*

102. In November of 2015, 3 Leaf agreed to fund Wingfield's purchase $280,000.00 worth of receivables from Two Paper Dolls, LLC, a business located in Wayne, Pennsylvania, in exchange for an immediate cash payment of $200,000.00 to Two

Paper Dolls, LLC. Two Paper Dolls, LLC agreed to pay 3 Leaf daily out of its receivables.

103. Defendants agreed to pay the entire $280,000.00 into 3 Leaf's account in order to provide capital to 3 Leaf.

104. Two Paper Dolls, LLC agreed deposit the payments into Wingfield's account. Wingfield agreed to promptly transfer the money to 3 Leaf's accounts.

105. Sethna and the other individual Defendants brokered the deal.

106. On or about November 15, 2015, Defendant Sethna made the following misrepresentations to Plaintiff:

    a.  That 3 Leaf would have to pay an ISO fee of $20,000.00 to a third party when, in reality, Defendants intended to pocket the payment;

    b.  That Defendants would reimburse Plaintiff for the $200,000.00 it paid into 3 Leaf's account for the purchase of Two Paper Dolls' receivables; and

    c.  That Wingfield would transfer the proceeds of its agreement with Two Paper Dolls, LLC into 3 Leaf's account as Wingfield received them.

107. Plaintiff, relying on Defendants' misrepresentations, transferred $200,000.00 to Wingfield, which Defendants claimed paid the same sum to Two Paper Dolls, LLC, in December, 2015, pursuant to the agreement.

108. In November of 2015, Sethna wrote a check out of 3 Leaf's account for $20,000.00 payable to Defendant Wingfield.

109. Defendant Sethna claimed to Plaintiff's representatives that the check was meant to reimburse a third-party broker for an ISO fee. Sethna refused to disclose the identity of the broker to Plaintiff's representatives. Sethna also refused to provide proof that Wingfield paid any third party for any costs related to the transaction with Two Paper Dolls, LLC.

110. In fact, Sethna fabricated the third-party broker and directed the $20,000.00 to Defendants.

111. Defendants consistently failed to transfer the proceeds to 3 Leaf's accounts on time, delaying payment by four to six weeks.

112. In September 2016, Wingfield ceased to transfer any additional proceeds to 3 Leaf. Defendants provided no explanation for this failure.

113. Between December 14, 2015, and October 4, 2016, Two Paper Dolls transferred money regularly into Wingfield's account.

114. Of the $280,000.00 owed to 3 Leaf, 3 Leaf only collected $177,000.00. Defendants stole the remaining $103,000.00, in addition to the fraudulent charge for an ISO broker.

*Defendants' Theft of Monies Related to 3 Leaf's First Agreement with Quality Products USA, Corp.*

115. In December of 2015, 3 Leaf agreed to purchase $85,200.00 worth of receivables from Quality Products USA, Corp., a business allegedly located in Clifton, New Jersey, in exchange for an immediate cash payment of $60,000.00 to Quality Products USA, Corp. Quality Products USA, Corp., agreed to pay 3 Leaf daily out of its receivables.

116. On or about December 1, 2015, Defendant Sethna made the following misrepresentations to Plaintiff:

   a. That Quality Products USA, Corp., was a bona fide customer of 3 Leaf and not a sham customer used by Sethna to steal money from Plaintiff;

   b. That 3 Leaf would have to pay an ISO fee of $6,000.00 to a third party when, in reality, Defendants intended to pocket the payment; and

   c. That Defendants would reimburse Plaintiff for the $60,000.00 it paid into 3 Leaf's account for the purchase of Quality Products USA's receivables.

117. Plaintiff, relying on Defendants' misrepresentations, transferred $60,000.00 to 3 Leaf, which immediately paid the same sum to Quality Products USA, Corp., in December, 2015, pursuant to the agreement.

118. Quality Products USA, Corp. agreed deposit the payments into Wingfield's account. Wingfield agreed to promptly transfer the money to 3 Leaf's accounts.

119. Defendant Sethna and the other individual Defendants brokered the deal. In December of 2015, Sethna wrote a check out of 3 Leaf's account for $6,000.00 payable to Defendant Wingfield.

120. Defendant Sethna claimed to Plaintiff's representatives that the check was meant to reimburse a third-party broker for an ISO fee. Sethna refused to disclose the

identity of the broker to Plaintiff's representatives. Sethna also refused to provide proof that Wingfield paid any third party for any costs related to the transaction with Quality Products USA, Corp.

121. In fact, Defendant Sethna fabricated the third-party broker and directed the $6,000.00 to Defendants.

122. Defendant Sethna admitted to Plaintiff's representatives that the owner of Quality Products USA, Corp., is his personal friend. Neither Quality Products USA, Corp., nor its owner has responded to any communications from Plaintiff or its employees.

123. Defendants recruited the owner of Quality Products USA, Corp., to assist in their scheme to defraud Plaintiff by posing as a legitimate counterparty to the funding agreement and to transfer any money received from 3 Leaf to Defendants in exchange for a kickback.

124. In September 2016, Defendants ceased transferring any additional proceeds to 3 Leaf. Defendants provided no explanation for this failure.

125. Of the $85,200.00 owed to 3 Leaf, 3 Leaf only collected $49,729.00. Defendants stole the remaining $35,471.00, in addition to the fraudulent charge for an ISO broker.

*Defendants' Theft of Monies Related to 3 Leaf's Second Agreement with Quality Products USA, Corp.*

126. In December of 2015, 3 Leaf agreed to purchase $86,904.00 worth of receivables from Quality Products USA, Corp., a business allegedly located in Clifton, New Jersey, in exchange for an immediate cash payment of $61,120.00 to Quality Products USA, Corp. Quality Products USA, Corp., agreed to pay 3 Leaf daily out of its receivables.

127. On or about December 18, 2015, Defendant Sethna made the following misrepresentations to Plaintiff:

    a. That Quality Products USA, Corp., was a bona fide customer of 3 Leaf and not a sham customer used by Sethna to steal money from Plaintiff;

    b. That 3 Leaf would have to pay an ISO fee of $6,120.00 to a third party when, in reality, Defendants intended to pocket the payment; and

    c. That Defendants would reimburse Plaintiff for the $61,200.00 it paid into 3 Leaf's account for the purchase of Quality Products USA's receivables.

128. Plaintiff, relying on Defendants' misrepresentations, transferred $60,120.00 to 3 Leaf, which immediately paid the same sum to Quality Products USA, Corp., in December, 2015, pursuant to the agreement.

129. Quality Products USA, Corp. agreed deposit the payments into Wingfield's account. Wingfield agreed to promptly transfer the money to 3 Leaf's accounts.

130. Sethna and the other individual Defendants brokered the deal. In December of 2015, Sethna wrote a check out of 3 Leaf's account for $6,120.00 payable to Defendant Wingfield.

131. Defendant Sethna claimed to Plaintiff's representatives that the check was meant to reimburse a third-party broker for an ISO fee. Sethna refused to disclose the identity of the broker to Plaintiff's representatives. Sethna also refused to provide proof that Wingfield paid any third party for any costs related to the transaction with Quality Products USA, Corp.

132. In fact, Sethna fabricated the third-party broker and directed the $6,120.00 to Defendants.

133. Defendant Sethna admitted to Plaintiff's representatives that the owner of Quality Products USA, Corp., is his personal friend. Neither Quality Products USA, Corp., nor its owner has responded to any communications from Plaintiff or its employees.

134. Defendants recruited the owner of Quality Products USA, Corp., to assist in their scheme to defraud Plaintiff by posing as a legitimate counterparty to the funding agreement and to transfer any money received from 3 Leaf to Defendants in exchange for a kickback.

135. In September 2016, Defendants ceased transferring any additional proceeds to 3 Leaf. Defendants provided no explanation for this failure.

136. Of the $86,904.00 owed to 3 Leaf, 3 Leaf only collected $39,744.00. Defendants stole the remaining $47,160.00, in addition to the fraudulent charge for an ISO broker.

*Defendants' Theft of Monies Related to 3 Leaf's First Agreement with 7110 Partners LLC*

137. In December of 2015, 3 Leaf agreed to purchase $248,500.00 worth of receivables from 7110 Partners, LLC (d/b/a Mendoza Argentine Steak House), which operated a restaurant business allegedly located in Brooklyn, New York, in exchange for an immediate cash payment of $175,500.00. 7110 Partners, LLC, agreed to pay 3 Leaf daily out of its receivables.

138. On or about December 19, 2015, Defendant Sethna made the following misrepresentations to Plaintiff:

   a. That 7110 Partners, LLC was a bona fide customer of 3 Leaf and not a sham customer used by Sethna and Defendants to steal money from Plaintiff;

   b. That 3 Leaf would have to pay an ISO fee of $17,500.00 to a third party when, in reality, Defendants intended to pocket the payment; and

   c. That Defendants would reimburse Plaintiff for the $175,000.00 it paid into 3 Leaf's account for the purchase of 7110 Partners' receivables.

139. Plaintiff, relying on Defendants' representations, transferred $175,500.00 to 3 Leaf, which immediately paid the same sum to 7110 Partners, LLC, in December, 2015, pursuant to the agreement.

140. 7110 Partners, LLC, agreed deposit the payments into a lockbox account, to which Defendants were co-signatories. Defendants agreed to promptly transfer the money to 3 Leaf's accounts upon receipt in the lockbox account.

141. Sethna and the other individual Defendants brokered the deal. In December of 2015, Sethna wrote a check out of 3 Leaf's account for $17,500.00 payable to Defendant Wingfield.

142. Defendant Sethna claimed to Plaintiff's representatives that the check was meant to reimburse a third-party broker for an ISO fee. Sethna refused to disclose the

identity of the broker to Plaintiff's representatives. Sethna also refused to provide proof that Wingfield paid any third party for any costs related to the transaction with 7110 Partners, LLC.

143. In fact, Sethna fabricated the third-party broker and directed the $17,500.00 to Defendants.

144. Burgis Sethna admitted to Plaintiff's representatives that the owners of 7110 Partners, LLC, are his personal friends. Neither 7110 Partners, LLC, nor its owners has responded to any communications from Plaintiff or its employees.

145. Defendants recruited the owners of 7110 Partners, LLC, to assist in their scheme to defraud Plaintiff by posing as a legitimate counterparty to the funding agreement and to transfer any money received from 3 Leaf to Defendants in exchange for a kickback.

146. 7110 Partners, LLC, immediately ceased operations of the restaurant funded by the agreement with 3 Leaf after receiving the funding and distributing it among themselves and Defendants.

147. Defendants hid this fact from Plaintiffs long enough to secure a second round of funding for 7110 Partners, LLC, for a business at a different location.

148. Defendants repeatedly misrepresented to Plaintiff via telephone calls and in-person conversations that they and 7110 Partners, LLC, would return the money 3 Leaf paid to 7110 Partners, LLC.

