# LIMITED LIABILITY COMPANY AGREEMENT

## OF

## THREE LEAF CAPITAL LLC

THIS LIMITED LIABILITY COMPANY AGREEMENT (this "Agreement") of Three Leaf Capital LLC, a [New York] limited liability company (the "Company"), is entered into as of November 25th, 2015 (the "Effective Date") by and between Wingfield Capital Corp. (the "Managing Member"), a [New York] corporation with an address at 1 Penn Plaza, Suite 2527, 25th floor, New York, NY 10119, and Capital 7 Cash Funding LLC (the "Capital 7"), a [New York] limited liability company with an address at 61-50 162nd Street, 1st Floor, Fresh Meadows, NY 11365. (Each of the Managing Member and Capital 7 may be referred to herein as a "Party" or a "Member" and, collectively, the "Members" or the "Parties").

WHEREAS, the Company was formed on November 25th, 2015 as a limited liability company pursuant to and in accordance with the New York Limited Liability Company Act, as amended from time to time (the "Act"); and

WHEREAS, the Members wish to set out their respective rights, obligations and duties regarding the Company and its assets and liabilities;

NOW THEREFORE, in consideration of the mutual promises contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby certify and agree as follows:

1. **Organization.**

    1.1  *Formation.* The Company was formed upon the filing of the Certificate of Formation of the Company, a copy of which is attached hereto as Exhibit A (the "Certificate"), with the Secretary of State of the State of New York on November 25th, 2015. The Certificate and the filing thereof, are hereby ratified and approved. The Company shall continue its existence until its dissolution or termination as provided in this Agreement or by applicable law.

    1.2  *Name.* The name of the Company formed hereby is Three Leaf Capital LLC or such name as the Managing Member may determine from time to time in accordance with applicable law; provided that the name shall always include the words "Limited Liability Company" or "LLC."

    1.3  *Purposes and Powers.* The purpose of the Company is to engage in any lawful act or activity for which a limited liability company may be organized under the Act and to engage in any and all activities necessary or incidental thereto. Notwithstanding the foregoing, except with the written consent of the Managing Member and all of the Members, the Company shall engage in no business other than purchasing future receivables from businesses in exchange for a onetime cash payment. The Company shall have any and all powers that are necessary or

desirable to carry out the purposes and business of the Company, to the extent the same may be legally exercised by limited liability companies under the Act. The Company shall carry out the foregoing activities pursuant to the arrangements set forth in this Agreement.

1.4  *Place of Business.* The principal office and place of business of the Company shall initially be 1 Penn Plaza, Suite 2527, 25th floor, New York, NY 10119. The principal place of business may be changed from time to time, and other offices may be established by actions taken in accordance with the provisions of this Agreement that govern management of the Company's business and affairs.

1.5  *Registered Office and Registered Agent.* The Company's initial registered office in the State of New York shall be located at 1 Penn Plaza, Suite 2527, 25th floor, New York, NY 10119, and the name of its initial registered agent in the State of New York at such address shall be Three Leaf Capital LLC. The Company may at any time change the location of the Company's registered office or change the registered agent by actions taken in accordance with the provisions of this Agreement that govern management of the Company's business and affairs.

2. **Members, Capital Contribution and Capital Accounts**

   2.1  *Identity and Powers of Members.*

   2.1.1  Identity and Membership Interests of the Members. The names and the percentages representing the outstanding membership interests (the "Membership Interests") of each Member are set forth in Schedule A to this Agreement. The Managing Member shall update Schedule A from time to time, as necessary, to accurately reflect the information therein in accordance with this Agreement, including, but not limited to any amendments and any changes resulting from the admission of additional members, if any.

   2.1.1  Powers of the Members. The Members shall have the power to exercise any and all rights and powers granted to the Members pursuant to the express terms of this Agreement. Except as otherwise specifically provided by this Agreement or required by the Act, only the Managing Member shall have the power to act for and on behalf of, and to bind, the Company. The Managing Member is hereby designated as an authorized person, within the meaning of the Act, to execute, deliver and file any amendments or restatements to the Certificate and any other certificates (and any amendments or restatements thereof) necessary for the Company to qualify to do business in a jurisdiction in which the Company may wish to conduct business.

   2.1.2  Officers; Designation; Term; Qualifications. The Managing Member may, from time to time, designate one or more persons to be officers of the Company, such persons to serve in such offices until resignation or removal. Any officer so designated shall have such authority and perform such duties as the Managing Member is permitted to perform under this Agreement and may, from time to time, delegate to such officer. The Managing Member may assign titles to particular officers, and unless the Managing Member decides otherwise, the assignment of such title shall constitute the delegation to such officer of the

authority and duties that are normally associated with that office. Each officer shall hold office for the term for which such officer is designated and until his or her successor shall be duly designated and shall qualify or until his or her death, resignation or removal (with or without cause) by the Managing Member or as otherwise provided in this Agreement. Any Person may hold any number of offices. No officer need be a manager, a Member, a [New York] resident or a United States citizen. Designation of such a person as an officer of the Company shall not of itself create any contractual rights in such person.

