UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
CAPITAL 7 FUNDING,

               Plaintiff,

    - against -

WINGFIELD CAPITAL CORPORATION, *et al.*,

               Defendants.
------------------------------------------------------------------X

**MEMORANDUM AND
ORDER**
17-CV-2374 (RRM) (ST)

ROSLYNN R. MAUSKOPF, Chief United States District Judge.

     Plaintiff Capital 7 Funding ("Capital 7") brings this action alleging violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.*, and New York state law arising out of a joint venture it formed with defendant Wingfield Capital Corporation ("Wingfield"), called Three Leaf Capital LLC, which Capital 7 alleges defendants used to fraudulently siphon money from Capital 7.  Now moving to dismiss are defendants Burgis Sethna, Heath Wagenheim, and Wingfield, (the "Sethna defendants"), as well as defendants Damian Laljie, Joseph Rabito, Prestige Investment Associates, Inc., and First Choice Payment Systems, Inc., (the "Laljie defendants").  The Sethna defendants also move to disqualify plaintiff's counsel, Gary Tsirelman.  For the reasons set forth below, the Laljie defendants' motion is granted in part and denied in part and the Sethna defendants' motions are denied in their entirety.

## BACKGROUND

### I.    Relevant Facts

     The following facts are drawn from Capital 7's Second Amended Complaint, (Second Amended Complaint, ("SAC") (Doc. No. 26)), and are assumed to be true for the purposes of this Order.

Plaintiff Capital 7 is a New York corporation with its principal place of business in New York City. (SAC ¶ 10.) Defendant Wingfield is a Nevada corporation with its principal place of business in New York City. (*Id.* ¶ 11.) On November 25, 2015, Capital 7 and Wingfield agreed to form Three Leaf Capital LLC ("3 Leaf"), a joint venture limited liability company to be owned in equal shares by Capital 7 and Wingfield. (*Id.* ¶ 23; *see also* SAC, Ex. A (Joint Venture Agreement) (Doc. No. 26-1).)

Capital 7 and Wingfield agreed that 3 Leaf was to operate "as a funding company, focusing on purchasing future receivables from businesses in need of short-term funding of less than $500,000.00." (SAC ¶ 27.) Capital 7 and Wingfield agreed to each contribute $2,500,000 in startup capital for 3 Leaf. (*Id.* ¶ 24.) 3 Leaf operated out of One Penn Plaza, Suite 2527, New York, New York. (*Id.* ¶ 25.) The office was leased either by Wingfield or by defendant Prestige Investment Associates, Inc. ("Prestige"). (*Id.*) Prestige is a Nevada corporation with its principal place of business in New York City. (*Id.* ¶ 12.) In November 2015, Capital 7 paid $78,750 to cover three months' rent and the security deposit for the office space. (*Id.* ¶ 25.) Also named in the complaint is First Choice Payment Systems, Inc. d/b/a/ 1st Choice Payments ("First Choice"), a corporation incorporated and with its principal place of business in New York. (*Id.* ¶ 13.)

Defendants Damian Laljie, Joseph Rabito, and Heath Wagenheim served, respectively, as Chief Operating Officer, Chief Financial Officer, and Chief Technology Officer of Wingfield. (SAC ¶¶ 15–17.) Capital 7 maintains that the "true owner and CEO" of Wingfield is defendant Burgis Sethna. (*Id.* ¶ 14.) Capital 7 alleges that Sethna was the "true owner and CEO" of Prestige and First Choice as well. (*Id.*)

2

Capital 7 and Wingfield agreed that Wagenheim, Laljie, and Rabito would serve as executives at 3 Leaf, managing its operations, but that Sethna would have the ultimate responsibility for the business. (SAC ¶¶ 26–32.) To this end, Wagenheim, Laljie, Rabito, and Sethna were co-signatories on 3 Leaf accounts. (*Id.* ¶ 33.) Despite having no formal executive position at 3 Leaf, Capital 7 alleges that Sethna supervised Laljie, Rabito, and Wagenheim's work at 3 Leaf and hired and fired 3 Leaf employees. (*Id.* ¶ 63.)

Capital 7 and defendants agreed that 3 Leaf would operate by providing immediate funding to businesses in exchange for a fixed share of the business's future receivables, to be collected by withdrawing an agreed-upon portion of the business's credit and debit card sales revenue directly from the business on a daily basis. (SAC ¶¶ 28–29.) These transactions were in essence loans, providing businesses with immediate cash in exchange for a larger value in future receivables. Sethna earned a six percent "management fee" calculated based on the total amount 3 Leaf lent to businesses. (*Id.* ¶ 31.)

Capital 7 alleges that Sethna, Wagenheim, Laljie, and Rabito "intended from the beginning to use 3 Leaf to defraud [Capital 7] and to siphon any monies invested into 3 Leaf" by Capital 7. (SAC ¶ 34.) Significantly, Capital 7 alleges that Wingfield never contributed any of the $2,500,000 in startup capital promised to 3 Leaf under the joint venture agreement. (*Id.* ¶ 42, Ex. A.) Capital 7 thus contributed all of 3 Leaf's initial capital. (*Id.*)

Defendants allegedly used 3 Leaf to defraud Capital 7 by arranging sham transactions with businesses that either did not exist, were "alter egos of Defendants, or [were] Defendants' co-conspirators." (SAC ¶ 35.) Capital 7 alleges that Sethna paid co-conspirators to pose as businesses seeking loans from 3 Leaf. (*Id.* ¶ 44.) The first way defendants would siphon money from Capital 7 in these transactions was through payments to non-existent third-party brokers.

For each transaction, Sethna would represent to Capital 7 that he had hired and used an independent sales organization ("ISO") broker to secure the customer's business, and that this broker charged a 10% fee. (*Id.* ¶ 47.) In reality, Capital 7 maintains, no ISO broker was used. (*Id.*) With each transaction, Sethna would write a check from 3 Leaf to Wingfield and distribute the 10% fee among defendants. (*Id.* ¶ 47; *see, e.g.*, *id.* ¶¶ 91, 93–95.)

Defendants also allegedly siphoned money from Capital 7 by redirecting most of the value of the sham loans 3 Leaf gave to businesses back to defendants' own accounts. Defendants allegedly used a few different strategies to siphon funds Capital 7 believed were being loaned in bona fide transactions, with the result that "the bulk" of the money 3 Leaf loaned to these businesses was ultimately redirected to defendants. (SAC ¶ 49.)

First, in some cases, defendants never sent the loan to a third-party business in the first place. In these cases, defendants transferred a portion of the loan amount back into 3 Leaf's account, falsely representing that the payments came from the third-party business. (SAC ¶ 73.)

Second, in the version of the scheme that applies most consistently to the allegations in the complaint, Capital 7 would contribute money that 3 Leaf would then loan to a business conspiring with defendants. Under the agreement with the loan recipient, 3 Leaf was normally supposed to receive daily payments out of the recipient's receivables. (SAC ¶ 50.) Instead, defendants would have the payments redirected to Wingfield accounts and, "generally within months" of when the loan was made, inform Capital 7 that the customer had defaulted. (*Id.* ¶¶ 46, 48–50.) Defendants would then tell Capital 7 that they were recovering the money from the loan recipient and begin transferring portions of the repayments owed by recipients into 3 Leaf's account. (*Id.* ¶ 53.) Ultimately, however, these loan recipients would never repay the full value

4

of the loan and defendants would keep "the bulk" of the loaned money and pay the loan recipient a kickback.  (*Id.* ¶¶ 45, 53.)

For instance, the Second Amended Complaint details a loan 3 Leaf made in February 2016 to Georgia-based Postal Hiring Authority.  (SAC ¶ 188.)  Capital 7 transferred to 3 Leaf the $200,000 required for the cash loan, and 3 Leaf then transferred the money to Postal Hiring Authority.  (*Id.* ¶ 190.)  Postal Hiring Authority, Capital 7 alleges, was recruited by defendants to "pos[e] as a legitimate counterparty," but instead transferred the money received under the loan back to defendants "in exchange for a kickback."  (*Id.* ¶ 195.)  To effectuate this scheme, Postal Hiring Authority defaulted on payments to 3 Leaf "within two months," but then defendants claimed to have separately recovered the loan amount.  (*Id.* ¶¶ 196–97.)  Between February 11, 2016, and August 9, 2016, Postal Hiring Authority made "automatic daily payments" to accounts defendants controlled, but only some of this money was ever redirected to 3 Leaf.  (*Id.* ¶¶ 198–99.)  Capital 7 alleges that defendants transferred $133,333 to 3 Leaf, but kept the remaining value of the loan.  (*Id.* ¶ 199.)

In the third variation of the scheme described, the loan recipient would pay back the loan via daily payments from its accounts or point of sale provider.  (SAC ¶¶ 69–70.)  While these payments would initially arrive consistently in 3 Leaf's accounts, defendants would eventually redirect the payments to accounts they controlled.  (*Id.* ¶ 70.)  For instance, Capital 7 alleges that it contributed $60,000 so that 3 Leaf could complete a loan to New Jersey-based Quality Products USA, Corp., a corporation allegedly colluding with defendants, in exchange for $85,200 in receivables.  (*Id.* ¶¶ 115, 117, 122–23.)  Quality Products made payments to Wingfield, which then transferred payments to 3 Leaf.  (*Id.* ¶ 118.)  After $49,729 was repaid, however, in September 2016, defendants stopped making payments to 3 Leaf.  (*Id.* ¶ 125.)