149. Defendants have not paid 3 Leaf any money pursuant to the agreement with 7110 Partners, LLC.

150. Defendants stole the entire $248,500.00, in addition to the fraudulent charge for an ISO broker.

*Defendants' Theft of Monies Related to 3 Leaf's Second Agreement with 7110 Partners LLC*

151. In March of 2016, 3 Leaf agreed to purchase $195,000.00 worth of receivables from 7110 Partners, LLC (d/b/a Bar 13, Inc.), a business allegedly located in New York, New York, in exchange for an immediate cash payment of $150,000.00. 7110 Partners, LLC, agreed to pay 3 Leaf daily out of its

receivables at a rate of 25%, which would be automatically transferred to a lockbox account on which Defendants were co-signatories.

152. On or about March 1, 2016, Defendant Sethna made the following misrepresentations to Plaintiff:

    a. That 7110 Partners, LLC was a bona fide customer of 3 Leaf and not a sham customer used by Sethna and Defendants to steal money from Plaintiff;

    b. That 3 Leaf would have to pay an ISO fee of $15,000.00 to a third party when, in reality, Defendants intended to pocket the payment; and

    c. That Defendants would reimburse Plaintiff for the $150,000.00 it paid into 3 Leaf's account for the purchase of 7110 Partners' receivables.

153. Plaintiff, relying on Defendants' misrepresentations, transferred $150,000.00 to 3 Leaf, which immediately paid the same sum to 7110 Partners, LLC, in March, 2016, pursuant to the agreement.

154. 7110 Partners, LLC agreed deposit the payments into a lockbox account to which Defendants were co-signatories. Defendants agreed to promptly transfer the money to 3 Leaf's account upon receipt.

155. Sethna and the other individual Defendants brokered the deal.

156. In December of 2015, Sethna wrote a check out of 3 Leaf's account for $15,000.00 payable to Defendant Wingfield.

157. Defendant Sethna claimed to Plaintiff's representatives that the check was meant to reimburse a third-party broker for an ISO fee. Sethna refused to disclose the identity of the broker to Plaintiff's representatives. Sethna also refused to provide proof that Wingfield paid any third party for any costs related to the transaction with 7110 Partners, LLC.

158. In fact, Sethna fabricated the third-party broker and directed the $15,000.00 to Defendants.

159. Burgis Sethna admitted to Plaintiff's representatives that the owners of 7110 Partners, LLC, are his personal friends. Neither 7110 Partners, LLC, nor its owners have responded to any communications from Plaintiff or its employees.

160. Defendants recruited the owner of 7110 Partners, LLC, to assist in their scheme to defraud Plaintiff by posing as a legitimate counterparty to the funding agreement and to transfer any money received from 3 Leaf to Defendants in exchange for a kickback.

161. In June 2016, Defendants ceased transferring any additional proceeds to 3 Leaf. Defendants continued to collect the payments from 7110 Partners, LLC.

162. Defendants effectuated this by changing the password to access the lockbox account on or about June 10, 2016.

163. From on or about June 15, 2016, to November 24, 2016, the daily automatic payments previously made to 3 Leaf were redirected to Defendants.

164. In July of 2016, Defendant Sethna and one of the co-owners of 7110 Partners, LLC, Mr. Eddie Batiz, came to the offices of 3 Leaf to intimidate and threaten Plaintiff's representatives. Mr. Batiz brought a golf club with him and threatened to use it to bludgeon Plaintiff's owners and representatives if they continued to inquire about payments due to 3 Leaf.

165. Of the $195,000.00 owed to 3 Leaf, 3 Leaf only collected $70,816.00. Defendants stole the remaining $124,184.00, in addition to the fraudulent charge for an ISO broker.

*Defendants' Theft of Monies Related to 3 Leaf's Agreement with Sabre Transportation, Corp.*

166. In December of 2015, 3 Leaf agreed to purchase $280,000.00 worth of receivables from Sabre Transportation, Corp., a business allegedly located in Hicksville, New York in exchange for an immediate cash payment of $200,000.00. Sabre Transportation, Corp., agreed to pay 3 Leaf daily out of its receivables via an automatic daily payment of $1,115.54 into 3 Leaf's account.

167. On or about December 15, 2015, Defendant Sethna made the following misrepresentations to Plaintiff:

   a. That Sabre Transportation, Corp., was a bona fide customer of 3 Leaf and not a sham customer used by Sethna and Defendants to steal money from Plaintiff;

b. That 3 Leaf would have to pay an ISO fee of $20,000.00 to a third party when, in reality, Defendants intended to pocket the payment; and

c. That Defendants would reimburse Plaintiff for the $200,000.00 it paid into 3 Leaf's account for the purchase of Sabre Transportation's receivables.

168. Plaintiff, relying on Defendants' misrepresentations, transferred $200,000.00 to 3 Leaf, which immediately paid the same sum to Sabre Transportation, Corp., in December, 2015, pursuant to the agreement.

169. Sabre Transportation, Corp., agreed to deposit the payments into 3 Leaf's account.

170. Sethna and the other individual Defendants brokered the deal. In December of 2015, Sethna wrote a check out of 3 Leaf's account for $20,000.00 payable to Defendant Wingfield.

171. Defendant Sethna claimed to Plaintiff's representatives that the check was meant to reimburse a third-party broker for an ISO fee. Sethna refused to disclose the identity of the broker to Plaintiff's representatives. Sethna also refused to provide proof that Wingfield paid any third party for any costs related to the transaction with Sabre Transportation, Corp.

172. In fact, Sethna fabricated the third-party broker and directed the $20,000.00 to Defendants.

173. Defendants recruited the owner of Sabre Transportation, Corp., to assist in their scheme to defraud Plaintiff by posing as a legitimate counterparty to the funding agreement and to transfer any money received from 3 Leaf to Defendants in exchange for a kickback.

174. Between December 17, 2016 and January 27, 2017, $1,115.54 was automatically transferred from Sabre Transportation Corp's accounts to 3 Leaf's account.

175. In September 2016, Defendants, as co-signatories on 3 Leaf's bank accounts, removed Plaintiff and Plaintiff's representatives as co-signatories on 3 Leaf's accounts, effectively stealing all contents of the accounts and preventing Plaintiffs from accessing their share of the proceeds of any agreement.

176. Of the $280,000.00 owed to 3 Leaf, 3 Leaf only collected $224,224.00. Defendants stole the remaining $55,776.00, in addition to the fraudulent charge for an ISO broker.

*Defendants' Theft of Monies Related to 3 Leaf's Agreement with Scrappy Auto Body Associates, Inc.*

177. In December of 2015, 3 Leaf agreed to purchase $280,000.00 worth of receivables from Scrappy Auto Body Associates, Inc., a business allegedly located in Hicksville, New York in exchange for an immediate cash payment of $200,000.00 to Scrappy Auto Body Associates, Inc. Scrappy Auto Body Associates, Inc., agreed to pay 3 Leaf daily out of its receivables via an automatic daily payment of $1,115.53 into 3 Leaf's account.

178. On or about December 15, 2015, Defendant Sethna made the following misrepresentations to Plaintiff:

   a. That Scrappy Auto Body Associates, Inc., was a bona fide customer of 3 Leaf and not a sham customer used by Sethna and Defendants to steal money from Plaintiff;

   b. That 3 Leaf would have to pay an ISO fee of $20,000.00 to a third party when, in reality, Defendants intended to pocket the payment; and

   c. That Defendants would reimburse Plaintiff for the $200,000.00 it paid into 3 Leaf's account for the purchase of Scrappy Auto Body Associates' receivables.

179. Plaintiff, relying on Defendants' misrepresentation, transferred $200,000.00 to 3 Leaf, which immediately paid the same sum to Scrappy Auto Body Associates, Inc., in December, 2015, pursuant to the agreement.

180. Scrappy Auto Body Associates, Inc., agreed deposit the payments into 3 Leaf's account.

181. Sethna and the other individual Defendants brokered the deal. In December of 2015, Sethna wrote a check out of 3 Leaf's account for $20,000.00 payable to Defendant Wingfield.

182. Defendant Sethna claimed to Plaintiff's representatives that the check was meant to reimburse a third-party broker for an ISO fee. Sethna refused to disclose the identity of the broker to Plaintiff's representatives. Sethna also refused to provide proof that Wingfield paid any third party for any costs related to the transaction with Sabre Transportation, Corp.

183. In fact, Sethna fabricated the third-party broker and directed the $20,000.00 to Defendants.

184. Defendants recruited the owner of Scrappy Auto Body Associates, Inc., to assist in their scheme to defraud Plaintiff by posing as a legitimate counterparty to the funding agreement and to transfer any money received from 3 Leaf to Defendants in exchange for a kickback.

185. Between January 29, 2016 and December 16, 2017, $1,115.53 was automatically transferred from Sabre Transportation Corp's accounts to 3 Leaf's account.

186. In September 2016, Defendants, as co-signatories on 3 Leaf's bank accounts, removed Plaintiff and Plaintiff's representatives as co-signatories on 3 Leaf's accounts, effectively stealing all contents of the accounts and preventing Plaintiffs from accessing their share of the proceeds of any agreement.

187. Of the $280,000.00 owed to 3 Leaf, 3 Leaf only collected $195,218.00. Defendants stole the remaining $84,782.00, in addition to the fraudulent charge for an ISO broker.

*Defendants' Theft of Monies Related to 3 Leaf's Agreement with Postal Hiring Authority*

188. In February of 2016, 3 Leaf agreed to purchase $280,000.00 worth of receivables from Postal Hiring Authority, a business allegedly located in Norcross, Georgia, in exchange for an immediate cash payment of $200,000.00. Postal Hiring Authority, agreed to pay 3 Leaf daily out of its receivables o via an automatic daily payment of $2,222.22 into 3 Leaf's account.

189. On or about February 1, 2016, Defendant Sethna made the following misrepresentations to Plaintiff:

wrongendation

    a.  That Postal Hiring Authority was a bona fide customer of 3 Leaf and not a sham customer used by Sethna and Defendants to steal money from Plaintiff;

    b.  That 3 Leaf would have to pay an ISO fee of $20,000.00 to a third party when, in reality, Defendants intended to pocket the payment; and

    c.  That Defendants would reimburse Plaintiff for the $200,000.00 it paid into 3 Leaf's account for the purchase of Postal Hiring Authority's receivables.

190. Plaintiffs transferred $200,000.00 to 3 Leaf, which immediately paid the same sum to Postal Hiring Authority, in February, 2016, pursuant to the agreement.

191. Postal Hiring Authority agreed deposit the payments into 3 Leaf's account.

192. Sethna and the other individual Defendants brokered the deal. In February of 2016, Sethna wrote a check out of 3 Leaf's account for $20,000.00 payable to Defendant Wingfield.