2.2 *Capital Contributions.*

2.2.1 Initial Capital Contributions. The Members shall provide the Company with the initial capital contributions set forth in Schedule A to this Agreement. The Managing Member shall cause Schedule A to be updated from time to time as necessary to accurately reflect the information required to be included therein by virtue of any developments after the date hereof. Any revision to Schedule A made in accordance with this Section 2.2.1 shall not be deemed an amendment to this Agreement. Any reference in this Agreement to Schedule A shall be deemed to be a reference to Schedule A as revised and in effect from time to time.

2.2.2 Additional Capital Contributions. No Member shall have any obligation to make additional capital contributions to the Company, unless otherwise determined by the Managing Member.

2.3 *Capital Accounts.*[1]

2.3.1 Maintenance of Capital Accounts. A separate capital account ("Capital Account") shall be established and maintained for each Member in the manner provided by Section 1.704-1(b)(2)(iv) of the Internal Revenue regulations, as amended from time to time (the "Regulations"). The Capital Account of each Member shall consist of the amount of cash and the fair market value of property (net of any liability secured by such property that the Company is considered to assume or take subject to under Section 752 of the Code (as defined below)) that the Member has contributed, or is deemed herein to have contributed, to the Company as a capital contribution, adjusted as follows:

2.3.2 Increases. The Capital Account of a Member shall be increased by (i) all profits allocated to such Member, (ii) any items in the nature of income or gains specially allocated to the Member pursuant to Section 3.6.4, and (iii) the amount of any Company liabilities assumed by the Member (or which are secured by Company property distributed to the Member).

2.3.3 Decreases. The Capital Account of a Member shall be decreased by (i) all losses allocated to the Member, (ii) any items in the nature of expenses or losses specially allocated to the Member pursuant to Section 3.6, and (iii) the amount of cash and the fair market value of any Company property distributed to the Member (net of any liability securing such

---

[1] NTD: This section is subject to further tax review by Shiboleth LLP.

distributed property that the Member is considered to assume or take subject to under Section 752 of the Code).

2.3.4 <u>Adjustments</u>. If the book value of the Company property is adjusted, in accordance with Section 3.6.7 of this Agreement, the Capital Account of each Member shall be adjusted to reflect the aggregate adjustment in the same manner as if the Company had recognized gain or loss equal to the amount of such aggregate adjustment.

2.3.5 <u>Compliance with Regulations</u>. It is intended that the Capital Accounts of all Members shall be maintained in compliance with the provisions of Section 1.704-1(b) of the Regulations, and all provisions of this Agreement relating to the maintenance of Capital Accounts shall be interpreted and applied in a manner consistent with such Regulations. The Capital Account of the Members shall be adjusted in any other manner required by such Regulations or otherwise in order to be deemed properly maintained for federal income tax purposes.

2.3.6 <u>No Obligation to Restore Negative Capital Accounts</u>. No Member shall have any liability or obligation to restore a negative or deficit balance in such Member's Capital Account (other than by adjustments to such Capital Account pursuant to Section 3.6).

2.3.7 <u>Return and Withdrawal of Capital Contributions.</u> No interest shall accrue or be payable on any Capital Contribution or Capital Account. No Member shall have the right to withdraw its Capital Contribution or to demand and receive property of the Company or any distribution in return for its Capital Contribution, except as required by law. To the extent that a Member has a right to demand a return of all or any portion of its Capital Contribution, the Member shall not have a right to demand and receive a return of its Capital Contribution in a form other than cash, irrespective of the nature of his Capital Contribution.

## 3. **Distributions and Allocations**

3.1 Distributable Cash. The amount of cash of the Company available for distribution ("Distributable Cash") as of the end of each calendar month shall be determined by the Managing Member, on or before 30 days following the end of such calendar month, by deducting from total cash receipts of the Company for such calendar month from any source, the total of: (i) all cash payments and other expenses due such month, to the extent such payments exceeded cash on hand at the beginning of such month and (ii) additional cash amounts required to cover future payments and expenses as determined by the Members.

3.2 *Distributions to Members.* To the extent permitted by the Act, Distributable Cash shall be distributed to the Members in proportion to their respective Membership Interests.

3.3 *Tax Distribution.* Notwithstanding Section 3.2, the Company shall (provided the Company has sufficient cash on hand) distribute to the Members an amount sufficient to enable the Members to pay projected tax liabilities attributable to the allocations of Profit (as defined below) and Loss (as defined below) by the Company using an assumed tax rate equal to the highest effective marginal combined U.S. federal, state and local income tax and assuming

that such Member does not have any offsetting losses, deductions or credits. Any such distribution shall be treated as an advance of amounts otherwise distributable to such Member pursuant to Section 3.2 such that, in determining a Member's right to distributions pursuant to Section 3.2, distributions received by such Member pursuant to the immediately foregoing sentence shall be taken into account as if received pursuant to Section 3.2.