Defendants then took control of 3 Leaf's accounts as well in October 2016.  (*Id.*  ¶¶ 58–59.)

Capital 7 alleges that the loan to Quality Products was a sham.  Any money transferred to

Quality Products was always intended to be transferred right back to 3 Leaf, and ultimately to

defendants, "in exchange for a kickback."  (*Id.* ¶ 134.)

　　For some of the loans Capital 7 describes as being part of this version of the scheme,

there is no allegation that the recipient conspired with defendants.  Instead, defendants appear to

have simply redirected loan repayments to their personal accounts and never transferred the

value of the loan repayments to 3 Leaf.  For example, Capital 7 alleges that in November 2015, 3

Leaf entered into an agreement with Carillo Trucking ("Carillo"), a business located in Hereford,

Texas, to provide $200,000 in cash in return for $280,000 paid back to 3 Leaf daily out of

Carillo's receivables.  (SAC ¶¶ 87–89.)  As Carillo made "regular" and "automatic" payments on

the loan, the proceeds were directed to Wingfield's account and Wingfield, generally after some

delay, would transfer the money to 3 Leaf.  (*Id.* ¶¶ 96–97.)  On or about September 1, 2016,

defendants began diverting the daily payments to other accounts under their control and ceased

transferring Carillo's payments to 3 Leaf altogether.  (*Id.* ¶¶ 98–99.)  In the end, 3 Leaf only

collected $177,000 of the money owed to it by Carillo, while defendants took the remaining

value of the loan.  (*Id.* ¶ 100.) Capital 7 alleges that defendants followed a similar pattern with

respect to a $280,000 loan 3 Leaf made to Wayne, Pennsylvania-based Two Paper Dolls, LLC,

once again pocketing a purported $20,000 payment to an ISO broker, terminating transfer of

repayment funds to 3 Leaf in September 2016, and ultimately retaining $103,000 of the $280,000

owed.  (SAC ¶¶ 102–114.)

　　For both the Carillo and the Two Paper Dolls, LLC, loans, Capital 7 alleges that Sethna,

Wagenheim, Laljie, and Rabito brokered the deal, but that Sethna told Capital 7 that a third-party

ISO broker had been used, and that the broker required a $20,000 fee. (*Id.* ¶¶ 90–94, 105–09.) Capital 7 alleges that the third-party broker did not exist, and that Sethna wrote $20,000 checks drawn on 3 Leaf's account, payable to Wingfield, and then transferred this purported broker's fee to defendants. (*Id.*)

The three above patterns do not account for each sham loan alleged in the complaint. For instance, 3 Leaf entered into two separate agreements with 7110 Partners, LLC ("7110 Partners"). In the December 2015, 3 Leaf agreed to purchase $248,500 of receivables from 7110 Partners's Mendoza Argentine Steak House, a restaurant formerly operating in Brooklyn, New York, for a $175,500 immediate cash payment, to be repaid daily. (SAC ¶ 137.) In the second agreement, made in March 2016, 3 Leaf agreed to purchase $195,000 in receivables from 7110 Partners's Bar 13, a bar located in Manhattan, in exchange for a $150,000 cash payment. (*Id.* ¶ 151.) Sethna stated that 3 Leaf would have to pay ISO broker fees to a fictitious third party for arranging these deals, but instead wrote checks for the fees of $17,500 and $15,000 to Wingfield and directed the funds to defendants. (*Id.* ¶¶ 138, 142–43, 152, 156–58.)

In each case, after Sethna represented to Capital 7 that 7110 Partners was a legitimate customer, and that defendants would reimburse Capital 7 its contribution, Capital 7 transferred the cash payments to 3 Leaf, which in turn transferred them to 7110 Partners. (SAC ¶¶ 139, 153.) Capital 7 alleges that defendants recruited 7110 Partners to "pos[e] as a legitimate counterparty to the funding agreement . . . in exchange for a kickback." (*Id.* ¶¶ 145, 160.) Capital 7 alleges that 7110 Partners "immediately ceased operations of the restaurant funded by the agreement" after receiving the December 2015 payment "and distributing it among themselves and Defendants." (*Id.* ¶ 146.) Under the December 2015 agreement, 7110 Partners was to deposit payments in a lockbox account, on which defendants were co-signatories, and

subsequently transfer the money in that account to 3 Leaf.  (*Id.* ¶ 140.)  3 Leaf has been paid

none of the money 7110 Partners owed under the agreement.  (*Id.* ¶¶ 149–150.)

 Defendants allegedly hid the dissolution of the restaurant from Capital 7 so that the

March 2016 funding agreement for Bar 13 would go forward.  (SAC ¶ 147.)  Under the March

2016 agreement, 7110 Partners agreed that 25% of receivables would be transferred to a lockbox

account on a daily basis, and subsequently transferred to 3 Leaf.  (*Id.* ¶¶ 151, 154.)  Defendants

were co-signatories on the account.  (*Id.* ¶ 151.)  7110 Partners made some payments to the

lockbox account, which were then transferred to 3 Leaf.  On June 10, 2016, however, defendants

changed the password on the lockbox account.  (*Id.* ¶ 162.)  7110 Partners continued making

payments from June 15 through November 24, 2016, however, those payments were not sent to 3

Leaf and were redirected to defendants.  (*Id.* ¶¶ 161, 163.)  3 Leaf ultimately collected $70,816

of the $195,000 it was supposed to receive under the agreement.  (*Id.* ¶ 165.)

Sethna allegedly admitted to Capital 7's representatives that the owners of 7110 Partners

were personal friends of his.  (SAC ¶ 144.)  When, in July 2016, Capital 7 representatives

inquired about the payments 7100 Partners owed to 3 Leaf, Sethna and 7110 Partners co-owner

Eddie Batiz allegedly came to the 3 Leaf offices "to intimidate and threaten [Capital 7]

representatives."  (*Id.* ¶ 164.)  Capital 7 alleges that Batiz "brought a golf club with him and

threatened to use it to bludgeon [Capital 7's] owners and representatives if they continued to

inquire about payments due to 3 Leaf."  (*Id.*)

In addition to the loans discussed above, Capital 7's complaint details loans 3 Leaf made

to a number of other companies.  (SAC ¶¶ 177–423.)  In each case, Capital 7 alleges that Sethna

and defendants recruited the business owner to present the business as a legitimate counterparty,

and that Sethna falsely represented in each case that a third party had brokered the deal and

wrote a check from 3 Leaf to defendants for 10% of the cash loan payment. (*Id.*) Finally, in each case, Capital 7 alleges that Sethna represented that defendants would reimburse Capital 7 for its contribution of capital to 3 Leaf – half of which was supposed to come from Wingfield. (*Id.*; *see also id.* ¶ 42, Ex. A.)

Capital 7 acknowledges that a "handful" of 3 Leaf's transactions were legitimate, but maintains that defendants only made these loans to conceal their scheme. (SAC ¶ 44.) Capital 7 also alleges that defendants hired "dozens of employees" for 3 Leaf, "virtually none of whom ever were able to close a sale or attract a customer." (*Id.* ¶ 54.) Defendants allegedly intended to use these employees as another source of income. (*Id.*) According to Capital 7, Sethna threated to use his connections to organized crime to order criminals "to hurt or kill the employees or their families" if the employees did not give Sethna a portion of their 3 Leaf paychecks. (*Id.* ¶¶ 55–56.) Capital 7 alleges that Sethna made the same threats to Capital 7's owners and representatives in order to prevent them from terminating the scheme. (*Id.* ¶ 57.)

Capital 7 maintains that Sethna organized the above-described scheme and served as its "ringleader." (SAC ¶ 61.) Sethna directed the work of Wagenheim, Laljie, and Rabito, who allegedly participated in the scheme by, among other things,

> concealing Sethna's activities, by falsifying records to conceal the scheme from [Capital 7], by falsifying records, including expense reports, to inflate the day-to-day costs of running 3 Leaf to conceal siphoned money, by making misrepresentations to [Capital 7] and its representatives regarding the amounts recouped from 3 Leaf's supposed customers, and by generally bolstering Sethna's assurances at meetings with Defendants and [Capital 7's] representatives regarding 3 Leaf that 3 Leaf's business was operating smoothly.

(*Id.* ¶ 64.)

Finally, in October 2016, defendants removed Capital 7 and its representatives as co-signatories on accounts held by 3 Leaf, "effectively seizing 3 Leaf's assets." (SAC ¶ 58.) The

seized accounts included accounts from Empire State Bank, Astoria Bank, and Bank of America holding $91,000, $25,800, and $500 respectively.  (*Id.* ¶ 59.)

## II.    Complaint

Capital 7 filed its complaint in this action on April 20, 2017.  (Doc. No. 1.)  Since then, Capital 7 has filed two amended complaints.  (Amended Complaint (Doc. No. 4); SAC.)  The Second Amended Complaint is now the operative pleading in this action.