193. Defendant Sethna claimed to Plaintiff's representatives that the check was meant to reimburse a third-party broker for an ISO fee. Sethna refused to disclose the identity of the broker to Plaintiff's representatives. Sethna also refused to provide proof that Wingfield paid any third party for any costs related to the transaction with Postal Hiring Authority.

194. In fact, Sethna fabricated the third-party broker and directed the $20,000.00 to Defendants.

195. Defendants recruited the owner of Postal Hiring Authority to assist in their scheme to defraud Plaintiff by posing as a legitimate counterparty to the funding agreement and to transfer any money received from 3 Leaf to Defendants in exchange for a kickback.

196. Postal Hiring Authority defaulted on its payments within two months of receiving funding.

197. Defendant Sethna claimed to Plaintiff's representatives that Defendants recovered the full remaining amount due under the agreement.

198. Defendants diverted all automatic daily payments from Postal Hiring Authority to accounts under Defendants' control. Thus, between February 11, 2016 and

August 9, 2016, daily automatic transfers from Postal Hiring Authority's accounts were made to accounts under the control of Defendants.

199. To date, Postal Hiring Authority and Defendants have paid 3 Leaf $133,333.00 of the $280,000.00 due under the agreement. Defendants stole the remaining $146,667.00, in addition to the fraudulent charge for an ISO broker.

*Defendants' Theft of Monies Related to 3 Leaf's Agreement with Progress Printing, Corp.*

200. In February of 2016, 3 Leaf agreed to purchase $399,000.00 worth of receivables from Progress Printing, Corp., a business allegedly located in Woodside, New York, in exchange for an immediate cash payment of $300,000.00. Progress Printing, Corp., agreed to pay 3 Leaf daily out of its receivables via payment of 20% of daily receipts into a lockbox account to which Defendants were co-signatories.

201. On or about February 1, 2016, Defendant Sethna made the following misrepresentations to Plaintiff:

    a.  That Progress Printing, Corp., was a bona fide customer of 3 Leaf and not a sham customer used by Sethna and Defendants to steal money from Plaintiff;

    b.  That 3 Leaf would have to pay an ISO fee of $30,000.00 to a third party when, in reality, Defendants intended to pocket the payment; and

    c.  That Defendants would reimburse Plaintiff for the $300,000.00 it paid into 3 Leaf's account for the purchase of Progress Printing's receivables.

202. Plaintiff, relying on Defendants' misrepresentations, transferred $300,000.00 to 3 Leaf, which immediately paid the same sum to Progress Printing, Corp., in February, 2016, pursuant to the agreement.

203. Progress Printing, Corp. agreed deposit the payments into a lockbox account to which Defendants were co-signatories. Defendants agreed to promptly transfer the money to 3 Leaf's account upon receipt.

204. Sethna and the other individual Defendants brokered the deal. In February of 2016, Sethna wrote a check out of 3 Leaf's account for $30,000.00 payable to Defendant Wingfield.

205. Defendant Sethna claimed to Plaintiff's representatives that the check was meant to reimburse a third-party broker for an ISO fee. Sethna refused to disclose the identity of the broker to Plaintiff's representatives. Sethna also refused to provide proof that Wingfield paid any third party for any costs related to the transaction with Progress Printing, Corp.

206. In fact, Sethna fabricated the third-party broker and directed the $30,000.00 to Defendants.

207. Defendants recruited the owner of Progress Printing, Corp. to assist in their scheme to defraud Plaintiff by posing as a legitimate counterparty to the funding agreement and to transfer any money received from 3 Leaf to Defendants in exchange for a kickback.

208. Progress Printing, Corp. defaulted on its payments within one month of receiving funding.

209. Defendant Sethna claimed that Defendants recovered the full remaining amount due under the agreement. Sethna agreed to pay the recovered amount back to 3 Leaf at a rate of $250.00 per day. Defendants ceased making the daily automatic payment to Plaintiff in September, 2016.

210. In reality, Defendants diverted the daily automatic transfers of money from Progress Printing Corp. to a different account under Defendants' control.

211. From March 20, 2016, until December 18, 2016, the automatic daily transfer of 20% of Progress Printing's daily receivables was diverted by Defendants into an account under their control.

212. To date, Progress Printing, Corp. and Defendants have paid 3 Leaf $39,100.00 of the $399,000.00 due under the agreement. Defendants stole the remaining $359,910.00, in addition to the fraudulent charge for an ISO broker.

*Defendants' Theft of Monies Related to 3 Leaf's Agreement with Texas National Contractors, LLC.*

213. In December of 2015, 3 Leaf agreed to purchase $13,500.00 worth of receivables from Texas National Contractors, LLC, a business allegedly located in Katy, Texas, in exchange for an immediate cash payment of $10,000.00. Texas National Contractors, LLC, agreed to pay 3 Leaf daily out of its receivables via an automatic daily payment of $129.00 into 3 Leaf's account.

214. On or about December 20, 2015, Defendant Sethna made the following misrepresentations to Plaintiff:

    a. That Texas National Contractors, LLC, was a bona fide customer of 3 Leaf and not a sham customer used by Sethna and Defendants to steal money from Plaintiff;

    b. That 3 Leaf would have to pay an ISO fee of $1,000.00 to a third party when, in reality, Defendants intended to pocket the payment; and

    c. That Defendants would reimburse Plaintiff for the $10,000.00 it paid into 3 Leaf's account for the purchase of Texas National Contractors' receivables.

215. Plaintiff, relying on Defendants' misrepresentations, transferred $10,000.00 to 3 Leaf, which immediately paid the same sum to Texas National Contractors, LLC, in December, 2015, pursuant to the agreement.

216. Texas National Contractors, LLC, agreed deposit the payments into 3 Leaf's account.

217. Sethna and the other individual Defendants brokered the deal. In December of 2015, Sethna wrote a check out of 3 Leaf's account for $1,000.00 payable to Defendant Wingfield.

218. Defendant Sethna claimed to Plaintiff's representatives that the check was meant to reimburse a third-party broker for an ISO fee. Sethna refused to disclose the identity of the broker to Plaintiff's representatives. Sethna also refused to provide proof that Wingfield paid any third party for any costs related to the transaction with Texas National Contractors, LLC.

219. In fact, Sethna fabricated the third-party broker and directed the $1,000.00 to Defendants.

220. Defendants recruited the owner of Texas National Contractors, LLC, to assist in their scheme to defraud Plaintiff by posing as a legitimate counterparty to the funding agreement and to transfer any money received from 3 Leaf to Defendants in exchange for a kickback.

221. Texas National Contractors, LLC, defaulted on its payments within one month of receiving funding.

222. Sethna claimed that Defendants recovered the full remaining amount due under the agreement from Texas National Contractors, LLC, and that Defendants would repay the same to Plaintiff.

223. Defendants did not make any further payments to Plaintiff or 3 Leaf as reimbursement for the funds Plaintiff laid out for the Texas National Contractors, LLC, transaction.

224. In reality, Defendants diverted the daily automatic transfers of money from Texas National Contractors, LLC, to a different account under Defendants' control.

225. From January 31, 2016, until May 27, 2016, the automatic daily transfer of $129.00 was diverted by Defendants into an account under their control.

226. To date, Texas National Contractors, LLC, and Defendants have paid 3 Leaf $1,161.00 of the $13,500.00 due under the agreement. Defendants stole the remaining $12,339.00, in addition to the fraudulent charge for an ISO broker.

*Defendants' Theft of Monies Related to 3 Leaf's Agreement with RGV Contracting, LLC.*

227. In January of 2016, 3 Leaf agreed to purchase $13,800.00 worth of receivables from RGV Contracting, LLC, a business allegedly located in Maineville, Ohio, in exchange for an immediate cash payment of $10,000.00. RGV Contracting, LLC, agreed to pay 3 Leaf daily out of its receivables via an automatic daily payment of $132.00 into 3 Leaf's account.

228. On or about January 2, 2016, Defendant Sethna made the following misrepresentations to Plaintiff:

    a. That RGV Contracting, LLC, was a bona fide customer of 3 Leaf and not a sham customer used by Sethna and Defendants to steal money from Plaintiff;

    b. That 3 Leaf would have to pay an ISO fee of $1,000.00 to a third party when, in reality, Defendants intended to pocket the payment; and

    c. That Defendants would reimburse Plaintiff for the $10,000.00 it paid into 3 Leaf's account for the purchase of RGV Contracting's receivables.

229. Plaintiff, relying on Defendants' misrepresentations, transferred $10,000.00 to 3 Leaf, which immediately paid the same sum to RGV Contracting, LLC in January, 2016, pursuant to the agreement.

230. RGV Contracting, LLC, agreed deposit the payments into 3 Leaf's account.

231. Sethna and the other individual Defendants brokered the deal. In January of 2016, Sethna wrote a check out of 3 Leaf's account for $1,000.00 payable to Defendant Wingfield.

232. Defendant Sethna claimed to Plaintiff's representatives that the check was meant to reimburse a third-party broker for an ISO fee. Sethna refused to disclose the identity of the broker to Plaintiff's representatives. Sethna also refused to provide proof that Wingfield paid any third party for any costs related to the transaction with RGV Contracting, LLC.

233. In fact, Sethna fabricated the third-party broker and directed the $1,000.00 to Defendants.

234. Defendants recruited the owner of RGV Contracting, LLC, to assist in their scheme to defraud Plaintiff by posing as a legitimate counterparty to the funding agreement and to transfer any money received from 3 Leaf to Defendants in exchange for a kickback.

235. RGV Contracting, LLC, defaulted on its payments within one month of receiving funding.

236. Defendant Sethna claimed that Defendants recovered the full remaining amount due under the agreement from RGV Contracting, LLC, and would repay the same to 3 Leaf.

237. Defendants did not make any further payments to Plaintiff or 3 Leaf as reimbursement for the funds Plaintiff laid out for the RGV Contracting, LLC, transaction.

238. In reality, Defendants diverted the daily automatic transfers of money from RGV Contracting, LLC, to a different account under Defendants' control.

239. From February 8, 2016, until June 7, 2016, the automatic daily transfer of $132.00 was diverted by Defendants into an account under their control.

240. To date, RGV Contracting, LLC, and Defendants have paid 3 Leaf $2,848.00 of the $13,800.00 due under the agreement. Defendants stole the remaining $10,952.00, in addition to the fraudulent charge for an ISO broker.


*Defendants' Theft of Monies Related to 3 Leaf's Agreement with Grandpark, Corp.*

241. In January of 2016, 3 Leaf agreed to purchase $77,000.00 worth of receivables from Grandpark, Corp., a business allegedly located in Chino Hills, California, in exchange for an immediate cash payment of $55,000.00. Grandpark, Corp., agreed to pay 3 Leaf daily out of its receivables via an automatic daily transfer of $523.81 into 3 Leaf's account.