3.4  *Withholding*. In the event the Company is required to deduct and withhold, pursuant to the Internal Revenue Code of 1986 or its counterpart in any subsequently enacted Internal Revenue Code (the "Code"), the Regulations or any other federal, state or local law, rule or regulation which is currently in effect or which may be promulgated hereafter including, without limitation, any tax treaty, any amount from an actual distribution to a Member, the amount so deducted and withheld from such distribution shall, for all purposes of this Agreement, be treated as a distribution to such Member of the same type as the distribution giving rise to the obligation.

3.5  *Allocations of Profits and Losses*. The net profit ("Profit") and net loss ("Loss") of the Company, for each fiscal year of the Company, shall be allocated among the Members in the same manner that such Member would be entitled to receive distributions, or suffer loss, if, at the end of each fiscal year, the Company were to be dissolved and its assets and liabilities settled and distributed in accordance with Section 7 hereof. Any credit available for income tax purposes shall be allocated among the Members in accordance with Section 1.704-1(b)(4)(ii) of the Regulations.

3.6  *Special Allocations.*

3.6.1  Minimum Gain Chargeback. Except as otherwise provided in Section 1.704-2(f) of the Regulations, if, during any taxable year, there is a net decrease in Minimum Gain, as defined in Section 1.704-2(f) of the Regulations, prior to any other allocation pursuant to this Subsection 3.6.1, each Member shall be specially allocated items of income and gain for such taxable year (and, if necessary, subsequent taxable years) in an amount equal to that Member's share of the net decrease in Minimum Gain, determined in accordance with Section 1.704-2(g) of the Regulations. Such allocations shall be made in proportion to the respective amounts required to be allocated to each Member pursuant to such Regulations. Allocations of income and gain pursuant to this Subsection shall be made first from gain recognized from the disposition of Company assets subject to non-recourse liabilities (within the meaning of the Regulations promulgated under Section 752 of the Code), to the extent of the Minimum Gain attributable to those assets, and thereafter, from a pro rata portion of the Company's other items of income and gain for the taxable year. This Subsection is intended to comply with the minimum gain chargeback requirement in Section 1.704-2(f) of the Regulations and shall be interpreted consistently therewith.

3.6.2  Member Minimum Gain. Except as otherwise provided in Section 1.704-1(i)(4) of the Regulations, if there is a net decrease in Member Minimum Gain during any taxable year, each Member who has a share of the Member Minimum Gain, determined in accordance with Section 1.704-2(i)(5) of the Regulations, shall be specially allocated items of Company income and gain for such taxable year (and, if necessary, subsequent taxable years) in

an amount equal to such person's share of the net decrease in Member Minimum Gain, determined in accordance with Section 1.704-2(i)(4) of the Regulations. Such allocations shall be made in proportion to the respective amounts required to be allocated to each Member pursuant to such Regulations. The items to be so allocated shall be determined in accordance with Sections 1.704-2(i)(4) and 1.704-2(j)(2) of the Regulations. This Subsection is intended to comply with the minimum gain chargeback requirement in Section 1.704-2(i)(4) of the Regulations and shall be interpreted consistently therewith.

3.6.3 <u>Qualified Income Offset</u>. No Member shall be allocated losses or deductions if the allocation causes a Member to have an Adjusted Capital Account Deficit (as defined in the Regulations). If a Member receives (i) an allocation of loss or deduction (or item thereof), or (ii) any distribution which causes the Member to have an Adjusted Capital Account Deficit at the end of any taxable year, then all items of income and gain of the Company (consisting of a pro rata portion of each item of Company income, including gross income and gain) for that taxable year shall be allocated to that Member, before any other allocation is made of Company items for that taxable year, in an amount and manner sufficient to eliminate the Adjusted Capital Account Deficit of such Member as quickly as possible and to the extent required by Section 1.704-1(b) (2) (ii) (d) of the Regulations. This Subsection is intended to comply with, and shall be interpreted consistently with, the "qualified income offset" provisions of the Regulations promulgated under Section 704(b) of the Internal Revenue Code.

3.6.4 <u>Nonrecourse Deductions</u>. Nonrecourse deductions for a taxable year or other period shall be specially allocated to the Members in proportion to their respective Membership Interests.

3.6.5 <u>Member Loan Nonrecourse Deductions</u>. Any Member Loan Nonrecourse Deduction (as defined in the Regulations) for any taxable year or other period shall be specially allocated to the Member who bears the risk of loss with respect to the loan to which the Member Loan Nonrecourse Deduction is attributable in accordance with Section 1.704-2(b) of the Regulations.