In its Second Amended Complaint, Capital 7 brings two claims under the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. § 1961 *et seq.*  Capital 7 brings its first RICO claim under 18 U.S.C. § 1962(c), alleging that defendants operated an enterprise affecting interstate commerce by which they engaged in a pattern of racketeering activity that included wire fraud, money laundering, and extortion.  (SAC ¶¶ 426–27.)  As the basis for the wire fraud predicate acts, Capital 7 points to defendants' alleged practices of using the wires to misrepresent 3 Leaf's business deals, to conceal and further the scheme, and "to siphon money from 3 Leaf and Plaintiffs via the diversion of automatic transfers of monies from 3 Leaf's customers into accounts controlled by Defendants."  (*Id.* ¶¶ 427–29.)  As the basis of the money laundering predicate acts, Capital 7 points to defendants' use of "the proceeds from their wire fraud to further finance their illegal scheme."  (*Id.* ¶ 77.)  As the basis for the extortion predicate acts, Capital 7 points to defendants' alleged threats of violence made to 3 Leaf employees while demanding a portion of the employees' wages, as well as to threats of violence directed at Capital 7 representatives in response to demands for "transparency" from Capital 7.  (*Id.* ¶ 427.)

Capital 7 also brings a RICO conspiracy claim under 18 U.S.C. § 1962(d) based on the same alleged conduct, claiming that defendants "knowingly and willfully . . . agreed, combined

and conspired to conduct and participate, directly and indirectly, in the . . . Enterprise's affairs through a pattern of racketeering activity."  (SAC ¶ 436.)

In addition to these RICO claims, Capital 7 brings state law claims of fraud, aiding and abetting fraud, and unjust enrichment against all defendants, including John Doe defendants 1– 15, (SAC ¶¶ 444–64), as well as breach of contract and conversion claims against the Sethna defendants and Laljie defendants only, (*Id.* ¶¶ 465–75.)

On July 25, 2017, this Court issued a RICO Case Management Order directing plaintiff to file a statement outlining his RICO claims and the facts supporting those claims.  (Order of 7/25/2017.)  On February 1, 2018, Capital 7 filed its RICO Case Management Statement.  (RICO Case Statement (Doc. No. 33).)

### III.    Motions to Dismiss and to Disqualify Counsel

On June 21, 2019, the Sethna defendants filed a motion to dismiss the Second Amended Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) and a motion to disqualify Capital 7's counsel, Gary Tsirelman.  (Memorandum of Law in Support of Motion to Dismiss by Sethna, Wagenheim, and Wingfield ("Sethna Defs.' Mot.") (Doc. No. 78-1).)  On the same day, the Laljie defendants moved to dismiss the Second Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).  (Memorandum of Law in Support of Motion to Dismiss by Laljie, Rabito, First Choice, and Prestige ("Laljie Defs.' Mot.") (Doc. No. 81).)

### A.    Sethna, Wagenheim, and Wingfield's Motions

The Sethna defendants first argue that Capital 7 has not pled sufficient facts to establish a violation of RICO, and that this Court must therefore dismiss the action for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1).  (Sethna Defs.' Mot. at 6.)[1]

---

[1] All page numbers refer to pagination assigned by the Court's Electronic Case Filing system.

They contend that Capital 7 fails to plead a "pattern of racketeering activity" under RICO because Capital 7 fails to allege racketeering activity with sufficient particularity. (*Id.* at 8–11.) The Sethna defendants characterize Capital 7's allegations that defendants used phony transactions and sham customers to siphon Capital 7's investment in 3 Leaf as "speculative" and "conclusory," arguing that the allegations "do not even make sense." (*Id.* at 10.) Instead, the Sethna defendants maintain, the Second Amended Complaint only describes "business deals gone sour," where 3 Leaf customers defaulted, and does not explain how the money was siphoned by defendants. (*Id.* at 10–11.) The Sethna defendants go on to argue that the Second Amended Complaint does not include sufficiently particularized facts to make out the alleged predicate acts of extortion, wire fraud, or money laundering. (*Id.* at 11–13.) The Sethna defendants also argue that Capital 7 fails to allege the existence of an "enterprise" under the RICO Act and that Capital 7 fails to allege defendants' "operation or management" of the enterprise. (*Id.* at 13–15.)

The Sethna defendants also move to dismiss the Second Amended Complaint under Federal Rule of Civil Procedure 12(b)(6), arguing that Capital 7 fails to adequately plead a RICO conspiracy claim under § 1962(d). (Sethna Defs.' Mot. at 15–16.) Defendants argue that Capital 7 pleads only a conclusory allegation that defendants conspired to violate the RICO Act and contains no specific allegations regarding an agreement among defendants to conduct the alleged scheme or to commit the alleged predicate acts. (*Id.* at 16–17.)

Finally, the Sethna defendants move to disqualify Capital 7's counsel, Gary Tsirelman, pursuant to the advocate-witness rule. (Sethna Defs.' Mot. at 17.) Defendants point to text messages submitted with their motion, (*id.*, exs. A–G), which they claim show that Tsirelman was involved in 3 Leaf "as an owner or funder," (*id.* at 18). Defendants also point to an email

from Tsirelman relating to a person named "Farid," who the Sethna defendants claim twice

"used violence to intimidate Mr. Sethna," and argue that Tsirelman is a witness regarding these

acts of violence. (*Id.* at 19.) The Sethna defendants assert that Tsirelman will be "an important

witness" in this case and his role as Capital 7's counsel "raises a significan[t] issue with respect

to which the attorney is a witness and the availability of other evidence of the same facts." (*Id.*

at 20.)

In response, Capital 7 first argues that it has pled a pattern of racketeering activity that

satisfies the particularity requirement of Federal Rule of Civil Procedure 9(b). (Capital 7's

Memorandum of Law in Opposition to Defendants' Motions to Dismiss ("Opp. Mot.") (Doc. No.

79) at 10.) Capital 7 argues that where a plaintiff's wire fraud claim is based on use of the wires

in furtherance of a fraudulent scheme, Rule 9(b) only requires that plaintiffs plead the

circumstances of the overall scheme involving defendants – and that Capital 7 has adequately

pled such facts. (Opp. Mot. at 11–12.)

Capital 7 next argues that it has adequately pled a pattern of racketeering activity. (Opp.

Mot. at 12.) Capital 7 notes that the racketeering acts described in the Second Amended

Complaint are alleged to be defendants' "regular way of doing business" and that the alleged

enterprise was created for the purpose of facilitating the racketeering acts described. (*Id.* at 13.)

Capital 7 goes on to note that the Court must ignore the Sethna defendants' factual allegations

and denials of facts plead in the Second Complaint in adjudicating a motion to dismiss. (*Id.* at

13–14.) Capital 7 also argues that it has adequately pled the existence of a RICO enterprise – 3

Leaf – which it alleges Wagenheim participated in as Chief Technology Officer and Sethna

participated in by orchestrating the scheme and coordinating deals with sham customers. (*Id.* at

16–17.)

Capital 7 opposes the motion to dismiss the RICO conspiracy claim by arguing that the primary RICO violation they plead in the Second Amended Complaint provides sufficient allegations to support a claim that defendants engaged in the conduct, including the money laundering and wire fraud predicate acts, as "part of an agreed-upon scheme." (Opp. Mot. at 18.)

Finally, Capital 7 opposes the motion to disqualify their counsel Gary Tsirelman. (Opp. Mot. at 19.) Capital 7 argues that disqualification based on the advocate-witness rule requires clear and convincing evidence that the lawyer will testify at trial in a manner prejudicial to the client. (*Id.* at 20.) Here, Capital 7 maintains, the Sethna defendants fail to point to a specific fact issue on which Tsirelman would need to testify. (*Id.* at 20.) Capital 7 argues that the motion should be denied as premature, given that the need for Tsirelman's testimony has not been established, that any trial in this matter is not imminent, and that defendants have not established that Tsirelman will even be the attorney handling the trial. (*Id.* at 20–21.) Lastly, Capital 7 notes that the only attorney to appear on behalf of Capital 7 in this matter has been Nicholas Bowers – of Gary Tsirelman, P.C. – and that the Sethna defendants make no argument in favor of disqualifying Bowers or Tsirelman's law firm. (*Id.* at 21.)

In reply, the Sethna defendants reiterate their claim that Capital 7's allegations are insufficient to make out a RICO conspiracy claim, (Reply in further support of Sethna, Wagenhein, and Wingfield's Motion to Dismiss ("Reply") (Doc. No. 80) at 8–9), that Capital 7 pleads inadequate support to establish a pattern of racketeering, (Reply at 9–12), and that Capital 7 fails to plead an "enterprise" within the meaning of the RICO Act because "[t]he only person in this case or complaint is Seth[na]" and Capital 7 fails to provide adequate detail to support its allegations, (*id.* at 13–15). Finally, the Sethna defendants further support their motion to

disqualify by arguing that the fact that Tsirelman "may be a witness" in the suit is an adequate basis for his disqualification.  (Reply at 17 (emphasis omitted).)