242. On or about January 2, 2016, Defendant Sethna made the following misrepresentations to Plaintiff:

    a.  That Grandpark, Corp., was a bona fide customer of 3 Leaf and not a sham customer used by Sethna and Defendants to steal money from Plaintiff;

    b.  That 3 Leaf would have to pay an ISO fee of $5,500.00 to a third party when, in reality, Defendants intended to pocket the payment; and

    c.  That Defendants would reimburse Plaintiff for the $55,000.00 it paid into 3 Leaf's account for the purchase of Grandpark's receivables.

243. Plaintiff, relying on Defendants' misrepresentations, transferred $55,000.00 to 3 Leaf, which immediately paid the same sum to Grandpark, Corp., in January, 2016, pursuant to the agreement.

244. Grandpark, Corp., agreed deposit the payments into 3 Leaf's account.

245. Defendant Sethna and the other individual Defendants brokered the deal. In January of 2016, Sethna wrote a check out of 3 Leaf's account for $5,500.00 payable to Defendant Wingfield.

246. Defendant Sethna claimed to Plaintiff's representatives that the check was meant to reimburse a third-party broker for an ISO fee. Sethna refused to disclose the identity of the broker to Plaintiff's representatives. Sethna also refused to provide proof that Wingfield paid any third party for any costs related to the transaction with Grandpark, Corp.

247. In fact, Sethna fabricated the third-party broker and directed the $5,500.00 to Defendants.

248. Defendants recruited the owner of Grandpark, Corp., to assist in their scheme to defraud Plaintiff by posing as a legitimate counterparty to the funding agreement and to transfer any money received from 3 Leaf to Defendants in exchange for a kickback.

249. Grandpark, Corp., defaulted on its payments within one month of receiving funding.

250. Defendant Sethna claimed that Defendants recovered the full remaining amount due under the agreement from Grandpark, Corp., and would repay the same to 3 Leaf.

251. Defendants did not make any further payments to Plaintiff or 3 Leaf as reimbursement for the funds Plaintiff laid out for the Grandpark, Corp., transaction.

252. In reality, Defendants diverted the daily automatic transfers of money from Grandpark, Corp., to a different account under Defendants' control.

253. From February 8, 2016, until August 5, 2016, the automatic daily transfer of $523.81 was diverted by Defendants into an account under their control.

254. To date, Grandpark, Corp., and Defendants have paid 3 Leaf $2,619.00 of the $77,000.00 due under the agreement. Defendants stole the remaining $74,381.00, in addition to the fraudulent charge for an ISO broker.

*Defendants' Theft of Monies Related to 3 Leaf's Agreement with KRP*
*Holdings/Soteria*

255. In February of 2016, 3 Leaf agreed to purchase $85,200.00 worth of receivables from KRP Holdings/Soteria, a business allegedly located in Buffalo, New York, in exchange for an immediate cash payment of $60,000.00. KRP Holdings/Soteria agreed to pay 3 Leaf daily out of its receivables via an automatic daily transfer of $579.59 into 3 Leaf's account.

256. On or about February 20, 2016, Defendant Sethna made the following misrepresentations to Plaintiff:

   a. That KRP Holdings/Soteria was a bona fide customer of 3 Leaf and not a sham customer used by Sethna and Defendants to steal money from Plaintiff;

   b. That 3 Leaf would have to pay an ISO fee of $6,000.00 to a third party when, in reality, Defendants intended to pocket the payment; and

   c. That Defendants would reimburse Plaintiff for the $60,000.00 it paid into 3 Leaf's account for the purchase of KRP Holdings/Soteria's receivables.

257. Plaintiff, relying on Defendants' misrepresentations, transferred $60,000.00 to 3 Leaf, which immediately paid the same sum to KRP Holdings/Soteria, in February, 2016, pursuant to the agreement.

258. KRP Holdings/Soteria agreed deposit the payments into 3 Leaf's account.

259. Sethna and the other individual Defendants brokered the deal. In February of 2016, Sethna wrote a check out of 3 Leaf's account for $6,000.00 payable to Defendant Wingfield.

260. Defendant Sethna claimed to Plaintiff's representatives that the check was meant to reimburse a third-party broker for an ISO fee. Sethna refused to disclose the identity of the broker to Plaintiff's representatives. Sethna also refused to provide proof that Wingfield paid any third party for any costs related to the transaction with KRP Holdings/Soteria.

261. In fact, Sethna fabricated the third-party broker and directed the $6,000.00 to Defendants.

262. Defendants recruited the owner of KRP Holdings/Soteria to assist in their scheme to defraud Plaintiff by posing as a legitimate counterparty to the funding agreement and to transfer any money received from 3 Leaf to Defendants in exchange for a kickback.

263. KRP Holdings/Soteria defaulted on its payments within two months of receiving funding.

264. Defendant Sethna claimed that Defendants recovered the full remaining amount due under the agreement from KRP Holdings/Soteria and would repay the same to 3 Leaf.

265. Defendants did not make any further payments to Plaintiff or 3 Leaf as reimbursement for the funds Plaintiff laid out for the KRP Holdings/Soteria, transaction.

266. In reality, Defendants diverted the daily automatic transfers of money from KRP Holdings/Soteria, to a different account under Defendants' control.

267. From April 26, 2016, until September 26, 2016, the automatic daily transfer of $579.59 was diverted by Defendants into an account under their control.

268. To date, KRP Holdings/Soteria and Defendants have paid 3 Leaf $10,433.00 of the $85,200.00 due under the agreement. Defendants stole the remaining $74,767.00, in addition to the fraudulent charge for an ISO broker.

*Defendants' Theft of Monies Related to 3 Leaf's Agreement with SBS America, LLC*

269. In March of 2016, 3 Leaf agreed to purchase $39,480.00 worth of receivables from SBS America, LLC, a business allegedly located in Auburn, AL, in exchange for an immediate cash payment of $28,000.00. SBS America, LLC, agreed to pay 3 Leaf daily out of its receivables via an automatic daily transfer of $220.00 into 3 Leaf's account.

270. On or about March 1, 2016, Defendant Sethna made the following misrepresentations to Plaintiff:

    a. That SBS America, LLC was a bona fide customer of 3 Leaf and not a sham customer used by Sethna and Defendants to steal money from Plaintiff;

    b.   That 3 Leaf would have to pay an ISO fee of $2,800.00 to a third party when, in reality, Defendants intended to pocket the payment; and

    c.   That Defendants would reimburse Plaintiff for the $28,000.00 it paid into 3 Leaf's account for the purchase of SBS America's receivables.

271. Plaintiff, relying on Defendants' misrepresentations, transferred $28,000.00 to 3 Leaf, which immediately paid the same sum to SBS America, LLC, in March, 2016, pursuant to the agreement.

272. SBS America, LLC agreed deposit the payments into 3 Leaf's account.

273. Sethna and the other individual Defendants brokered the deal. In February of 2016, Sethna wrote a check out of 3 Leaf's account for $2,800.00 payable to Defendant Wingfield.

274. Defendant Sethna claimed to Plaintiff's representatives that the check was meant to reimburse a third-party broker for an ISO fee. Sethna refused to disclose the identity of the broker to Plaintiff's representatives. Sethna also refused to provide proof that Wingfield paid any third party for any costs related to the transaction with SBS America, LLC.

275. In fact, Sethna fabricated the third-party broker and directed the $2,800.00 to Defendants.

276. Defendants recruited the owner of SBS America, LLC to assist in their scheme to defraud Plaintiff by posing as a legitimate counterparty to the funding agreement and to transfer any money received from 3 Leaf to Defendants in exchange for a kickback.

277. SBS America, LLC defaulted on its payments within two months of receiving funding.

278. Defendant Sethna claimed that Defendants recovered the full remaining amount due under the agreement from SBS America, LLC and would repay the same to 3 Leaf. Defendants did not make any further payments to Plaintiff or 3 Leaf as reimbursement for the funds Plaintiff laid out for the SBS America, LLC, transaction.

279. In reality, Defendants diverted the daily automatic transfers of money from SBS America, LLC, to a different account under Defendants' control.

280. From May 8, 2016, until September 5, 2016, the automatic daily transfer of $220.00 was diverted by Defendants into an account under their control.

281. To date, SBS America, LLC and Defendants have paid 3 Leaf $27,940.00 of the $39,480.00 due under the agreement. Defendants stole the remaining $11,540.00, in addition to the fraudulent charge for an ISO broker.

*Defendants' Theft of Monies Related to 3 Leaf's Agreement with Direct Enterprises/ReMax*

282. In March of 2016, 3 Leaf agreed to purchase $137,000.00 worth of receivables from Direct Enterprises/ReMax in exchange for an immediate cash payment of $100,000.00. Direct Enterprises/ReMax agreed to pay 3 Leaf daily out of its receivables via an automatic daily transfer of $815.47 into 3 Leaf's account.

283. On or about March 1, 2016, Defendant Sethna made the following misrepresentations to Plaintiff:

   a.   That Direct Enterprises/ReMax was a bona fide customer of 3 Leaf and not a sham customer used by Sethna and Defendants to steal money from Plaintiff;

   b.   That 3 Leaf would have to pay an ISO fee of $10,000.00 to a third party when, in reality, Defendants intended to pocket the payment; and

   c.   That Defendants would reimburse Plaintiff for the $100,000.00 it paid into 3 Leaf's account for the purchase of Direct Enterprises/ReMax's receivables.

284. Plaintiff, relying on Defendants' misrepresentations, transferred $100,000.00 to 3 Leaf, which immediately paid the same sum to Direct Enterprises/ReMax in March, 2016, pursuant to the agreement.

285. Direct Enterprises/ReMax agreed deposit the payments into 3 Leaf's account.

286. Sethna and the other individual Defendants brokered the deal. In February of 2016, Sethna wrote a check out of 3 Leaf's account for $10,000.00 payable to Defendant Wingfield.

287. Defendant Sethna claimed to Plaintiff's representatives that the check was meant to reimburse a third-party broker for an ISO fee. Sethna refused to disclose the identity of the broker to Plaintiff's representatives. Sethna also refused to provide proof that Wingfield paid any third party for any costs related to the transaction with Direct Enterprises/ReMax.

288. In fact, Sethna fabricated the third-party broker and directed the $10,000.00 to Defendants.

289. Defendants recruited the owner of SBS America, LLC to assist in their scheme to defraud Plaintiff by posing as a legitimate counterparty to the funding agreement and to transfer any money received from 3 Leaf to Defendants in exchange for a kickback.

290. Direct Enterprises/ReMax defaulted on its payments in September, 2016.

291. Defendant Sethna claimed that Defendants recovered the full remaining amount due under the agreement from Direct Enterprises/ReMax and would repay the same to 3 Leaf.

292. In reality, Defendants diverted the daily automatic transfers of money from Direct Enterprises/ReMax to a different account under Defendants' control.

293. From September 6, 2016 until November 6, 2016, the automatic daily transfer of $815.47 was diverted by Defendants into an account under their control.