3.6.6 <u>Guaranteed Payments</u>. To the extent any compensation paid to any Member by the Company is determined by the Internal Revenue Service not to be a guaranteed payment under Section 707 of the Code or is not paid to the Member other than in the person's capacity as a Member within the meaning of Section 707(a) of the Code, the Member shall be specially allocated gross income of the Company in an amount equal to the amount of that compensation, and the Member's Capital Account shall be adjusted to reflect the payment of that compensation.

3.6.7 <u>Contributed Property and Book-Ups</u>. In accordance with Section 704(c) of the Code and the Regulations thereunder, as well as Section 1.704-1(b)(2)(iv)(d)(3) of the Regulations, income, gain, loss, and deduction with respect to any property contributed (or deemed contributed) to the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of the property to the Company for federal income tax purposes and its fair market value of the date of contribution (or deemed contribution). If the adjusted book value of any Company asset is adjusted as provided

herein, subsequent allocations of income, gain, loss, and deduction with respect to the asset shall take account of any variation between the adjusted basis of the asset for federal income tax purposes and its adjusted book value in the manner required under Section 704(c) of the Code and the Regulations thereunder.

    3.6.8 <u>Revaluation of Capital Accounts</u>. The Capital Accounts of the Members may, in the discretion of the majority of Membership Interest in the Company, be increased or decreased to reflect a revaluation of the Company's assets (including intangible assets such as goodwill) on the Company's books upon the occurrence of an event set forth in Section 1.704-1(b)(2)(f)(5) of the Regulations. The revaluation shall be made in a manner consistent with Sections 1.704-1(b)(2)(f)(1), (2), (3) and (4) of the Resolutions. If the adjusted book value of any Company asset is adjusted as provided herein, subsequent allocations of income, gain, loss, and deduction with respect to the asset shall take account of any variation between the adjusted basis of the asset for federal income tax purposes and its adjusted book value in the manner required under Section 704(c) of the Code and the Regulations thereunder.

    3.6.9 <u>Section 754 Election</u>. By a vote of the majority of interests in the Company, the Company shall make an election pursuant to Section 754 of the Internal Revenue Code, in the circumstances described therein.

## 4. **Limitation of Liability**

    4.1 *Limitation of Liability*. No Member, manager or officer shall be liable to the Company or its Members for monetary damages for breach of fiduciary duty as a Member, manager, officer or otherwise liable, responsible or accountable to the Company or its Members for monetary damages or otherwise for any acts performed, or for any failure to act; *provided, however*, that this provision shall not eliminate or limit the liability of a Member, manager or officer (i) for acts or omissions which involve intentional misconduct or a knowing violation of law, or (ii) for any transaction from which the Member, manager or officer received any improper personal benefit.

    4.2 *Personal Guarantees by Members*. No Member shall be required to provide a personal guarantee or undertake any personal liability in connection with or arising out of the Company's business, without such Member's prior consent.

## 5. **Buy/Sell.**

    5.1 *Deadlock*. In the event that the Managing Member and Capital 7 are unable to agree on any Major Decision (as defined below) for a period of at least 60 days (after good faith negotiation to resolve such dispute) ("<u>Deadlock</u>"), Capital 7 and the Managing Member shall mediate the Deadlock within 30 days from the date a written request for mediation by Capital 7 or the Managing Member. Such mediation shall take place in New York, New York and shall be conducted by a single mediator agreed upon between Capital 7 and the Managing Member; provided, that if Capital 7 and the Managing Member cannot agree on a single mediator, Capital 7 and the Managing Member shall each select a mediator and such mediators shall mutually select a neutral mediator who will conduct the mediation. Each of Capital 7 and the Managing

Member shall bear the fees of its mediator (if applicable) and shall share equally the fees of any neutral or mutually selected mediator. Capital 7 and the Managing Member shall cooperate in good faith to resolve the Deadlock through mediation for at least thirty (30) days (the "Mediation Period") following the date the final mediator is selected. Until such time as a Deadlock is resolved, the Company shall continue to operate in a manner consistent with prior practices in respect of the issue giving rise to the Deadlock. If, at any time a Deadlock is unresolved following the Mediation Period, the provisions of this Section 5.1 shall apply. Each Member shall have the right to deliver to the other Member(s) a notice (the "Notice") which shall contain an offer to sell the entire Membership Interest of the offering Member (herein referred to as the "Interest") (the delivering Member(s) herein referred to as the "Offeror" and the receiving Member herein referred to as the "Offeree"). Such sale shall be effected by the Offeror stating, along with the Notice, a value for the Interest. Within thirty (30) days of the receipt of the offer, each of the Offerees wishing to acquire the Interest, whether alone or together with third parties, shall notify the Offeror of such acceptance ("Acceptance Notice"). The offer shall be irrevocable for a period (herein referred to as the "Option Period") of ninety (90) days after receipt of the Notice (the "Option"). If the Offeree fails to confirm its consent to purchase the Interest of the Offeror within the above 30 day period or if the transaction is not closed within the above 90-day period, then the Offeree shall have no further rights under the Option. In such event, the Offeror shall be entitled to cause the Company, during an additional period of 90 days, to offer the Company (for the avoidance of doubt, not limited to the Offeror's Interest) for sale to a third party for a price equal to or exceeding the Company's assets (including, for this purpose, all Company cash and other assets owned by the Company) and in such case the proceeds of the such sale shall be distributed in accordance with Section 3.2 above (a "Third Party Sale"). For the avoidance of doubt, the Offeror shall cause the Company to close the transaction with the Offeree and shall not enter into a Third Party Sale in the event that the Offeree has agreed to purchase the Interest of the Offeror.