### B.  Laljie, Rabito, First Choice, and Prestige's Motion to Dismiss

In support of their motion to dismiss, the Laljie defendants first argue that the Second Amended Complaint fails to allege the Laljie defendants' involvement in the RICO predicate acts with sufficient particularity.  (Laljie Defs.' Mot. at 4–6.)  The Laljie defendants also argue that Capital 7 fails to plead the elements to establish defendants' involvement in an "enterprise" or to establish a "pattern of racketeering" under the RICO Act.  (*Id.* at 6–7.)  In the absence of an underlying RICO violation, and given the absence of a sufficiently alleged agreement among defendants, the Laljie defendants argue, Capital 7's RICO conspiracy claim must be dismissed as well.  (*Id.* at 7.)

The Laljie defendants also seek dismissal of Capital 7's state law claims.  They argue that Capital 7's fraud claims fall short of the Federal Rule of Civil Procedure 9(b) requirement that fraud claims be pled with particularity.  (Laljie Defs.' Mot at 7.)  The Laljie defendants go on to argue that Capital 7's fraud, conversion, and unjust enrichment claims are pled with "broad and generic allegations" and fail to sufficiently plead the elements of any of these claims.  (*Id.* at 8.)  Regarding Capital 7's breach of contract claims, the Laljie defendants argue that the allegations of a breach have not been pled with the requisite specificity.  (*Id.* at 8–10.)  Finally, to the extent that Capital 7 has failed to adequately plead a violation of the RICO Act, the Laljie defendants argue, the Court should dismiss the federal claims and decline to exercise supplemental jurisdiction over the remaining state law claims.  (*Id.* at 10.)

Capital 7 did not file an opposition to the Laljie defendants' motion.

## STANDARD OF REVIEW

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A complaint need not contain "detailed factual allegations," but it must contain "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).  That is, a complaint must include "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 570).  The determination of whether "a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 678 (citing *Iqbal v. Hasty*, 490 F.3d 143, 157–58 (2d Cir. 2007)).  Failure to oppose a motion to dismiss is not a sufficient basis for granting dismissal. *See McCall v. Pataki*, 232 F.3d 321, 322–23 (2d Cir. 2000).

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000) (citing Fed. R. Civ. P. 12(b)(1).)  A defendant's Rule 12(b)(1) motion may be a "facial" or "factual" challenge.  "When the Rule 12(b)(1) motion is facial, *i.e.*, based solely on the allegations of the complaint or the complaint and exhibits attached to it . . . , the plaintiff has no evidentiary burden.  The task of the district court is to determine whether the Pleading alleges facts that affirmatively and plausibly suggest that the

plaintiff has standing to sue."  *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56 (2d Cir. 2016)

(internal citation and quotation marks omitted) (alteration omitted).  On the other hand, in a

factual challenge to the Court's jurisdiction, a defendant may submit evidence challenging the

factual underpinning of the Court's jurisdiction.  *See id.* at 57.  "However, the plaintiffs are

entitled to rely on the allegations in the Pleading if the evidence proffered by the defendant is

immaterial because it does not contradict plausible allegations that are themselves sufficient to

show standing."  *Id.*

Federal Rule of Civil Procedure 9(b) provides, "In alleging fraud or mistake, a party must

state with particularity the circumstances constituting fraud or mistake."  "[I]n order to comply

with Rule 9(b), 'the complaint must: (1) specify the statements that the plaintiff contends were

fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4)

explain why the statements were fraudulent.'"  *Mills v. Polar Molecular Corp.*, 12 F.3d 1170,

1175 (2d Cir. 1993).

## DISCUSSION

## I.  Capital 7's § 1962(c) Claim

### A.  Applicable Law

18 U.S.C. § 1962(c) provides,

> It shall be unlawful for any person employed by or associated with any enterprise
> engaged in, or the activities of which affect, interstate or foreign commerce, to
> conduct or participate, directly or indirectly, in the conduct of such enterprise's
> affairs through a pattern of racketeering activity or collection of unlawful debt.

To allege a violation of § 1962(c) "a plaintiff must show '(1) conduct (2) of an enterprise (3)

through a pattern (4) of racketeering activity.'"  *DeFalco v. Bernas*, 244 F.3d 286, 306 (2d Cir.

2001) (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985)).  The legal

requirements for satisfying each of these pleading requirements are elucidated in the sections that

follow.  In general, however, "a plaintiff must establish that a defendant, through the commission

of two or more acts constituting a pattern of racketeering activity, directly or indirectly

participated in an enterprise, the activities of which affected interstate or foreign commerce."  *Id.*

at 306.

### B.   The Enterprise

Both the Sethna and Laljie defendants argue that Capital 7 fails to adequately allege that

defendants were involved in an "enterprise."  (Sethna Defs.' Mot. at 13–14; Laljie Defs.' Mot. at

6–7.)  For the purposes of the RICO Act, an "enterprise" is defined to "include[] any individual,

partnership, corporation, association, or other legal entity, and any union or group of individuals

associated in fact although not a legal entity."  18 U.S.C. § 1961(4).  While the "statute does not

does not specifically define the outer boundaries of the 'enterprise' concept," *Boyle v. United*

*States*, 556 U.S. 938, 944 (2009), in general, "RICO requirements are most easily satisfied when

the enterprise is a formal legal entity," *First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385

F.3d 159, 173 (2d Cir. 2004).  In addition to pleading the existence of an enterprise, a RICO

plaintiff must further plead "a nexus between the enterprise and the racketeering activity that is

being conducted."  *First Capital Asset Mgmt., Inc.*, 385 F.3d at 174 (citing *United States v.*

*Indelicato*, 865 F.2d 1370, 1384 (2d Cir. 1989) (en banc)).

Capital 7 maintains that the enterprise at the heart of defendants' scheme was 3 Leaf, a

limited liability company formed as a joint venture formed by defendant Wingfield and Capital

7.  (SAC ¶¶ 26–35; SAC, Ex. A; *see also* RICO Case Statement at 6.)  Because Capital 7 alleges

an enterprise that was a separate legal entity, defendants' arguments that this action should be

dismissed because Capital 7 does not allege that defendants shared "a common purpose" miss the

mark.  (Sethna Defs.' Mot. at 14 ("Plaintiff's complaint fails to allege that all the Defendants

share a common purpose to engage in a particular course of conduct and work together to achieve their goal."); *see also* Laljie Defs.' Mot. at 6.)  Courts scrutinize RICO defendants' shared common purpose when an association-in-fact enterprise is alleged – not where, as here, the alleged enterprise is a legal entity separate from the defendants.  *See First Capital Asset Mgmt., Inc.*, 385 F.3d at 174 (noting that to plead an enterprise comprised of an association of individuals, "the individuals must share a common purpose to engage in the particular fraudulent course of conduct"); *see also United States v. Turkette*, 452 U.S. 576, 583 (1981).  As evidenced by the joint venture agreement appended to Capital 7's Second Amended Complaint, 3 Leaf constituted a legal entity separate from defendants.  (SAC, Ex. A.)

For much the same reason, and contrary to defendants' arguments, Capital 7 pleads an enterprise distinct from the people engaged in the alleged racketeering activity.  (*See* Laljie Defs.' Mot. at 7 ("Capital 7 fails to adequately plead the existence of an 'enterprise' separate and distinct from the people conducting the alleged racketeering activity.").)  Legal entities like 3 Leaf are by their nature distinct from the individuals alleged to be conducting the racketeering activity.  *See First Capital Asset Mgmt., Inc.*, 385 F.3d at 173 (citing cases and explaining that because a RICO enterprise must be "distinct from the person conducting the affairs of the enterprise," it is the case that "RICO requirements are most easily satisfied when the enterprise is a formal legal entity").  Nor is the distinctness requirement complicated by alleging defendant Wingfield's involvement in the enterprise.  *See Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.*, 30 F.3d 339, 344 (2d Cir. 1994) (noting that the distinctness requirement "does not foreclose the possibility of a corporate entity being held liable as a defendant under section 1962(c) where it associates with others to form an enterprise that is sufficiently distinct

from itself").  Capital 7 pleads sufficient facts in Second Amended Complaint in support of the

conclusion that 3 Leaf was an enterprise distinct from defendants.

Finally, Capital 7 pleads a sufficient nexus between 3 Leaf and the racketeering acts it

alleges.  Capital 7 alleges that defendants formed 3 Leaf "as a vehicle from which to siphon

money for their personal use" by "steal[ing] as much money from Plaintiffs as possible."  (SAC

¶¶ 2–3.)  More specifically, Capital 7 alleges that defendants' "core scheme was to illegally

siphon money from [Capital 7] and to steal the proceeds of any [3 Leaf] purchase agreement by

depositing the proceeds from any [3 Leaf] funding agreement into Wingfield's accounts and

refusing to transfer money owed to 3 Leaf."  (SAC ¶ 38.)  Capital 7's second amended complaint

not only details how defendants allegedly engaged in wire fraud and money laundering while

using 3 Leaf as a vehicle to make sham loans to purported customers, but also how defendants

extorted 3 Leaf employees in order to obtain portions of their paychecks, and extorted Capital 7

representatives to prevent them from collecting on money owed to 3 Leaf.  (SAC ¶¶ 35–39, 164,

427.)  Insofar as 3 Leaf was the conduit through which defendants allegedly siphoned money

from Capital 7, and that defendants allegedly used 3 Leaf business deals and employees in their

alleged racketeering activities, Capital 7 adequately pleads a "nexus" between the 3 Leaf

enterprise and the racketeering activity alleged.  *First Capital Asset Mgmt., Inc.*, 385 F.3d at 174.