294. To date, Direct Enterprises/ReMax and Defendants have paid 3 Leaf $93,673.00 of the $137,000.00 due under the agreement. Defendants stole the remaining $43,327.00, in addition to the fraudulent charge for an ISO broker.

*Defendants' Theft of Monies Related to 3 Leaf's Agreement with L and B Snacks, LLC*

295. In March of 2016, 3 Leaf agreed to purchase $34,500.00 worth of receivables from L & B Snacks, LLC, a business allegedly located in Charleston, South Carolina, in exchange for an immediate cash payment of $25,000.00. L & B Snacks, LLC, agreed to pay 3 Leaf daily out of its receivables via an automatic daily transfer of $164.29 into 3 Leaf's account.

296. On or about March 15, 2016, Defendant Sethna made the following misrepresentations to Plaintiff:

 a. That L & B Snacks, LLC, was a bona fide customer of 3 Leaf and not a sham customer used by Sethna and Defendants to steal money from Plaintiff;

 b. That 3 Leaf would have to pay an ISO fee of $2,500.00 to a third party when, in reality, Defendants intended to pocket the payment; and

 c. That Defendants would reimburse Plaintiff for the $25,000.00 it paid into 3 Leaf's account for the purchase of L & B Snacks' receivables.

297. Plaintiff, relying on Defendants' misrepresentations, transferred $25,000.00 to 3 Leaf, which immediately paid the same sum to L & B Snacks, LLC, in March, 2016, pursuant to the agreement.

298. L & B Snacks, LLC agreed deposit the payments into 3 Leaf's account.

299. Sethna and the other individual Defendants brokered the deal. In February of 2016, Sethna wrote a check out of 3 Leaf's account for $2,500.00 payable to Defendant Wingfield.

300. Defendant Sethna claimed to Plaintiff's representatives that the check was meant to reimburse a third-party broker for an ISO fee. Sethna refused to disclose the identity of the broker to Plaintiff's representatives. Sethna also refused to provide proof that Wingfield paid any third party for any costs related to the transaction with L & B Snacks, LLC.

301. In fact, Defendant Sethna fabricated the third-party broker and directed the $2,500.00 to Defendants.

302. Defendants recruited the owner of L & B Snacks, LLC to assist in their scheme to defraud Plaintiff by posing as a legitimate counterparty to the funding agreement and to transfer any money received from 3 Leaf to Defendants in exchange for a kickback.

303. L & B Snacks, LLC, defaulted on its payments within three months of receiving funding.

304. Defendant Sethna claimed that Defendants recovered the full remaining amount due under the agreement from L & B Snacks, LLC and would repay the same to 3 Leaf.

305. In reality, Defendants diverted the daily automatic transfers of money from L & B Snacks, LLC, to a different account under Defendants' control.

306. From May 31, 2016 until February 1, 2017, the automatic daily transfer of $164.29 was diverted by Defendants into an account under their control.

307. To date, L & B Snacks, LLC and Defendants have paid 3 Leaf $9,200.00 of the $34,500.00 due under the agreement. Defendants stole the remaining $25,300.00, in addition to the fraudulent charge for an ISO broker.

*Defendants' Theft of Monies Related to 3 Leaf's Agreement with Christopher's House*

308. In March of 2016, 3 Leaf agreed to purchase $104,250.00 worth of receivables from Christopher's House, a business allegedly located in Cuyahoga Falls, Ohio, in exchange for an immediate cash payment of $75,000.00. Christopher's House agreed to pay 3 Leaf daily out of its receivables via an automatic daily transfer of $620.54 into 3 Leaf's account.

309. On or about March 15, 2016, Defendant Sethna made the following misrepresentations to Plaintiff:

   a. That Christopher's House was a bona fide customer of 3 Leaf and not a sham customer used by Sethna and Defendants to steal money from Plaintiff;

   b. That 3 Leaf would have to pay an ISO fee of $7,500.00 to a third party when, in reality, Defendants intended to pocket the payment; and

   c. That Defendants would reimburse Plaintiff for the $75,000.00 it paid into 3 Leaf's account for the purchase of Christopher's House's receivables.

310. Plaintiff, relying on Defendants' misrepresentations, transferred $75,000.00 to 3 Leaf, which immediately paid the same sum to Christopher's House, in March, 2016, pursuant to the agreement.

311. Christopher's House agreed deposit the payments into 3 Leaf's account.

312. Sethna and the other individual Defendants brokered the deal. In March of 2016, Sethna wrote a check out of 3 Leaf's account for $7,500.00 payable to Defendant Wingfield.

313. Defendant Sethna claimed to Plaintiff's representatives that the check was meant to reimburse a third-party broker for an ISO fee. Sethna refused to disclose the identity of the broker to Plaintiff's representatives. Sethna also refused to provide proof that Wingfield paid any third party for any costs related to the transaction with Christopher's House.

314. In fact, Defendant Sethna fabricated the third-party broker and directed the $7,500.00 to Defendants.

315. Defendants recruited the owner of Christopher's House to assist in their scheme to defraud Plaintiff by posing as a legitimate counterparty to the funding agreement and to transfer any money received from 3 Leaf to Defendants in exchange for a kickback.

316. Christopher's House defaulted on its payments within two months of receiving funding.

317. Defendant Sethna claimed that Defendants recovered the full remaining amount due under the agreement from Christopher's House and would repay the same to 3 Leaf.

318. In reality, Defendants diverted the daily automatic transfers of money from Christopher's House, to a different account under Defendants' control.

319. From June 12, 2016 until September 5, 2017, the automatic daily transfer of $620.54 was diverted by Defendants into an account under their control.

320. To date, Christopher's House and Defendants have paid 3 Leaf $14,893.00 of the $104,250.00 due under the agreement. Defendants stole the remaining $89,357.00, in addition to the fraudulent charge for an ISO broker.

*Defendants' Theft of Monies Related to 3 Leaf's First Agreement with Chicky Boom*

321. In March of 2016, 3 Leaf agreed to purchase $27,000.00 worth of receivables from Chicky Boom, a business allegedly located in Red Bank, New Jersey, in exchange for an immediate cash payment of $20,000.00. Chicky Boom agreed to

pay 3 Leaf daily out of its receivables via an automatic daily transfer of 35% of its daily receipts into a lockbox account to which Defendants were co-signatories.

322. On or about February 10, 2016, Defendant Sethna made the following misrepresentations to Plaintiff:

    a. That Chicky Boom was a bona fide customer of 3 Leaf and not a sham customer used by Sethna and Defendants to steal money from Plaintiff;

    b. That 3 Leaf would have to pay an ISO fee of $2,000.00 to a third party when, in reality, Defendants intended to pocket the payment; and

    c. That Defendants would reimburse Plaintiff for the $20,000.00 it paid into 3 Leaf's account for the purchase of Chicky Boom's receivables.

323. Plaintiff, relying on Defendants' misrepresentations, transferred $20,000.00 to 3 Leaf, which immediately paid the same sum to Chicky Boom, in March, 2016, pursuant to the agreement.

324. Chicky Boom agreed deposit the payments into a lockbox account, to which Defendants were co-signatories. Defendants agreed to promptly transfer the money to 3 Leaf's accounts upon receipt in the lockbox account.

325. Sethna and the other individual Defendants brokered the deal. In March of 2016, Sethna wrote a check out of 3 Leaf's account for $2,000.00 payable to Defendant Wingfield.

326. Defendant Sethna claimed to Plaintiff's representatives that the check was meant to reimburse a third-party broker for an ISO fee. Sethna refused to disclose the identity of the broker to Plaintiff's representatives. Sethna also refused to provide proof that Wingfield paid any third party for any costs related to the transaction with Chicky Boom.

327. In fact, Defendant Sethna fabricated the third-party broker and directed the $2,000.00 to Defendants.

328. Defendants recruited the owner of Chicky Boom to assist in their scheme to defraud Plaintiff by posing as a legitimate counterparty to the funding agreement and to transfer any money received from 3 Leaf to Defendants in exchange for a kickback.

329. Chicky Boom defaulted on its payments within three months of receiving funding.

330. Sethna claimed that Defendants recovered the full remaining amount due under the agreement from Chicky Boom and would repay the same to 3 Leaf.

331. In reality, Defendants diverted the daily automatic transfers of money from Chicky Boom to a different account under Defendants' control.

332. From May 16, 2016, until August 16, 2016, the automatic daily transfer of 35% of Chicky Boom's daily receivables was diverted by Defendants into an account under their control.

333. To date, Chicky Boom and Defendants have not paid 3 Leaf any of the $27,000.00 due under the agreement. Defendants thus stole $27,000.00, in addition to the fraudulent charge for an ISO broker.

*Defendants' Theft of Monies Related to 3 Leaf's Second Agreement with Chicky Boom*

334. In March of 2016, 3 Leaf agreed to purchase $27,000.00 worth of receivables from Chicky Boom, a business allegedly located in Red Bank, New Jersey, in exchange for an immediate cash payment of $20,000.00. Chicky Boom agreed to pay 3 Leaf daily out of its receivables via an automatic daily transfer of 35% of its daily receipts into a lockbox account to which Defendants were co-signatories.

335. On or about February 10, 2016, Defendant Sethna made the following misrepresentations to Plaintiff:

    a. That Chicky Boom was a bona fide customer of 3 Leaf and not a sham customer used by Sethna and Defendants to steal money from Plaintiff;

    b. That 3 Leaf would have to pay an ISO fee of $2,000.00 to a third party when, in reality, Defendants intended to pocket the payment; and

    c. That Defendants would reimburse Plaintiff for the $20,000.00 it paid into 3 Leaf's account for the purchase of Chicky Boom's receivables.

336. Plaintiff, relying on Defendants' misrepresentations, transferred $20,000.00 to 3 Leaf, which immediately paid the same sum to Chicky Boom, in March, 2016, pursuant to the agreement.

337. Chicky Boom agreed deposit the payments into a lockbox account, to which Defendants were co-signatories. Defendants agreed to promptly transfer the money to 3 Leaf's accounts upon receipt in the lockbox account.

338. Sethna and the other individual Defendants brokered the deal. In March of 2016, Sethna wrote a check out of 3 Leaf's account for $2,000.00 payable to Defendant Wingfield.

339. Defendant Sethna claimed to Plaintiff's representatives that the check was meant to reimburse a third-party broker for an ISO fee. Sethna refused to disclose the identity of the broker to Plaintiff's representatives. Sethna also refused to provide proof that Wingfield paid any third party for any costs related to the transaction with Chicky Boom.

340. In fact, Sethna fabricated the third-party broker and directed the $2,000.00 to Defendants.

341. Defendants recruited the owner of Chicky Boom to assist in their scheme to defraud Plaintiff by posing as a legitimate counterparty to the funding agreement and to transfer any money received from 3 Leaf to Defendants in exchange for a kickback.