## 6. Transfer of Membership Interest.

6.1  *Restriction on Transfers.* A Transfer (as defined below) of a Membership Interest in the Company shall be null and void, unless such Transfer is (i) made in accordance with the provisions of this Agreement, (ii) approved by the Managing Member, and (iii) the transferee duly signs this Agreement (or a consent and joinder with respect thereto) and any amendments made thereto. To the extent that a Member shall acquire or receive the Membership Interest of another Member, the provisions of this Agreement, including sections relating to Transfer of Membership Interest in the Company, shall continue to apply to such Membership Interest acquired or received. For purposes of this Agreement, the term "Transfer" shall mean, when used as a noun, any sale, hypothecation, pledge, assignment, gift, or other transfer, be it voluntary or involuntary, to any person, inter vivos, testamentary, by operation of laws of devise and descent or other laws, and, when used as a verb, to sell, hypothecate, pledge, assign, gift, or otherwise transfer to any person, be it voluntarily or involuntarily, inter vivos, testamentary, by operation of the laws of devise or descent or any other laws.

6.2  *Admission of Additional Members.* A person or a legal entity may be admitted as an additional Member (meaning a Member who receives its Membership Interest directly

from the Company and not by virtue of a transfer of an Membership Interest from an existing Member), from time to time, on such terms and conditions as set forth in this Agreement and determined and approved by the Members, provided that such additional Member shall duly sign this Agreement (or a consent and joinder with respect thereto) and any amendments made thereto.

6.3 *Permitted Transfers*. Each Member shall be entitled, without any prior approval required per Section 5.1(ii), to transfer all or a portion of its Membership Interests to any (i) corporate entity fully owned and controlled by such Member or by such Member's parent(s), sibling(s), spouse and/or child or children ("Immediate Family Member") or (ii) Immediate Family Member (each of (i) and (ii) a "Permitted Transfer"). Sections 6.4 and 6.5 below shall not apply to Permitted Transfers.

6.4 *Right of First Refusal*. In the event a Member wishes to sell all or part of its Membership Interests (such Member desiring to sell, the "Seller") the other Members shall have a right of first refusal (the "Right of First Refusal") to purchase the offered Seller's Membership Interests and the following shall apply:

6.4.1 Sale Notice. The Seller shall give a written notice (the "Proposed Sale Notice") to all other Members stating (i) its desire to effect such a sale; (ii) the name and address of the proposed purchaser; (iii) the total proposed consideration to be paid for the Membership Interest (the "Proposed Price"); and (iv) the terms of payment and other terms and conditions of the proposed sale (the "Proposed Terms").

6.4.2 Purchase of Membership Interest by Members. The Members shall have the right to purchase the Seller's Membership Interest offered in the Proposed Sale Notice under the same terms specified in the Proposed Sale Notice. To do so, a Member must exercise its Right of First Refusal (such Member desiring to purchase, the "Purchaser") within 30 calendar days of receipt of the Proposed Sale Notice a number of Membership Interest equal to the Purchaser's pro rata share (calculated based on the ratio of the Purchaser's Membership Interests to the sum of all Membership Interests other than the Seller's Membership Interests). If a Member so exercises its Right of First Refusal, it shall pay to the Seller the Proposed Price in a manner and at such times as prescribed for in the Proposed Sale Notice.

6.4.3 Purchase of Membership Interests by Proposed Purchaser. If no Member exercises the Right of First Refusal within such 30-day period, the Seller shall be free to sell its Membership Interest, but only to the proposed purchaser named in the Proposed Sale Notice, and only for the full Proposed Price and upon the Proposed Terms.

6.5 *Tag-Along*.

6.5.1 No Member (the "Transferring Member") may Transfer any Membership Interests to one or more third parties if such transactions, together with all Membership Interests previously transferred by the Transferring Member to one or more third parties, would, if consummated, result in the Transferring Member transferring more than 55% of the aggregate number of Membership Interests held by the Transferring Member, unless each

Member is offered a right to sell (the "Tag-Along Right") in such Transfer with such Transferring Member.