### C.  Defendants' Involvement in the Enterprise

As the Second Circuit has explained, "For RICO purposes, simply establishing the

presence of an enterprise is not enough.  Plaintiffs must also allege that the defendants conducted

or participated, directly or indirectly, in the conduct of such enterprise's affairs through a pattern

of racketeering activity."  *First Capital Asset Mgmt., Inc.*, 385 F.3d at 175–76 (citing 18 U.S.C.

§1962(c)) (internal quotation marks omitted).  This inquiry as to whether the defendant

"conducted or participated" in the enterprise means that the defendant must have had "some part in directing [the enterprise's] affairs." *Id.* at 176 (quoting *Reves v. Ernst & Young*, 507 U.S. 170, 177–79 (1993)).  "In this Circuit, the 'operation or management' test typically has proven to be a relatively low hurdle for plaintiffs to clear, . . . especially at the pleading stage." *First Capital Asset Mgmt., Inc.*, 385 F.3d at 176 (citations omitted).

Liability for corporate defendants need not be established directly – corporations' liability for violations of the RICO Act may also be established based on vicarious liability. However, "Courts within the Second Circuit generally do not impose vicarious liability under RICO unless the corporate defendant is a 'central figure' in the RICO scheme." *Mikhlin v. HSBC*, No. 08-CV-1302 (CPS), 2009 WL 485667, at *8 (E.D.N.Y. Feb. 26, 2009) (quoting *Qatar Nat. Navigation & Transp. Co., Ltd. v. Citibank, N.A.*, 1992 WL 276565, at *7 (S.D.N.Y. Sept. 29, 1992), *aff'd*, 182 F.3d 901 (2d Cir. 1999)).

Capital 7 pleads ample facts to establish the involvement of Sethna, Wagenheim, Laljie, and Rabito (the "individual defendants") in the "operation or management" of 3 Leaf.  The Second Amended Complaint specifically alleges the individual defendants' particular job responsibilities in the 3 Leaf and Wingfield organizations, as well as details about Laljie, Wagenheim, and Rabito's alleged roles in covering up the various money siphoning schemes that Sethna allegedly directed at 3 Leaf.  (SAC ¶¶ 26–32, 37, 63–66.)

The Second Amended Complaint also includes sufficient facts to establish Wingfield's involvement in 3 Leaf.  Wingfield was Capital 7's partner in creating the 3 Leaf joint venture, (*id.*, Ex. A), Laljie, Wagenheim, and Rabito were Wingfield executives during the time of the alleged scheme, (*id.* ¶¶ 15–17), and Wingfield made sham purchases and received money owed to 3 Leaf as part of the alleged scheme, (*see* ¶¶ 38, 50, 87–95).  Each of the individual

defendants, as well Wingfield, is alleged to have played a role in conducting 3 Leaf's affairs. Capital 7 thus meets the "low hurdle" for establishing these defendants' individual involvement in the alleged enterprise at this early pleading stage.  *First Capital Asset Mgmt., Inc.*, at 176.

Capital 7 does not plead adequate facts to establish the involvement of defendants Prestige and First Choice.  Capital 7 alleges that Sethna is the "true owner and CEO" of both of these corporations, but fails to allege any substantial facts about these corporations' role in the scheme.  (SAC ¶ 14.)  The most Capital 7 alleges about either of these defendants is that "Wingfield and/or Prestige" leased office space for 3 Leaf.  (*Id.* ¶ 25.)  Capital 7 also does not plead facts supporting liability for Prestige and First Choice under a vicarious liability theory, as Capital 7 pleads no facts to support the conclusion that Prestige and First Choice were "central figures" in the RICO scheme.  *See Mikhlin*, 2009 WL 485667, at *8.  The facts alleged thus fall short of establishing either Prestige or First Choice's role in the operation or management of the enterprise.  Capital 7's § 1962(c) claim against Prestige and First Choice is therefore dismissed.

### D.  Pattern of Racketeering Activity

To state a claim under § 1962(c), Capital 7 must also allege that defendants' enterprise harmed Capital 7 by engaging in a "pattern of racketeering activity" consisting of "at least two [predicate] acts of racketeering activity committed in a ten-year period which amount to or pose a threat of continued criminal activity."  *First Capital Asset Mgmt., Inc.*, at 178 (citations and internal quotation marks omitted).

Capital 7 alleges predicate acts of wire fraud, money laundering, and extortion in its Second Amended Complaint.  (SAC ¶¶ 54–57, 68–86, 427.)  The Sethna and Laljie defendants argue that Capital 7 fails to plead facts to support a wire fraud predicate act with the particularity required by Federal Rule of Civil Procedure 9(b).  (Sethna Defs.' Mot. at 8–11; Laljie Defs.'

22

Mot. at 4–6.)  As explained below, Capital 7 sufficiently pleads a pattern of racketeering activity based on wire fraud, as well as Sethna, Wagenheim, Laljie, Rabito, and Wingfield's roles in that activity.  Because the wire fraud allegations satisfy the requirements for pleading a pattern of racketeering activity under RICO, the Court need not address the other predicate acts alleged in Capital 7's Second Amended Complaint.

### 1. Wire Fraud

#### i. Applicable Law

Federal wire fraud is comprised of three elements: "(1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) use of the mails or wires to further the scheme." *United States v. Greenberg*, 835 F.3d 295, 305 (2d Cir. 2016) (citation and internal quotation marks omitted).  To constitute a "scheme to defraud" in violation of the federal wire fraud statute, "the actual transmissions that use the mails and wires do not have to be false or contain misrepresentations—only the scheme must be fraudulent." *City of New York v. Cyco.Net, Inc.*, 383 F. Supp. 2d 526, 552 (S.D.N.Y. 2005) (citation and quotation marks omitted).  In the context of a civil RICO pleading alleging wire fraud, a plaintiff must also plead scienter by either "(1) identify[ing] circumstances indicating conscious or reckless behavior by the defendants, or (2) alleg[ing] facts showing a motive for committing fraud and a clear opportunity for doing so." *Bigsby v. Barclays Capital Real Estate, Inc.*, 298 F. Supp. 3d 708, 717 (S.D.N.Y. 2018) (quoting *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 813 (2d Cir. 1996)).

While the heightened pleading requirement of Rule 9(b) applies to fraud allegations, the specificity required under Federal Rule of Civil Procedure 9(b) changes with the nature of the fraud allegations.  Where the allegations focus on "specific statements or mailings [that] were

themselves fraudulent, the complaint should specify the fraud involved, identify the parties responsible for the fraud, and state where and when the fraud occurred." *Aiu Ins. Co. v. Olmecs Med. Supply, Inc.*, No. 04-CV-2934 (ERK), 2005 WL 3710370, at *11 (E.D.N.Y. Feb. 22, 2005). In contrast, "in cases in which the mail [or wires were] simply used in furtherance of a master plan to defraud . . . and a detailed description of the underlying scheme and the connection therewith of the mail and/or wire communications, is sufficient to satisfy Rule 9(b)." *Id.* This is because courts "do not regard mailings [or wire communications] in furtherance of the scheme, but which are not themselves false or misleading, as 'averments of fraud' within the language of Rule 9(b)." *Spira v. Nick*, 876 F. Supp. 553, 559 (S.D.N.Y. 1995); *see also Sanchez v. ASA Coll., Inc.*, No. 14-CV-5006 (JMF), 2015 WL 3540836, at *6 (S.D.N.Y. June 5, 2015).

### ii.  Wire Fraud at 3 Leaf

Capital 7 alleges a scheme that relied on wire fraud to operate.  As detailed in the Second Amended Complaint, defendants repeatedly approached Capital 7 with new businesses to which 3 Leaf could extend a loan.  As outlined in the complaint, many of these businesses allegedly colluded with defendants to receive the money under the pretense of needing a loan.  In each case, Capital 7, or possibly 3 Leaf, funded the loan – not Wingfield or any of the other defendants.  In some cases, the businesses would pay back the loan via daily automated transfers, but defendants would eventually divert these payments to accounts they controlled.  In other cases, defendants would report that the business receiving the loan had defaulted shortly after the loan was issued, take back much of the original loan amount through automatic payments made to accounts controlled by defendants, and ultimately transfer only a portion of that recovered amount back to 3 Leaf.

Capital 7 pleads substantial facts regarding a loan fitting the first pattern made by 3 Leaf to Texas-based Carillo Trucking.  (SAC ¶¶ 87–101.)  Defendants allegedly received Carillo's automatic payments in Wingfield's accounts, sent some of those payments onto 3 Leaf, and eventually diverted the payments from Wingfield to other accounts defendants controlled.  (*Id.*)  In doing so, defendants used a series of interstate bank transfers between Carillo, Wingfield, 3 Leaf, and other accounts defendants controlled to siphon the money Capital 7 believed it had invested in Carillo.  (*Id.*)

Capital 7 describes a loan fitting the second pattern made by 3 Leaf to Georgia-based Postal Hiring Authority in February 2016.  (SAC ¶¶ 188–99.)  After Postal Hiring Authority had defaulted on the $200,000 cash loan, defendants allegedly "diverted" automatic payments from Postal Hiring Authority between February 11, 2016, and August 9, 2016, into accounts under defendants' control, under the pretense of recovering the amount of the loan.  (*Id.* ¶¶ 196–98.)  3 Leaf ultimately received only $133,333 of the original loan amount, meaning at least $66,667 in cash from the original loan, less any kickback, was taken by defendants.  (*Id.* ¶ 199.)