342. Chicky Boom defaulted on its payments within three months of receiving funding.

343. Sethna claimed that Defendants recovered the full remaining amount due under the agreement from Chicky Boom and would repay the same to 3 Leaf.

344. In reality, Defendants diverted the daily automatic transfers of money from Chicky Boom to a different account under Defendants' control.

345. From July 5, 2016, until September 5 ,2016, the automatic daily transfer of 35% of Chicky Boom's daily receivables was diverted by Defendants into an account under their control.

346. To date, Chicky Boom and Defendants have paid 3 Leaf $25,167.00 of the $27,000.00 due under the agreement. Defendants thus stole $1,833.00, in addition to the fraudulent charge for an ISO broker.

*Defendants' Theft of Monies Related to 3 Leaf's Agreement with Haileys/Middleton Pub, Corp.*

347. In March of 2016, 3 Leaf agreed to purchase $144,000.00 worth of receivables from Haileys/Middleton Pub, Corp., a business allegedly located in Middleton, Massachusetts, in exchange for an immediate cash payment of $100,000.00. Haileys/Middleton Pub, Corp., greed to pay 3 Leaf daily out of its receivables via an automatic daily transfer of 25% of its daily receipts into a lockbox account to which Defendants were co-signatories.

348. On or about February 10, 2016, Defendant Sethna made the following misrepresentations to Plaintiff:

   a. That Haileys/Middleton Pub, Corp., was a bona fide customer of 3 Leaf and not a sham customer used by Sethna and Defendants to steal money from Plaintiff;

   b. That 3 Leaf would have to pay an ISO fee of $10,000.00 to a third party when, in reality, Defendants intended to pocket the payment; and

   c. That Defendants would reimburse Plaintiff for the $100,000.00 it paid into 3 Leaf's account for the purchase of Haileys/Middleton Pub's receivables.

349. Plaintiff, relying on Defendants' misrepresentations, transferred $100,000.00 to 3 Leaf, which immediately paid the same sum to Haileys/Middleton Pub, Corp., in March, 2016, pursuant to the agreement.

350. Haileys/Middleton Pub, Corp. agreed deposit the payments into a lockbox account, to which Defendants were co-signatories. Defendants agreed to promptly transfer the money to 3 Leaf's accounts upon receipt in the lockbox account.

351. Sethna and the other individual Defendants brokered the deal. In March of 2016, Sethna wrote a check out of 3 Leaf's account for $10,000.00 payable to Defendant Wingfield.

352. Defendant Sethna claimed to Plaintiff's representatives that the check was meant to reimburse a third-party broker for an ISO fee. Sethna refused to disclose the identity of the broker to Plaintiff's representatives. Sethna also refused to provide proof that Wingfield paid any third party for any costs related to the transaction with Haileys/Middleton Pub, Corp.

353. In fact, Sethna fabricated the third-party broker and directed the $10,000.00 to Defendants.

354. Defendants recruited the owner of Haileys/Middleton Pub, Corp. to assist in their scheme to defraud Plaintiff by posing as a legitimate counterparty to the funding agreement and to transfer any money received from 3 Leaf to Defendants in exchange for a kickback.

355. Haileys/Middleton Pub, Corp. defaulted on its payments within three months of receiving funding.

356. Defendant Sethna claimed that Defendants recovered the full remaining amount due under the agreement from Haileys/Middleton Pub, Corp. and would repay the same to 3 Leaf.

357. In reality, Defendants diverted the daily automatic transfers of money from Haileys/Middleton Pub, Corp., to a different account under Defendants' control.

358. From May 16, 2016, until August 16, 2016, the automatic daily transfer of 25% of Haileys/Middleton Pub's daily receivables was diverted by Defendants into an account under their control.

359. To date, Haileys/Middleton Pub, Corp. and Defendants have paid 3 Leaf $109,869.00 of the $144,000.00 due under the agreement. Defendants thus stole $34,131.00, in addition to the fraudulent charge for an ISO broker.

*Defendants' Theft of Monies Related to 3 Leaf's Agreement with Corcho Vine Corp.*

360. In March of 2016, 3 Leaf agreed to purchase $182,000.00 worth of receivables from Corcho Vine Corp., a business allegedly located in New York, New York, in exchange for an immediate cash payment of $130,000.00. Corcho Vine Corp., Corp., agreed to pay 3 Leaf daily out of its receivables via an automatic daily

transfer of 25% of its daily receipts into a lockbox account to which Defendants were co-signatories.

361. On or about March 10, 2016, Defendant Sethna made the following misrepresentations to Plaintiff:

    a. That Corcho Vine Corp. was a bona fide customer of 3 Leaf and not a sham customer used by Sethna and Defendants to steal money from Plaintiff;

    b. That 3 Leaf would have to pay an ISO fee of $13,000.00 to a third party when, in reality, Defendants intended to pocket the payment; and

    c. That Defendants would reimburse Plaintiff for the $130,000.00 it paid into 3 Leaf's account for the purchase of Corcho Vine's receivables.

362. Plaintiff, relying on Defendants' misrepresentations, transferred $130,000.00 to 3 Leaf, which immediately paid the same sum to Corcho Vine Corp. in March, 2016, pursuant to the agreement.

363. Corcho Vine Corp. agreed deposit the payments into a lockbox account, to which Defendants were co-signatories. Defendants agreed to promptly transfer the money to 3 Leaf's accounts upon receipt in the lockbox account.

364. Defendant Sethna and the other individual Defendants brokered the deal. In March of 2016, Sethna wrote a check out of 3 Leaf's account for $13,000.00 payable to Defendant Wingfield.

365. Defendant Sethna claimed to Plaintiff's representatives that the check was meant to reimburse a third-party broker for an ISO fee. Sethna refused to disclose the identity of the broker to Plaintiff's representatives. Sethna also refused to provide proof that Wingfield paid any third party for any costs related to the transaction with Corcho Vine Corp.

366. In fact, Sethna fabricated the third-party broker and directed the $13,000.00 to Defendants.

367. Defendants recruited the owner of Corcho Vine Corp. to assist in their scheme to defraud Plaintiff by posing as a legitimate counterparty to the funding agreement and to transfer any money received from 3 Leaf to Defendants in exchange for a kickback.

368. Corcho Vine Corp. defaulted on its payments within three months of receiving funding.

369. Defendant Sethna claimed that Defendants recovered the full remaining amount due under the agreement from Corcho Vine Corp. and would repay the same to 3 Leaf.

370. In reality, Defendants diverted the daily automatic transfers of money from Corcho Vine Corp. to a different account under Defendants' control.

371. From June 15, 2016, until December 1, 2016, the automatic daily transfer of 25% of Corcho Vine Corp's daily receivables was diverted by Defendants into an account under their control.

372. To date, Corcho Vine Corp. and Defendants have paid 3 Leaf $97,195.00 of the $182,000.00 due under the agreement. Defendants thus stole $84,805.00, in addition to the fraudulent charge for an ISO broker.

*Defendants' Theft of Monies Related to 3 Leaf's Agreement with Furnishing Direct*

373. In March of 2016, 3 Leaf agreed to purchase $104,000.00 worth of receivables from Furnishing Direct, a business allegedly located in Garden Grove, California, in exchange for an immediate cash payment of $80,000.00. Furnishing Direct agreed to pay 3 Leaf daily out of its receivables via an automatic daily transfer of 20% of its daily receipts into a lockbox account to which Defendants were co-signatories.

374. On or about March 10, 2016, Defendant Sethna made the following misrepresentations to Plaintiff:

    d. That Furnishing Direct was a bona fide customer of 3 Leaf and not a sham customer used by Sethna and Defendants to steal money from Plaintiff;

    a. That 3 Leaf would have to pay an ISO fee of $8,000.00 to a third party when, in reality, Defendants intended to pocket the payment; and

    b. That Defendants would reimburse Plaintiff for the $80,000.00 it paid into 3 Leaf's account for the purchase of Furnishing Direct's receivables.

375. Plaintiffs transferred $80,000.00 to 3 Leaf, which immediately paid the same sum to Furnishing Direct in March, 2016, pursuant to the agreement.

376. Furnishing Direct agreed deposit the payments into a lockbox account, to which Defendants were co-signatories. Defendants agreed to promptly transfer the money to 3 Leaf's accounts upon receipt in the lockbox account.

377. Sethna and the other individual Defendants brokered the deal. In March of 2016, Sethna wrote a check out of 3 Leaf's account for $8,000.00 payable to Defendant Wingfield.

378. Defendant Sethna claimed to Plaintiff's representatives that the check was meant to reimburse a third-party broker for an ISO fee. Sethna refused to disclose the identity of the broker to Plaintiff's representatives. Sethna also refused to provide proof that Wingfield paid any third party for any costs related to the transaction with Furnishing Direct.

379. In fact, Sethna fabricated the third-party broker and directed the $8,000.00 to Defendants.

380. Defendants recruited the owner of Furnishing Direct to assist in their scheme to defraud Plaintiff by posing as a legitimate counterparty to the funding agreement and to transfer any money received from 3 Leaf to Defendants in exchange for a kickback.

381. Defendant Sethna locked Plaintiff and its representatives out of the lockbox and 3 Leaf's accounts in September of 2016, effectively stealing the contents of those accounts as well as any subsequent payments into those accounts by Furnishing Direct.

382. Furthermore, Defendants diverted the daily automatic transfers of money from Furnishing Direct to a different account under Defendants' control.

383. From June 15, 2016, until November 15, 2016, the automatic daily transfer of 2% of Furnishing Direct's daily receivables was diverted by Defendants into an account under their control.

384. To date, Furnishing Direct and Defendants have paid 3 Leaf $42,735.00 of the $104,000.00 due under the agreement. Defendants thus stole $61,265.00, in addition to the fraudulent charge for an ISO broker.

*Defendants' Theft of Monies Related to 3 Leaf's Agreement with Luxe Boutique, LLC*

385. In December of 2015, 3 Leaf agreed to purchase $29,600.00 worth of receivables from Luxe Boutique, LLC, in exchange for an immediate cash payment of $20,000.00. Luxe Boutique, LLC, agreed to pay 3 Leaf daily out of its receivables via an automatic daily transfer into 3 Leaf's account.

386. On or about December 15, 2015, Defendant Sethna made the following misrepresentations to Plaintiff:

    a. That Luxe Boutique, LLC, was a bona fide customer of 3 Leaf and not a sham customer used by Sethna and Defendants to steal money from Plaintiff;

    b. That 3 Leaf would have to pay an ISO fee of $2,000.00 to a third party when, in reality, Defendants intended to pocket the payment; and

    c. That Defendants would reimburse Plaintiff for the $20,000.00 it paid into 3 Leaf's account for the purchase of Luxe Boutique's receivables.