6.5.2 At least 20 days prior to any such Transfer, a Transferring Member will deliver a sale notice to all the Members specifying the identity of the prospective transferee(s) and disclosing in reasonable detail the number of Membership Interests, the price and other terms and conditions of the proposed transfer, including, without limitation, the expected aggregate holdings of the Transferring Member immediately after consummation of such proposed Transfer (the "Tag-Along Notice"). The Members who elect to participate in the proposed Transfer (the "Tag-Along Members") shall deliver written notice of their election to participate to the Transferring Member prior to the expiration of such 20-day period.

6.5.3 Each Tag-Along Member will be entitled to sell in such proposed Transfer, at the same price and on the same terms as the Transferring Member, a number of Membership Interest equal to the product of (x) the quotient determined by dividing the number of Membership Interests then held by such Tag Along Member by the aggregate number of Membership Interests then held by the Principal Members (as defined below) and all Tag-Along Members multiplied by (y) the number of Membership Interests to be sold in such proposed transfer. The number of Membership Interests proposed to be transferred by the Transferring Member in the current transfer shall be reduced to the extent necessary to provide for the sale of Membership Interest by each Tag-Along Member exercising its rights hereunder.

6.5.4 The Transferring Member and the Tag-Along Members may transfer the Membership Interests at the price and on the terms and conditions set forth in the sale notice for a period of 60 days from the expiration of the 20-day period commencing on the date of delivery of the sale notice to the other Members. Any Membership Interests not transferred within such period again shall be subject to the provisions of this Section 5 in connection with any subsequent transfer.

6.5.5 The failure of any other Member to give written notice as specified in 6.5 within the time period specified herein shall be deemed to be a waiver of its rights under Section 6.5.

6.6 *Bring-Along*. In the event that one or more one or more Members who, together, beneficially own 65% or more of the Membership Interests (collectively, the "Principal Members") shall have received, or following receipt of a Tag-Along Notice wish to exercise their Tag-Along Right pursuant to, a bona fide offer from a person that is not an affiliate or Permitted Transferee of the Principal Members (or shall have entered into a bona fide written agreement with such Person) relating to a Sale of the Company (as defined below), and the Principal Members desire to effect, or cause the Company to effect, such Sale of the Company, the Principal Members shall be entitled to give a notice (a "Buyout Notice") to the other Members (the "Bring-Along Members"), not less than 60 days prior to the closing of such Sale of the Company, stating that it proposes to effect (or cause the Company to effect) such transaction, specifying the name and address of the proposed parties to such transaction, the anticipated closing date, the consideration payable in connection therewith and the terms and conditions thereof, and attaching a copy of all writings between the Principal Members (or the

Company) and the other parties to such Sale of the Company transaction necessary to establish the terms of such transaction. "Sale of the Company" shall mean the sale of the Company to a person (or group) that is not an affiliate or Permitted Transferee of any Member, pursuant to which such person (or group) shall acquire beneficial ownership of all the Membership Interests (whether by merger, consolidation or transfer of Membership Interests).

## 7. Dissolution and Winding Up.

7.1 *Dissolution Events*. The Company shall be dissolved and its affairs shall be wound up upon the occurrence of any of the following events ("Dissolution Events"):

    7.1.1 The entry of a decree of judicial dissolution under the Act or under an arbitration award; or

    7.1.2 The administrative dissolution of the Company under the Act; or

    7.1.3 Determination by all of the Members.

7.2 *Effect of Dissolution*. Upon a Dissolution Event, the Managing Member shall immediately proceed to wind up all of the Company's affairs and proceed to liquidate all of the Company's assets as promptly as is consistent with obtaining their fair value.

7.3 *Distribution of Assets*. Upon the winding up of the Company, the assets of the Company shall be distributed as follows:

    7.3.1 First, to the creditors of the Company to satisfy the liabilities of the Company;

    7.3.2 Second, to the Members in accordance with the positive balances in their respective Capital Accounts, after taking into account any allocations of profits or losses, any distributions, and all other Capital Account adjustments for the Company's taxable year in which the liquidation occurs; and

    7.3.3 Then to the Members as per Section 3.2 above.

## 8. Representations and Warranties.

8.1 Each of the Parties hereby represents and warrants to the other Parties that:

    8.1.1 They have full capacity to enter into this Agreement;

    8.1.2 They are not a party to any judgment, order, agreement or obligation which restricts their ability to perform their respective obligations under this Agreement; and

    8.1.3 None of them are currently the subject of a civil, criminal, administrative, liquidation or bankruptcy proceeding, nor to their knowledge has one been threatened against them, which will materially impair their ability to perform their obligations in any manner under this Agreement. All of the funds remitted to the Company by the Members are

compliant with all U.S., state and local laws and regulations, including, but not limited to USA Patriot Act.