Capital 7 provides detailed accounts of allegedly transactions matching this pattern with respect to 3 Leaf loans made to Maineville, Ohio-based RGV Contracting, LLC, (SAC ¶¶ 227–40), Chino Hills, California-based Grandpark, Corp., (*id.* ¶¶ 241–54), Charleston, South Carolina-based L & B Snacks, LLC, (*id.* ¶¶ 295–307), and a number of other companies.  In each case, Sethna is alleged to have falsely represented the company as a bona fide customer when in fact defendants are alleged to have recruited the business to participate in the scheme in exchange for a kickback.  (*See, e.g.*, *id.* ¶¶ 296, 302.)

Capital 7 also alleges that each loan made included a payment of about 10% of the value loaned from 3 Leaf to Wingfield, purportedly to be paid to a third-party broker who had arranged

the loan.  (SAC ¶¶ 73; *see, e.g.*, SAC ¶¶ 91, 93.)  In reality, 3 Leaf alleges, no third-party broker

was used, as the companies to which 3 Leaf loaned money were colluding with defendants.

Defendants allege that Wingfield fraudulently obtained thousands of dollars with each loan 3

Leaf made by falsely representing that 3 Leaf needed to pay a non-existent third-party broker.  In

each case, Capital 7 alleges that Sethna refused to identify the third-party broker used or to

provide proof that the payments made to Wingfield were ever paid to a third party.  (*See, e.g.*, ¶

94.)

In the schemes detailed above, defendants would transfer money between 3 Leaf, Capital

7, Wingfield, out of state third-party businesses, and other defendant-controlled accounts in the

course of perpetrating the alleged fraud.  These allegations about the role fraudulent bank

transfers played in defendants' scheme are sufficient on their own to state a claim for wire fraud.

In *Bascuñán v. Elsaca*, the plaintiff alleged that defendant Elsaca created the New York-

based Capri Star Trust for the purpose of funding the plaintiff's charitable contributions.  927

F.3d 108, 112 (2d Cir. 2019).  In reality, the plaintiff alleged, Elasca created the trust, which held

assets that were already actively managed by a bank, so that Elasca could name himself an

investment advisor for the trust and charge it sham advisory fees.  *Id.* at 112–13.  Elasca

provided no advice and created the trust for the sole purpose of generating fees for himself, fees

which he directed the bank managing the assets to pay to him.  *Id.*  The Second Circuit explained

that the plaintiff's allegation amounted to a claim that Elasca "created the bogus Capri Star Trust

. . . and then used domestic mail and wires to order UBS . . . to transfer millions of dollars from

that account to himself . . . ."  *Id.* at 123.  This allegation, the Court explained, "support[ed] a

reasonable inference that the repeated use of domestic mail and wires to fraudulently order a

domestic bank to transfer millions of dollars out of a domestic account was a core component of the alleged scheme to defraud." *Id.*

Here, too, Capital 7 alleges a wide-ranging scheme through which defendants knowingly used the wires as "a core component" of a scheme to defraud Capital 7. Capital 7 alleges in its Second Amended Complaint that defendants regularly used telephones and cell phones to further their fraudulent scheme, (SAC ¶¶ 68, 72, 73, 74), but even more simply, the alleged scheme depended upon defendants using the wires to direct sham bank transfers between the accounts and point of sale providers of businesses located across the country, as well as accounts controlled by defendants, Capital 7, and 3 Leaf. (*Id.* ¶ 69, 86.)

Defendants do not substantially dispute that the allegations, as pled, satisfy the elements of the federal wire fraud statute. They instead spend much of their respective motions disputing the factual content of Capital 7's complaint, (*see* Sethna Defs.' Mot. at 9–11), and arguing that Capital 7 fails to plead adequate details regarding "how the money was stolen," (Sethna Defs.' Mot. at 10; *see also* Laljie Defs.' Mot. at 5). On the contrary, however, Capital 7 pleads a "detailed description" of Capital 7's underlying scheme and the "connection therewith of . . . wire communications," and therefore satisfies Rule 9(b) in pleading a series of RICO predicate acts of wire fraud. *Aiu Ins. Co.*, 2005 WL 3710370, at *11. Capital 7 also adequately pleads scienter, as it alleges with respect to individual defendants "a motive for committing fraud" – siphoning money from Capital 7 for their personal gain – and "a clear opportunity for doing so." *Bigsby*, 298 F. Supp. 708 at 717.

### iii.  Allegations of Wire Fraud with Respect to Each Defendant

For the wire fraud predicate acts to serve as the basis of its RICO claim, Capital 7 must also plead facts showing that each defendant engaged in the wire fraud predicate acts alleged.

"To constitute a mail or wire fraud violation it is not necessary to show that defendants actually mailed or wired anything themselves; it is sufficient if they caused it to be done." *City of New York v. Smokes-Spirits.com, Inc.*, 541 F.3d 425, 446 (2d Cir. 2008) (alterations and citation omitted), *rev'd and remanded sub nom. on other grounds*, *Hemi Grp., LLC v. City of New York, N.Y.*, 559 U.S. 1 (2010).

The Laljie defendants argue that the Second Amended Complaint should be dismissed because Capital 7 "repeatedly alleges" conduct by "the defendants" and "fail[s], as required, to allege with any specificity or particularity what the defendants did or said." (Laljie Defs.' Mot. at 4.) This is not the standard. While "a bare allegation of an individual defendant's affiliation with entities allegedly committing fraudulent acts is not enough to satisfy" the Rule 9(b) heightened pleading requirement, "Rule 9(b) does not require Plaintiffs to allege a 'specific connection between fraudulent representations ... and particular defendants ... where ... defendants are insiders or affiliates participating in the [allegedly fraudulent conduct] in question.'" *Angermeir v. Cohen*, 14 F. Supp. 3d 134, 147 (S.D.N.Y. 2014) (alterations in original) (quoting *DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir. 1987)). In other words, because Capital 7 pleads a scheme to use the wires to defraud, Capital 7 can adequately allege the wire fraud claim against the individual defendants by pleading their knowing participation in the overall scheme – and does not need to plead facts regarding each individual defendant's particular fraudulent acts. *Cf. Mills*, 12 F.3d at 1175 ("The mere fact that the Directors were controlling persons at Polar does not link them to the statements; the plaintiffs also had to allege that the Directors *personally* knew of, or participated in, the fraud.").

Although the Second Amended Complaint includes more detail about Sethna's conduct in particular, it is not devoid of allegations about the other defendants' participation in the

scheme.  As an initial matter, Capital 7 alleges that "Sethna and the other Individual Defendants intended from the beginning to use 3 Leaf to defraud [Capital 7] and to siphon any monies invested into 3 Leaf by [Capital 7]."  (SAC ¶ 34.)  Capital 7 attaches to the Second Amended Complaint the joint venture agreement creating 3 Leaf, signed by Laljie and Wagenheim as representatives of Wingfield.  (*Id.*, Ex. A at 16.)  Wingfield is alleged throughout the complaint to have received bank transfers due to 3 Leaf as part of the alleged fraud and to have made the sham purchases of receivables.  (*Id.* ¶¶ 38, 50, 87–92.)  The Second Amended Complaint also identifies Laljie, Rabito, Wagenheim, and Sethna's particular roles in the Wingfield organization.  (*Id.* ¶¶ 14–17.)  Finally, Capital 7 alleges specific responsibilities for the individual defendants in the 3 Leaf organization:  Wagenheim and Laljie were allegedly responsible for "managing day-to-day operations, including obtaining office equipment, business productivity software, and hiring and managing employees."  (*Id.* ¶ 26; *see also id.* ¶ 32 (noting that Wagenheim, Laljie, and Rabito had responsibility for "perform[ing] c-level executive work, including management of 3 Leaf's operations, finances, and technology.").  In these roles, Capital 7 alleges, Rabito, Laljie, and Wagenheim furthered the scheme by, among other things, "concealing Sethna's activities, and by falsifying records to conceal the scheme from [Capital 7]."  (*Id.* ¶ 64.)

This level of detail satisfies the requirements of Rule 9(b).  For instance, in *Angermeir v. Cohen*, a court in this Circuit denied a motion to dismiss where the "complaint plausibly allege[d] that each Defendant directly participated in the scheme, and because the scheme involved multiple communications with individuals outside of New York, each participant could reasonably foresee that mails and interstate wires would be used in furtherance of the scheme."  14 F. Supp. 3d 134, 149 (S.D.N.Y. 2014) (citation and internal quotation marks

omitted).  With the exception of Prestige and First Choice, Capital 7 alleges the Sethna and

Laljie defendants' knowing participation in the wire fraud alleged – as well as particular details

about each defendant's role in the scheme.  Capital 7 thus adequately alleges wire fraud predicate

acts against the remaining defendants.