387. Plaintiff, relying on Defendants' misrepresentations, transferred $20,000.00 to 3 Leaf, which immediately paid the same sum to Luxe Boutique, LLC, in December, 2015, pursuant to the agreement

388. Luxe Boutique, LLC, agreed deposit the payments into 3 Leaf's account.

389. Defendant Sethna and the other individual Defendants brokered the deal. In December of 2015, Sethna wrote a check out of 3 Leaf's account for $2,000.00 payable to Defendant Wingfield.

390. Defendant Sethna claimed to Plaintiff's representatives that the check was meant to reimburse a third-party broker for an ISO fee. Sethna refused to disclose the identity of the broker to Plaintiff's representatives. Sethna also refused to provide proof that Wingfield paid any third party for any costs related to the transaction with Luxe Boutique, LLC.

391. In fact, Defendant Sethna fabricated the third-party broker and directed the $2,000.00 to Defendants.

392. Defendants recruited the owner of Luxe Boutique, LLC to assist in their scheme to defraud Plaintiff by posing as a legitimate counterparty to the funding

agreement and to transfer any money received from 3 Leaf to Defendants in exchange for a kickback.

393. Luxe Boutique, LLC defaulted on its payments within three months of receiving funding.

394. Defendant Sethna claimed that Defendants recovered the full remaining amount due under the agreement from Luxe Boutique, LLC, and would repay the same to 3 Leaf.

395. In reality, Defendants diverted the daily automatic transfers of money from Luxe Boutique, LLC, to a different account under Defendants' control.

396. From March 17, 2016 until June 10, 2016, the automatic daily automatic transfer was diverted by Defendants into an account under their control.

397. To date, Luxe Boutique, LLC, and Defendants have paid 3 Leaf $24,857.00 of the $29,600.00 due under the agreement. Defendants stole the remaining $4,743.00, in addition to the fraudulent charge for an ISO broker.

*Defendants' Theft of Monies Related to 3 Leaf's Agreement with Millennium Travel & Tours*

398. In April of 2016, 3 Leaf agreed to purchase $42,600.00 worth of receivables from Millennium Travel & Tours in exchange for an immediate cash payment of $30,000.00. Millennium Travel & Tours agreed to pay 3 Leaf daily out of its receivables via an automatic daily transfer into 3 Leaf's account.

399. On or about April 1, 2016, Defendant Sethna made the following misrepresentations to Plaintiff:

   a. That Millennium Travel & Tours was a bona fide customer of 3 Leaf and not a sham customer used by Sethna and Defendants to steal money from Plaintiff;

   b. That 3 Leaf would have to pay an ISO fee of $3,000.00 to a third party when, in reality, Defendants intended to pocket the payment; and

   c. That Defendants would reimburse Plaintiff for the $30,000.00 it paid into 3 Leaf's account for the purchase of Millennium Travel & Tours' receivables.

400. Plaintiff, relying on Defendants' misrepresentations, transferred $30,000.00 to 3 Leaf, which immediately paid the same sum to Millennium Travel & Tours in April, 2016, pursuant to the agreement.

401. Millennium Travel & Tours agreed deposit the payments into 3 Leaf's account.

402. Defendant Sethna and the other individual Defendants brokered the deal. In December of 2015, Sethna wrote a check out of 3 Leaf's account for $3,000.00 payable to Defendant Wingfield.

403. Defendant Sethna claimed to Plaintiff's representatives that the check was meant to reimburse a third-party broker for an ISO fee. Sethna refused to disclose the identity of the broker to Plaintiff's representatives. Sethna also refused to provide proof that Wingfield paid any third party for any costs related to the transaction with Millennium Travel & Tours.

404. In fact, Sethna fabricated the third-party broker and directed the $3,000.00 to Defendants.

405. Defendants recruited the owner of Millennium Travel & Tours to assist in their scheme to defraud Plaintiff by posing as a legitimate counterparty to the funding agreement and to transfer any money received from 3 Leaf to Defendants in exchange for a kickback.

406. Millennium Travel & Tours defaulted on its payments within months of receiving funding.

407. Defendant Sethna claimed that Defendants recovered the full remaining amount due under the agreement from Millennium Travel & Tours and would repay the same to 3 Leaf.

408. In reality, Defendants diverted the daily automatic transfers of money from Millennium Travel & Tours to a different account under Defendants' control.

409. From June 4, 2016 until December 1, 2016, the automatic daily automatic transfer was diverted by Defendants into an account under their control.

410. To date, Millennium Travel & Tours and Defendants have paid 3 Leaf $12,607.00 of the $42,600.00 due under the agreement. Defendants stole the remaining $29,993.00, in addition to the fraudulent charge for an ISO broker.

*Defendants' Theft of Monies Related to 3 Leaf's Agreement with DRT Testerman*

411. In April of 2016, 3 Leaf agreed to purchase $41,700.00 worth of receivables from DRT Testerman in exchange for an immediate cash payment of $30,000.00. DRT Testerman agreed to pay 3 Leaf daily out of its receivables via an automatic daily transfer into 3 Leaf's account.

412. On or about April 5, 2016, Defendant Sethna made the following misrepresentations to Plaintiff:

    a. That Millennium Travel & Tours was a bona fide customer of 3 Leaf and not a sham customer used by Sethna and Defendants to steal money from Plaintiff;

    b. That 3 Leaf would have to pay an ISO fee of $3,000.00 to a third party when, in reality, Defendants intended to pocket the payment; and

    c. That Defendants would reimburse Plaintiff for the $30,000.00 it paid into 3 Leaf's account for the purchase of Millennium Travel & Tours' receivables.

413. Plaintiffs transferred $30,000.00 to 3 Leaf, which immediately paid the same sum to DRT Testerman in April, 2016, pursuant to the agreement.

414. DRT Testerman agreed deposit the payments into 3 Leaf's account.

415. Defendant Sethna and the other individual Defendants brokered the deal. In December of 2015, Sethna wrote a check out of 3 Leaf's account for $3,000.00 payable to Defendant Wingfield.

416. Defendant Sethna claimed to Plaintiff's representatives that the check was meant to reimburse a third-party broker for an ISO fee. Sethna refused to disclose the identity of the broker to Plaintiff's representatives. Sethna also refused to provide proof that Wingfield paid any third party for any costs related to the transaction with DRT Testerman.

417. In fact, Sethna fabricated the third-party broker and directed the $3,000.00 to Defendants.

418. Defendants recruited the owner of DRT Testerman to assist in their scheme to defraud Plaintiff by posing as a legitimate counterparty to the funding agreement

and to transfer any money received from 3 Leaf to Defendants in exchange for a kickback.

419. DRT Testerman defaulted on its payments within months of receiving funding.

420. Sethna claimed that Defendants recovered the full remaining amount due under the agreement from DRT Testerman and would repay the same to 3 Leaf.

421. In reality, Defendants diverted the daily automatic transfers of money from Millennium Travel & Tours to a different account under Defendants' control.

422. From June 4, 2016 until November 11, 2016, the automatic daily automatic transfer was diverted by Defendants into an account under their control.

423. To date, DRT Testerman and Sethna have paid 3 Leaf $39,908.00 of the $41,700.00 due under the agreement. Defendants stole the remaining $2,792.00, in addition to the fraudulent charge for an ISO broker.

424. Plaintiff is therefore entitled to $1,324,571.00 in damages, plus costs and attorney fees related to Defendants' fraudulent scheme.

## CAUSES OF ACTION
### First Cause of Action (Count I)
### Against All Defendants
### [Violation of RICO, 18 U.S.C § 1962(c)]

425. Plaintiff incorporates, as though fully set forth herein, each and every allegation as set forth in the paragraphs above.

426. The Defendants together operated 3 Leaf as an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4). The enterprise engages in activities that affect interstate commerce.

427. The Defendants knowingly and willfully have conducted and participated in the conduct of the Enterprise's affairs through a pattern of racketeering activity, including wire fraud, as defined by 18 U.S.C. §1343, money laundering as defined by 18 U.S.C. § 1956, and extortion. Defendants routinely used the wires to make misrepresentations to Plaintiff regarding the nature of the sham business transactions Defendants engineered to siphon money from Plaintiff. Defendants engaged in a number of financial transactions to both conceal and further their

fraudulent scheme. Defendants also extorted money from 3 Leaf's employees by threatening violence against them and their loved ones if they would not turn over a portion of their wages to Sethna. Defendants further attempted to extort Plaintiff's representatives by threatening violence against them should Plaintiff continue to demand transparency from Defendants.

428. Defendants used the wires again and again to make material misrepresentations to Plaintiff regarding the nature of the supposed deals for 3 Leaf to buy the supposed customers' future receivables, to make misrepresentations about the need for Plaintiff to transfer money to 3 Leaf for day-to-day expenses, and about the need to employ supposed ISO specialists to facilitate 3 Leaf's deals. Defendants used the wires to induce Plaintiff to transfer money to 3 Leaf and/or Defendants under false pretenses and proceeded to siphon the money to Defendants.

429. Furthermore, Defendants also routinely used the wires to siphon money from 3 Leaf and Plaintiffs via the diversion of automatic transfers of monies from 3 Leaf's customers into accounts controlled by Defendants, as laid out in Section 6 above.

430. As a direct result of and in reasonable reliance upon Defendants' misrepresentations, the Plaintiffs transferred money to Defendants and/or 3 Leaf in the belief such money would be used in legitimate business.

431. Defendants associated with the foregoing enterprise, and participated-both directly and indirectly-in the conduct of this enterprise through a pattern of racketeering activities, notably making misrepresentations as to the nature of a large number of 3 Leaf's transactions in order to induce Plaintiff to transfer money to 3 Leaf, which Defendants then siphoned.

432. Defendants' conduct in violation of 18 U.S.C. § 1962(c) was therefore the direct and proximate cause of Plaintiff's injury.

433. By virtue of the Defendants' violations of 18 U.S.C. § 1962(c), Plaintiff is entitled to recover from them three times the damages sustained by reason of the reports submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.  Plaintiff is entitled to

recover an amount to be determined at trial, but in no event less than $3,973,000.00 (three million and nine hundred seventy three thousand dollars), for claims denied as a result of the aforementioned conduct.

## Second Cause of Action (Count II)

### Against All Defendants

### [Violation of RICO, 18 U.S.C § 1962(d)]

434. Plaintiff incorporates, as though fully set forth herein, each and every allegation as set forth in the paragraphs above.

435. 210.  The Defendants together operated 3 Leaf as an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4).  The enterprise engages in activities that affect interstate commerce.

436. The Defendants knowingly and willfully have agreed, combined and conspired to conduct and participate, directly or indirectly, in the conduct of the Sethna Enterprise's affairs through a pattern of racketeering activity.