## 9. Indemnification.

9.1 *Indemnification Rights.* The Company shall indemnify to the fullest extent permitted by law each of the Members, the officers and any employee or agent of the Company against expenses (including reasonably attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by any such person in connection with any action, suit, proceeding or claim commenced or threatened against such person arising from any act, or failure to act, by such person in connection with the business and affairs of the Company after the date of this Agreement, if such person acts in good faith, without gross negligence and in a manner the person reasonably believes to be in, or not opposed to the best interests of the Company, and, with respect to any criminal action or proceeding, had no reasonable cause to believe that such person's conduct was unlawful. It shall be a further requirement for indemnification that if the indemnitee is a party to this Agreement, that the act giving rise to indemnification was not made in violation of this Agreement.

9.2 *Indemnification by the Parties.* Each of the Parties, shall indemnify and hold harmless the other Party and its respective affiliates, members, directors, officers, employees, agents and controlling persons from and against any and all claims, actions, suits, liabilities, losses, damages, costs and expenses, including, but not limited to reasonable fees and expenses of counsel, arising out of a breach of any of the representations and warranties contained in this Agreement. This indemnification provision shall survive termination of this Agreement. The rights of indemnification provided for in this Section shall be in addition to, and shall not exclude, limit or preclude, any other rights to which any such indemnified person may be entitled to under the Act, any agreement or contract, any other applicable law, or otherwise.

## 10. Accounting, Records and Reports.

10.1 Financial Year. The financial year of the Company for financial reporting and for tax purposes shall commence on the first day of January in each year and end on the last day of December in each year.

10.2 Books and Records. The Company shall keep or cause to be kept complete and accurate books and records of the Company and supporting documentation of transactions with respect to the conduct of the Company's business. The books and records shall be maintained in accordance with sound accounting practices and shall be appropriate and adequate for the Company's business. A reasonable charge for copying books and records may be charged by the Company.

10.3 Required Records. The Company shall keep at its office the following records and information:

10.3.1 A list of the full name and last known address of each Member, setting forth the amount of cash each Member has contributed, a description and statement of the agreed

value of the other property that each Member has contributed or has agreed to contribute in the future, and the date on which each became a Member;

        10.3.2   If applicable, a list of the full name and last known address of each person holding an option to acquire a Membership Interest, setting forth the full terms and conditions of said option;

        10.3.3   A copy of the Certificate, as amended or restated, together with executed copies of any powers of attorney under which any Certificate or application has been executed;

        10.3.4   Copies of the Company's federal, state and local income tax returns and reports, if any, for the three (3) most recent years; and

        10.3.5   Copies of this Agreement currently in effect, and any amendments thereto, any executed consent and joinders to this Agreement, and any financial statements of the Company for the three (3) most recent years.

    10.4   <u>Access to Records</u>. Each Member and their duly authorized representatives shall have the right, at such person's sole expense, to inspect and copy the records of the Company where the records are located, upon reasonable request, during ordinary business hours.

    10.5   <u>Tax Returns and Information</u>. The Company shall cause to be prepared and timely filed all tax returns required to be filed by the Company pursuant to the Code and the laws of each state in which the Company does business. The Board managers shall use commercially reasonable efforts to cause the Company to deliver, within three (3) calendar months after the end of each taxable year of the Company, to each person who was a Member at any time during such taxable year all tax information concerning the Company which is necessary for the preparation of the Member's federal and state income tax returns for such taxable year, as required by the Code, the Regulations, and the laws of any state.

## 11. **Miscellaneous Provisions.**

    11.1   <u>Good Faith Cooperation</u>. The Parties acknowledge and agree that obtaining a successful relationship which would be beneficial to the Company shall require their full and mutual good faith cooperation. The Parties undertake to act in good faith and make their best efforts to fully cooperate with the other Party in promoting the Company's business and the transactions contemplated herein. The Parties hereby agree to pass resolutions and to sign any appropriate document necessary to implement the provisions of this Agreement.

    11.2   <u>Headings, Gender, Currency</u>. The use of headings in this Agreement is for convenience of reference only and shall not affect its interpretation. Words expressed in the singular include the plural and vice-versa and words in one gender include all genders. Unless otherwise indicated, all dollar amounts referred to in this Agreement are in United States dollars.

11.3 Confidentiality. The Parties agree to maintain in confidence all confidential information with regard to the operation of the Company and its business, and shall prevent such information from becoming known to anyone other than necessary employees or agents, if any, of the Company.

11.4 Amendments. This Agreement may be amended or modified from time to time only by a written instrument unanimously approved by the Parties.