### 2.   Racketeering "Pattern"

Defendants also argue that Capital 7 fails to adequately plead a "pattern" of racketeering

activity, as required by the RICO statute.  (Laljie Defs.' Mot. at 7; Sethna Defs.' Mot. at 8.)  The

RICO Act defines a "pattern of racketeering activity" as "at least two acts of racketeering

activity, one of which occurred after the effective date of this chapter and the last of which

occurred within ten years (excluding any period of imprisonment) after the commission of a prior

act of racketeering activity."  18 U.S.C. § 1961(5).  The alleged predicate acts must be (1)

"related," and (2) "amount to or pose a threat of continued criminal activity."  *See Cofacredit,*

*S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 242 (2d Cir. 1999) (citing *H.J. Inc. v. Nw.*

*Bell Tel. Co.*, 492 U.S. 229, 239 (1989)).

"Predicate crimes must be related both to each other (termed 'horizontal relatedness') and

to the enterprise as a whole ('vertical relatedness')."  *Reich v. Lopez*, 858 F.3d 55, 60–61 (2d Cir.

2017) (citing *United States v. Cain*, 671 F.3d 271, 284 (2d Cir. 2012)).  In cases where the

alleged enterprise's "business is racketeering activity" – in other words, the enterprise is not

"primarily a legitimate business" – "horizontal relatedness can be established simply by linking

each act to the enterprise."  *Reich*, 858 F.3d at 61 (quoting *United States v. Coppola*, 671 F.3d

220, 243 (2d Cir. 2012)).  Vertical relatedness "requires that the defendant was enabled to

commit the offense solely because of his position in the enterprise or his involvement in or

control over the enterprise's affairs, or because the offense related to the activities of the

enterprise." *United States v. Burden*, 600 F.3d 204, 216 (2d Cir. 2010) (citing *United States v. Daidone*, 471 F.3d 371, 375 (2d Cir. 2006) (per curiam)).

Capital 7 argues that it has pled facts sufficient to establish an open-ended pattern of racketeering activity.  (Opp. Mot. at 12.)  The Court agrees.  Capital 7 alleges that 3 Leaf was formed with the purpose of siphoning money from Capital 7 through the racketeering predicate acts alleged.  (SAC ¶¶ 2–3.)  Critically, Capital 7 further alleges that the whole of defendants' operation of 3 Leaf was directed toward furthering the scheme.  To the extent 3 Leaf made non-sham loans to real businesses not conspiring with defendants, Capital 7 maintains defendants only "salt[ed] 3 Leaf's customer base with a handful of legitimate customers in order to conceal their scheme." (*Id.* ¶ 44.)  Capital 7 thus alleges *all* of 3 Leaf's business deals – even those with legitimate businesses – were used to further defendants' scheme of siphoning money from Capital 7.  In *SKS Constructors, Inc. v. Drinkwine*, the Court found that the plaintiff had sufficiently pleaded open-ended continuity where the plaintiff alleged that "predicate acts [were] the only way in which [the defendant home improvement business] operated," even if it would be a "difficult fact to establish at trial." *SKS Constructors, Inc. v. Drinkwine*, 458 F. Supp. 2d 68, 80 (E.D.N.Y. 2006).  Because Capital 7 alleges that 3 Leaf's "business [was] racketeering activity," *GICC Capital Corp.*, 67 F.3d at 466, Capital 7 adequately pleads an open-ended pattern of racketeering.

Capital 7 satisfies horizontal relatedness requirement as well because the alleged predicate acts are plainly linked to the 3 Leaf enterprise.  *See Reich*, 858 F.3d at 61.  Finally, Capital 7 adequately alleges vertical relatedness because, as alleged in the complaint, the defendants were "enabled to commit" the predicate acts because of their positions in 3 Leaf and

because of the relationship between the predicate acts and the enterprise's affairs.  *See Burden*, 600 F.3d at 216.

Capital 7 has thus pled sufficient facts to state a claim under § 1962(c) against Sethna, Wagenheim, Laljie, Rabito, and Wingfield.

## II.    Capital 7's § 1962(d) Conspiracy Claim

Capital 7 brings a RICO conspiracy claim under § 1962(d).  (SAC ¶¶ 434–43.)  As the Second Circuit has explained:

> The requirements for RICO's conspiracy charges under § 1962(d) are less demanding than those for substantive violations.  A conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense, but it suffices that he adopt the goal of furthering or facilitating the criminal endeavor.  In the civil context, a plaintiff must allege that the defendant knew about and agreed to facilitate the scheme.

*City of New York v. Bello*, 579 F. App'x 15, 17 (2d Cir. 2014) (internal citation, alterations, and quotation marks omitted).  "A defendant's consent to join a RICO conspiracy may be 'manifested by an assent to commit predicate acts of racketeering,' or 'inferred from circumstantial evidence of the defendant's status in the enterprise or knowledge of the wrongdoing.'"  *Fuji Photo Film U.S.A., Inc. v. McNulty*, 640 F. Supp. 2d 300, 312 (S.D.N.Y. 2009) (quoting *First Interregional Advisors Corp. v. Wolff*, 956 F. Supp. 480, 488 (S.D.N.Y. 1997)).

Capital 7 adequately alleges a RICO conspiracy at this early stage.  As outlined in the preceding sections, with the exception of defendants Prestige and First Choice, Capital 7 pleads non-conclusory allegations of a fraudulent scheme perpetrated by defendants, and includes allegations of the particular roles played by defendants in that scheme.  These allegations, if proven, would likely constitute adequate circumstantial evidence to establish a conspiracy to commit the racketeering described.  *See Fuji Photo Film U.S.A., Inc*, 640 F. Supp. 2d at 312; *see*

*also City of New York v. Chavez*, No. 11-CV-2691 (BSJ), 2012 WL 1022283, at *8 (S.D.N.Y. Mar. 26, 2012).  Furthermore, Capital 7 specifically alleges defendant's roles in the organization and that together they planned, from the beginning, to use 3 Leaf for the alleged scheme.  (SAC ¶¶ 26–32, 34.)  As noted previously, however, Capital 7 pleads no similar facts about the roles of Prestige and First Choice in the alleged scheme.  Accordingly, the § 1962(d) against Prestige and First Choice is dismissed, but the § 1962(d) claim survives against the remaining defendants.

## III.    State Law Claims

Only the Laljie defendants move to dismiss Capital 7's state law claims of fraud, aiding and abetting fraud, unjust enrichment, breach of contract, and conversion.  (SAC ¶¶ 444–75.) With respect to its claims against Prestige and First Choice, this motion to dismiss is granted.  As explained above, the Second Amended Complaint is devoid of specific allegations regarding Prestige and First Choice's role in any of the misconduct alleged; accordingly, Capital 7's state law claims against Prestige and First Choice must be dismissed.  Below, the Court analyzes Capital 7's state law claims against Laljie and Rabito.

### A.    Fraud Claims

Under New York law, "[t]o state a cause of action for fraud, a plaintiff must allege a representation of material fact, the falsity of the representation, knowledge by the party making the representation that it was false when made, justifiable reliance by the plaintiff and resulting injury."  *Kaufman v. Cohen*, 760 N.Y.S.2d 157, 165 (N.Y. App. Div. 2003).  "To establish liability for aiding and abetting fraud, the plaintiffs must show '(1) the existence of a fraud; (2) [the] defendant's knowledge of the fraud; and (3) that the defendant provided substantial assistance to advance the fraud's commission.'"  *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 292 (2d Cir. 2006) (quoting *JP Morgan Chase Bank v. Winnick*, 406 F. Supp. 2d 247, 252 (S.D.N.Y.

2005)).  Given the different pleading requirements, a plaintiff may plead sufficient facts to support a wire fraud predicate act against a defendant while failing to plead sufficient facts to support a fraud claim under state law against the same defendant.  *See Chevron Corp. v. Donziger*, 871 F. Supp. 2d 229, 249–50 (S.D.N.Y. 2012) (noting that the RICO wire fraud scheme "need not otherwise be prohibited by state or federal law, nor need it fit traditional common law concepts of fraud"); *cf. New York State Catholic Health Plan, Inc. v. Acad. O & P Assocs.*, 312 F.R.D. 278, 297 (E.D.N.Y. 2015) ("The statutory offense of wire fraud does not incorporate all of the elements of common-law fraud.").

Finally, the Second Circuit "has read Rule 9(b) to require that a complaint '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004) (quoting *Mills*, 12 F.3d at 1175).

Capital 7 pleads substantial detail about allegedly fraudulent statements made by defendant Sethna, including the dates on which these statements were made and the content of these statements.  For instance, Capital 7 pleads that on February 1, 2016, Sethna falsely told Capital 7 Postal Hiring Authority was a bona fide customer of 3 Leaf, that 3 Leaf owed a $20,000 fee to an ISO broker for arranging the loan, and that defendants would reimburse Capital 7 for its contribution to the cost of the cash loan.  (*See, e.g.*, SAC ¶ 189.)  Capital 7 includes allegations of this sort for each of the loans described in its complaint.  While the Sethna defendants are not seeking to dismiss the state law fraud claim here, the Court notes that the Second Amended Complaint does satisfy the pleading requirements for fraud claims under New York state law and Rule 9(b) with respect to its fraud claim against Sethna.