437. Defendants conducted the enterprise through a pattern of racketeering activity, including wire fraud, as defined by 18 U.S.C. §1343, money laundering as defined by 18 U.S.C. § 1956, and extortion. Defendants routinely used the wires to make misrepresentations to Plaintiff regarding the nature of the sham business transactions Defendants engineered to siphon money from Plaintiff. Defendants engaged in a number of financial transactions to both conceal and further their fraudulent scheme. Defendants also extorted money from 3 Leaf's employees by threatening violence against them and their loved ones if they would not turn over a portion of their wages to Sethna. Defendants further attempted to extort Plaintiff's representatives by threatening violence against them should Plaintiff continue to demand transparency from Defendants.

438. Defendants used the wires again and again to make material misrepresentations to Plaintiff regarding the nature of the supposed deals for 3 Leaf to buy the supposed customers' future receivables, to make misrepresentations about the need for Plaintiff to transfer money to 3 Leaf for day-to-day expenses, and about the need to employ supposed ISO specialists to facilitate 3 Leaf's deals.

Defendants used the wires to induce Plaintiff to transfer money to 3 Leaf and/or Defendants under false pretenses and proceeded to siphon the money to Defendants.

439. Furthermore, Defendants also routinely used the wires to siphon money from 3 Leaf and Plaintiffs via the diversion of automatic transfers of monies from 3 Leaf's customers into accounts controlled by Defendants, as laid out in Section 6 above.

440. As a direct result of and in reasonable reliance upon Defendants' misrepresentations, the Plaintiffs transferred money to Defendants and/or 3 Leaf in the belief such money would be used in legitimate business.

441. Defendants associated with the foregoing enterprise, and participated-both directly and indirectly-in the conduct of this enterprise through a pattern of racketeering activities, notably making misrepresentations as to the nature of a large number of 3 Leaf's transactions in order to induce Plaintiff to transfer money to 3 Leaf, which Defendants then siphoned.

442. Defendants conspired to engage in conduct in violation of 18 U.S.C. § 1962(c).

443. By virtue of the Defendants' violations of 18 U.S.C. § 1962(d), Plaintiff is entitled to recover from them three times the damages sustained by reason of the reports submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.  Plaintiff is entitled to recover an amount to be determined at trial, but in no event less than $3,973,000.00 (three million and nine hundred seventy three thousand dollars), for claims denied as a result of the aforementioned conduct.

**Third Cause of Action (Count III)**

**Against All Defendants**

**(Common Law Fraud)**

444. Plaintiff incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

445. Defendants knowingly and intentionally made false and fraudulent statements of material fact to Plaintiff and have concealed material facts from Plaintiff in the course of their relationship with Plaintiff.

446. The false and fraudulent statements of material fact and acts of fraudulent concealment include, but are not limited to:

    a. Defendants' representations that the proposed transaction in which 3 Leaf would buy customers' future receivables were bona fide transactions when, in reality, the transactions were shams with the purpose of inducing Plaintiff to transfer money to 3 Leaf, which defendants then siphoned;

    b. Defendants' representations that each such transaction required an ISO Broker fee when no such fee was ever paid but was retained by Defendants; and

    c. Defendants' misrepresentations as to the amounts needed by 3 Leaf for its day-to-day operations, which induced Plaintiff to transfer money to 3 Leaf, which Defendants then siphoned to themselves.

447. Defendants intentionally made the above-detailed false and fraudulent statements and concealed material acts in a calculated effort to induce Plaintiff to transfer money to 3 Leaf's account, to which Defendants had access. Defendants then siphoned the money from 3 Leaf's account to their own, stealing the money from Plaintiff.

448. The conduct of Defendants deprived Plaintiff of over $1,400,000.00 (one million and four hundred thousand dollars), the exact amount to be determined at trial.

449. Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and dishonesty that entitles Plaintiff to recover punitive damages.

450. Accordingly, by virtue of the foregoing, Plaintiff is entitled to compensatory and punitive damages/together with interest and costs, and any other relief the Court deems just and proper.

## Fourth Cause of Action (Count IV)

### Against All Defendants

### (Aiding and Abetting Common Law Fraud)

451. Plaintiff incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

452. Defendants, including John Doe Defendants, aided and abetted the rest of the Defendants in perpetrating their fraudulent scheme.

453. Defendants knowingly and intentionally made false and fraudulent statements of material fact to Plaintiff and have concealed material facts from Plaintiff in the course of their relationship with Plaintiff.

454. The false and fraudulent statements of material fact and acts of fraudulent concealment include, but are not limited to:

    a. Defendants' representations that the proposed transaction in which 3 Leaf would buy customers' future receivables were bona fide transactions when, in reality, the transactions were shams with the purpose of inducing Plaintiff to transfer money to 3 Leaf, which defendants then siphoned;

    b. Defendants' representations that each such transaction required an ISO Broker fee when no such fee was ever paid but was retained by Defendants; and

    c. Defendants' misrepresentations as to the amounts needed by 3 Leaf for its day-to-day operations, which induced Plaintiff to transfer money to 3 Leaf, which Defendants then siphoned to themselves.

455. Defendants intentionally made the above-detailed false and fraudulent statements and concealed material acts in a calculated effort to induce Plaintiff to transfer money to 3 Leaf's account, to which Defendants had access. Defendants then siphoned the money from 3 Leaf's account to their own, stealing the money from Plaintiff.

456. Furthermore, Defendants, including John Doe Defendants, presented themselves to Plaintiff as bona fide customers seeking to sell future receivables in exchange for a one-time payment from 3 Leaf.

457. Defendants also aided the fraud by operating 3 Leaf as a supposedly functioning company, which included hiring sales staff and managing office space. At no time did 3 Leaf operate as an actual company, as the sales staff made no sales; all of the supposed purchases of receivables were managed by Defendant Sethna.

458. The conduct of Defendants deprived Plaintiff of over $1,400,000.00 (one million and four hundred thousand dollars), the exact amount to be determined at trial.

459. Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and dishonesty that entitles Plaintiff to recover punitive damages.

460. Accordingly, by virtue of the foregoing, Plaintiff is entitled to compensatory and punitive damages/together with interest and costs, and any other relief the Court deems just and proper.

### Fifth Cause of Action (Count V)
### Against All Defendants
### (Unjust Enrichment)

461. Plaintiff incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

462. As set forth above, Defendants have engaged in unlawful and improper acts, resulting in harm to Plaintiff.

463. Defendants have been enriched at Plaintiff's expense by siphoning money from 3 Leaf to which Plaintiffs' are entitled.

464. By reason of the above, Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $1,400,000.00 (one million and four hundred thousand dollars).

### Sixth Cause of Action (Count VI)
### Against Wingfield, Sethna, Laljie, Rabito, Wagenheim, Prestige, and First Choice ("Breach Defendants")
### (Breach of Contract)

465. Plaintiff incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

466. The Breach Defendants and Plaintiff entered into agreements, including written contracts, providing that Plaintiff would contribute half of the funds required for the set-up and operation of 3 Leaf and that Plaintiff would receive half of any profits realized by 3 Leaf.

467. Defendants contributed no money to 3 Leaf and, instead, continually induced Plaintiff to contribute money to 3 Leaf to fund 3 Leaf's day-to-day operation.

468. Defendants retained the majority of money received by 3 Leaf in violation of their agreements with Plaintiff.

469. In October of 2016, Defendants illegally seized control of 3 Leaf's bank accounts by removing Plaintiff's representatives as signatories, in violation of their agreement.

470. By reason of the above, Defendants have caused damages to Plaintiff in an amount to be determined at trial, but in no event less than $1,400,000.00 (one million and four hundred thousand dollars).

## Seventh Cause of Action (Count VII)

### Against Wingfield, Sethna, Laljie, Rabito, Wagenheim, Prestige, and First Choice ("Conversion Defendants")

### (Conversion)

471. Plaintiff incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

472. Plaintiff had a right to the funds in 3 Leaf's possession.

473. The Conversion Defendants illegally seized control of 3 Leaf's bank accounts by removing Plaintiff's representatives as signatories.

474. Defendants have refused Plaintiffs access to 3 Leaf's accounts and its contents.

475. By reason of the above, Defendants have caused damages to Plaintiff in an amount to be determined at trial, but in no event less than $100,000.00 (one hundred thousand dollars).

**WHEREFORE**, Plaintiff Capital 7 Funding, demands that a Judgment be entered in its favor:

A. On the First Cause of action against the Defendants named therein, a judgment holding that by virtue of the Defendants' violations of 18 U.S.C. § 1962(c), Plaintiff is entitled to recover from them three times the damages sustained by reason of the reports submitted by them, and others acting in concert with them, the amount to be determined at trial, but in no event less than $3,973,000.00 (three million and nine hundred seventy three thousand dollars),  together with the costs of suit, including reasonable attorney's fees.

B. On the Second Cause of Action against Defendants named therein, a judgment holding that by virtue of the Defendants' violations of 18 U.S.C. § 1962(d), Plaintiff is entitled to recover from them three times the damages sustained by reason of the reports submitted by them, and others acting in concert with them, the amount to be determined at trial, but in no event less than $3,973,000.00 (three million and nine hundred seventy three thousand dollars), together with the costs of suit, including reasonable attorney's fees.

D. On the Third Cause of Action against Defendants named therein, a judgment holding that by virtue of the allegations contained therein, Plaintiff is entitled to compensatory and punitive damages/together with interest and costs, the amount to be determined at trial, but in no event less than $1,400,000.00 (one million and four hundred thousand dollars), together with reasonable attorney's fees, and any other relief the Court deems just and proper.

E. On the Fourth Cause of Action against Defendants named therein, a judgment holding that by virtue of the allegations contained therein, Plaintiff is entitled to compensatory and punitive damages/together with interest and costs, the amount to be determined at trial, but in no event less than $1,400,000.00 (one million and four hundred thousand dollars), together with reasonable attorney's fees and any other relief the Court deems just and proper.

F.      On the Fifth Cause of Action against Defendants named therein, a judgment holding that by virtue of the allegations contained therein, Plaintiff is entitled to compensatory and punitive damages/together with interest and costs, the amount to be determined at trial, but in no event less than$1,400,000.00 (one million and four hundred

thousand dollars), together with reasonable attorney's fees and any other relief the Court deems just and proper

G.      On the Sixth Cause of Action against Defendants named therein, a judgment holding that by virtue of the allegations contained therein, Plaintiff is entitled to compensatory and punitive damages/together with interest and costs, the amount to be determined at trial, but in no event less than $1,400,000.00 (one million and four hundred thousand dollars), together with reasonable attorney's fees and any other relief the Court deems just and proper.

G.      On the Seventh Cause of Action against Defendants named therein, a judgment holding that by virtue of the allegations contained therein, Plaintiff is entitled to compensatory and punitive damages/together with interest and costs, the amount to be determined at trial, but in no event less than $100,000.00 (one hundred thousand dollars), together with reasonable attorney's fees and any other relief the Court deems just and proper.

Dated:  August 31, 2017

_____

Nicholas Bowers, Esq.

GARY TSIRELMAN, P.C.

Attorneys for Plaintiff

129 Livingston Street

2nd Floor

Brooklyn, NY  11201