11.5 Waivers. No provision of this Agreement shall be deemed to have been waived unless such waiver is executed in writing by the party waiving such provision. No waiver of any provision of this Agreement shall constitute a waiver of any other provision of this Agreement. No waiver of any breach or violation of any provision of this Agreement shall constitute a waiver of any subsequent breach of such provision.

11.6 Title to Company Property. Legal title to all property of the Company shall be held and conveyed in the name of the Company.

11.7 Organization Expenses. The Company shall pay all expenses incurred in connection with the organization of the Company and the matters arising from the Company's business.

11.8 No Partnership Intended for Non-Tax Purposes. The Members have formed the Company under the Act and expressly do not intend hereby to form a partnership or limited partnership. The Members do not intend to be partners to one another or partners as to any third party. To the extent that any Member, by word or action, represents to another person that any other Member is a partner or that the Company is a partnership, the Member making such wrongful representation shall be liable to any other Member who incurs personal liability by reason of such wrongful representation.

11.9 Rights of Creditors. This Agreement is entered into among the Members for the exclusive benefit of the Company and the Members, and their successors and assigns (subject to the provisions hereof restricting transfer of Membership Interests), and is expressly not intended for the benefit of any creditor of the Company or any other person. Except and only to the extent provided by applicable statute, no such creditor or third person shall have any rights or remedies under this Agreement or any agreement between the Company and any Member with respect to any Capital Contribution or otherwise.

11.10 Notices. Except as expressly provided otherwise in this Agreement, any notice or other communication required to be given pursuant to this Agreement shall be in writing and shall be made by one of the following methods: (i) delivered personally to the party to be notified, (ii) sent by certified or registered United States mail, return receipt requested, first class postage prepaid, to the party to be notified, (iii) electronic mail with read receipt, if available; or (iv) delivered by an overnight delivery courier service to the party to be notified. Any notice to the Company shall be addressed to the Company's principal place of business, and any notice to any Member shall be addressed to such Member's address specified on the head page of this Agreement or otherwise duly provided to the Company. Any such notice shall be deemed to have

been given as of the date of actual receipt or refusal of such notice. Any party to this Agreement may designate a different address to which notices are to be sent to such party by notifying all other parties to this Agreement as to such different address in the manner set forth above in this Section. Copies of all such notices shall also be sent to the Party's last known counsel, by (i) electronic mail with read receipt; or (ii) regular mail.

11.11 <u>Severability</u>. If any provision of this Agreement is held to be unenforceable, invalid or void, such provision shall be deemed to be severable from the remaining provisions of this Agreement, and such holding shall in no way impair or affect the validity or enforceability of the remaining provisions of this Agreement, which shall then be construed as if such invalid or unenforceable provision were omitted.

11.12 <u>Entire Agreement</u>. This Agreement constitutes the entire agreement among the Parties and the Company with respect to the subject matter of this Agreement and supersedes all prior and contemporaneous agreements, representations, understandings, conditions, and warranties, written or oral, not contained in this Agreement or the Articles.

11.13 <u>Controlling Law and Dispute Resolution</u>. This Agreement and the rights of the Parties hereunder shall be governed by, interpreted, and enforced in accordance with the laws of the State of Delaware. Upon the occurrence of a dispute between the Parties as well as with the Company arising under or with respect to the operations of the Company or relating to this Agreement, such dispute shall be submitted to arbitration in the state of Delaware, under the rules of the American Arbitration Association. The arbitration award shall be final and binding upon the Parties and enforceable in any court of competent jurisdiction. Notwithstanding the above, a Party shall have the right to seek provisional equitable relief against the other party in any jurisdiction in which the second party is alleged to be committing a breach of this agreement.

11.14 <u>Successors and Assigns</u>. This Agreement shall be binding upon, and inure to the benefit of, the Parties hereto and their respective successors and assigns, subject to the provisions hereof restricting the transfer of Membership Interests.

11.15 <u>Counterparts</u>. This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed an original, but all of such counterparts together shall constitute but one and the same instrument.

[Signature Page Follows]

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement, or multiple counterparts thereof, as of the date first above written.

MEMBERS:

WINGFIELD CAPITAL CORP.

By: _____
Name: Damian Laljie
Title: Managing Member

By: _____
Name: Heath Wagenheim
Title: Managing Member

CAPITAL 7 CASH FUNDING LLC

By: _____
Name: Radion Aminov
Title: Managing Member

By: _____
Name: Farid Peysakhov
Title: Managing Member

[[Global JobMatch] LLC Agreement Signature Page]

**EXHIBIT A**
**CERTIFICATE OF FORMATION**

## SCHEDULE A
## INITIAL CAPITAL CONTRIBUTION

| Member's Name | Initial Capital Contribution | Membership Interest |
|---|---|---|
| | **Capital Contribution** | |
| Wingfield Capital Corp. | $2,500,000 | 50% |
| Capital 7 Cash Funding LLC | $2,500,000 | 50% |
| **Total** | | **100%** |