The detailed pleading of Sethna's allegedly false statements sets in relief the scant detail pled about Laljie and Rabito's alleged false statements.  Capital 7 alleges that Laljie and Rabito performed the "c-level executive work" at 3 Leaf managing the company's operations and finances, (SAC ¶ 32), and attributes misrepresentations to "defendants" generally, (*id.* ¶ 92), but fails to plead specific misrepresentations by Laljie and Rabito in the course of managing this allegedly fraudulent scheme.  Because Capital 7 fails to specify particular statements by Laljie and Rabito that were false, or where and when the statements were made, the Second Amended Complaint fails to state a claim for fraud under New York state law against Laljie and Rabito. *See Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004).  The state law fraud claim against Laljie and Rabito must be dismissed.

The result is different with respect to the aiding and abetting fraud claim.  The well-pled fraud claim against Sethna satisfies the requirement that a plaintiff plead "the existence of a fraud" for the purposes of an aiding and abetting fraud claim.  *See Lerner*, 459 F.3d at 292.  In light of having pled the existence of a fraud, Capital 7 has certainly pled sufficient facts regarding Laljie and Rabito's "knowledge of the fraud" and how they "provided substantial assistance to advance the fraud[]" in their executive roles at 3 Leaf.  *Id.*  Accordingly, Laljie and Rabito's motion to dismiss the aiding and abetting fraud claim against them is denied.

## B.  Unjust Enrichment

"The basic elements of an unjust enrichment claim in New York require proof that (1) defendant was enriched, (2) at plaintiff's expense, and (3) equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover." *Briarpatch Ltd., L.P v. Phoenix Pictures, Inc.*, 373 F.3d 296, 306 (2d Cir. 2004).  Under New York law, however, a plaintiff may not state a claim for unjust enrichment simply by duplicating the allegations

35

underlying a separate tort or contract claim.  *See Koenig v. Boulder Brands, Inc.*, 995 F. Supp. 2d 274, 290 (S.D.N.Y. 2014).  Capital 7's unjust enrichment claim adds no new allegations beyond Capital 7's existing tort and contract claims.  For this reason, the unjust enrichment claim against Laljie and Rabito is dismissed.

### C.  Breach of Contract Claim

"The elements of a breach of contract claim in New York are: (1) the existence of a contract, (2) performance by the party seeking recovery, (3) non-performance by the other party, and (4) damages attributable to the breach."  *RCN Telecom Servs., Inc. v. 202 Ctr. St. Realty LLC.*, 156 F. App'x 349, 350–51 (2d Cir. 2005).  The Laljie defendants present no substantive argument in favor of dismissing this claim; they only generally argue that Capital 7 "makes broad and generic allegations" against Laljie and Rabito.  (Laljie Defs.' Mot. at 8.)

Capital 7 has adequately pled a breach of contract claim against Laljie and Rabito here. Capital 7 alleges that defendants "verbally agreed" to jointly operate 3 Leaf as a "funding company, focusing on purchasing future receivables from businesses in need of short-term funding," and that it was specifically agreed that Laljie and Rabito would manage 3 Leaf's operations and finances.  (SAC ¶¶ 26–32.)  These allegations are supported by a written contract establishing 3 Leaf, signed by Laljie.  (*Id.*, Ex. A.)  Capital 7's allegations that it contributed the agreed-upon capital for funding 3 Leaf, and that defendants failed to perform on their promise to make bona fide short-term loans, are pled with adequate specificity and state a claim for breach of contract under New York state law.

### D.  Conversion

Under New York law, a "conversion takes place when someone, intentionally and without authority, assumes or exercises control over personal property belonging to someone

else, interfering with that person's right of possession." *Colavito v. New York Organ Donor Network, Inc.*, 8 N.Y.3d 43, 49–50 (2006).  The Laljie defendants argue that Capital 7 fails to allege "how any of these defendants exercised unauthorized control over the funds in question." (Laljie Defs.' Mot. at 8.)  On the contrary, Capital 7 specifically alleges that defendants, including Laljie and Rabito, acted to "remove Plaintiff and its representative[s] as co-signatories on 3 Leaf's accounts" in October 2016, and goes on to plead the specific accounts and the amount of money held in each account when seized by defendants.  (SAC ¶¶ 58–59.) Furthermore, Capital 7 repeatedly states that defendants directed money owed to 3 Leaf by purported loan recipients to accounts defendants controlled.  (*See, e.g.*, *id.* ¶ 99.)  "In New York, an unauthorized wire transfer from one bank account to another constitutes conversion." *Newbro v. Freed*, 409 F. Supp.2d 386, 395 (S.D.N.Y. 2006), *aff'd*, No. 06-CV-1722, 2007 WL 642941 (2d Cir. Feb. 27, 2007).  At this early pleading stage, Capital 7 pleads sufficient facts to support a conversion cause of action against Laljie and Rabito.

## IV.      Motion to Disqualify Plaintiff's Counsel

Finally, the Sethna defendants move to disqualify Capital 7's counsel, Gary Tsirelman, arguing that Tsirelman "will certainly become a witness in this case."  (Sethna Defs.' Mot. at 17.)  "To succeed on a motion to disqualify an attorney under the 'Attorney Witness Rule,' a movant must show that the adverse attorney's testimony is both necessary and substantially likely to be prejudicial to the attorney's client." *Kriss v. Bayrock Grp. LLC*, No. 10 CIV. 3959 (LGS) (FM), 2014 WL 2212063, at *10 (S.D.N.Y. May 29, 2014).  Courts determine whether an attorney's testimony is necessary by considering, among other things, "the significance of the matters as to which the attorney's testimony is sought, 'the weight of the testimony, and the availability of other evidence.'" *Id.*  (quoting *Paramount Commc'ns, Inc. v. Donaghy*, 858 F.

Supp. 391, 394 (S.D.N.Y. 1994)).  Testimony is prejudicial where it is "sufficiently adverse to

the factual assertions or account of events offered on behalf of the client, such that the client

might have an interest in . . . discrediting that testimony." *Id.* (quoting *Donaghy*, 858 F. Supp at

395).  The party moving to disqualify the attorney bears the burden of establishing both "what

issues in the case the prejudice may occur and that the likelihood of prejudice occurring is

substantial." *Id.* (quoting *Donaghy*, 858 F. Supp at 395).

Courts in the Second Circuit have consistently recognized that the advocate-witness rule

primarily raises concerns when the attorney will be retained as trial counsel.  *See Amusement

Indus., Inc. v. Stern*, 657 F. Supp. 2d 458, 462 (S.D.N.Y. 2009) (citing cases).  In the early stages

of a case, it is difficult to establish with any certainty what factual issues will be in dispute

should the case go to trial, whether the attorney will in fact be a necessary witness on any of

those issues, and whether the attorney will be the client's trial counsel at all.  Courts thus

regularly deny early-stage motions to disqualify as premature – even where the attorney is

apparently closely involved in the facts of the case.  *See, e.g.*, *Lyman v. City of Albany*, No. 06-

CV-1109 (LEK) (DRH), 2007 WL 496454, at *4 (N.D.N.Y. Feb. 12, 2007) (denying early-stage

motion to disqualify as premature despite the fact that defendant's lawyer was "personally and

directly involved in many of the allegations of fact in the amended complaint" because the

availability of other witnesses to those events and the factual issues to be disputed at trial are still

unknown).

The Sethna defendants fail to point to specific factual issues on which Tsirelman's

testimony would be necessary and prejudicial to his client.  The Sethna defendants do identify

one factual issue for which Tsirelman might serve as a witness – the alleged use of violence by a

man named "Farid" to intimidate Sethna – but they then fail to provide any explanation as to

why this factual issue would be relevant in the instant action.  (Sethna Defs.' Mot. at 19.)

Because the Sethna defendants fail to point to specific factual issues *in this action* on which

Tsirelman's testimony would be necessary, the Court denies the motion to disqualify.  *See Kriss*,

2014 WL 2212063, at *10.  But even if the Sethna defendants had made such a showing, their

motion would still be premature.  While plaintiffs do not state that Tsirelman *will not* be trial

counsel, they do note that, at this early stage, defendants "cannot credibly state that Tsirelman

will actually be the trial advocate in this matter should it go before a jury."  (Opp. Mot. at 20–

21.)  Setting aside whether Tsirelman will ultimately serve as trial counsel, the Sethna defendants

fail to explain why Tsirelman's representation will pose an ethical problem at this early stage.

Accordingly, the Sethna defendants' motion to disqualify Tsirelman as counsel is denied without

prejudice to renewal at a later stage of this litigation.

## CONCLUSION

For the reasons above, the Capital 7's claims against First Choice Payment Systems, Inc.,

and Prestige Investment Associates, Inc., are dismissed – as are Capital 7's fraud and unjust

enrichment claims against Laljie and Rabito.  Otherwise, the Laljie defendants' motion to

dismiss is denied, as is the entirety of the Sethna defendants' motion to dismiss.  The Sethna

defendants' motion to disqualify counsel is also denied.  This action is recommitted to

Magistrate Judge Tiscione for all remaining pre-trial matters, including settlement discussions if

appropriate.

SO ORDERED.

Dated: Brooklyn, New York
      May 29, 2020

*Roslynn R. Mauskopf*

_____

ROSLYNN R. MAUSKOPF
Chief United States District Judge