Undersigned Steven A. Metcalf II herein respectfully submits this memorandum of law in support of the instant Motion for Disqualification of the attorney and law firm of Gary Tsirelman, P.C. (hereinafter "plaintiff's counsel") from representing Plaintiff ("Capital 7") in this case. The basis for the instant application is *inter alia* plaintiff's counsel acquired a personal and proprietary interest in the subject matter of this litigation by virtue of the fact that he is a founding partner/member who invested potentially $300,000.00 (Three Hundred Thousand Dollars) of his personal money into the joint venture at issue here. *Cf. Mickens v. Taylor*, 535 U.S. 162, 174 (2002); *Cheng v. GAF Corp.,* 631 F.2d 1052 (2d Cir., 1980); *Red Ball Interior Demolition Corp. v. Palmadessa,* 908 F. Supp. 1226 (S.D.N.Y. 1996); *Schmidt v. Magnetic Head Corp*., 101 A.D.2d 268, 276, 476 N.Y.S.2d 151, 156 (N.Y. App. Div. 1984).

## I.   PRELIMINARY STATEMENT

1.     From a bird's eye view, the essence of this matter involves two companies from different worlds and walks of life merging into a joint venture. Company One (Plaintiff Capital 7), at the time, sought to invest and be introduced into the business of cash advance.

2.      Based on limited knowledge and experience in such business, Capital 7 sought to learn and partner with Burgis Sethna through his work and experience with the company Wingfield Capital (herein "Wingfield" or "Sethna Defendants") – Company Two.

3.      Thereafter, the creation of Three Leaf Capital LLC (herein "3 Leaf" or "joint venture") came to fruition, and Company One and Company merged.

4.      Within weeks of the merger Sethna Defendants brought two clients to the table, and this "joint venture" took off. In hindsight, or as a litigation posture, Capital 7's expectations were not managed as they thought every dollar on ever single deal was going to be paid back in-full.

5.      The gravamen of this case centers on Capital 7's allegations that Sethna Defendants[1] – after entering a joint business venture with Capital 7 – are liable for violations of the Racketeering Act ("RICO") and related claims.

6.      Yet, Plaintiff's original demands, as noted on the docket sheet are in the amount of $397,000.00. The numbers never made sense in the beginning and still do not add up.

---

[1] As co-defense counsel Daniel Bibb has emphasized time-and-time again throughout this case – he was conveyed the message that all other individuals and corporations were added to the complaint as "throw-in" defendants.

7.    The discovery phases here have taken an astronomical amount of time. Despite all prior disputes, the purpose of this filing is strictly from a factual perspective based on the information elicited in the depositions and the interpretation of Rule 3.7. *See* Sections IV and V at p. 18-35, *Infra*.

8.    Unexpected delay based on the undersigned counsel medical issues have recently surfaced. I have had to deal with my own medical battle for the last five months, which have rendered me at times – for days – physically and mentally unable to work and perform tasks I have completed successfully for over the last decade. While my blood work and tests continue to yield positive results[2] – since November 1, 2024 (our last conference) I still have had to continue this battle, and was extremely ill during this time. With my own personal – medical issues – I neither make this application to delay nor as a personal attack on counsel. Rather, there is an inadvertent issue that should be left to the sound discretion of the Court.

## II.    THE INSTANT APPLICATION IS NOT TO STALL OR DELAY, AND DOES NOT ALLEGE A PERSONAL ATTACK

9.    This is not a personal attack on counsel, or a delay tactic. As Plaintiff will unquestionably argue – the motives behind this motion are somehow personal in nature and done in an effort to delay or stall.

---

[2] On Friday, November 15, 2024, my family received my most recent results, which were extremely positive.

10.    To the contrary, I raised such issue around the time that Rule 12, motions to dismiss were filed. At such time, I was not equipped with the facts that I currently possess. In good faith, the timing of this application is ripe because of the testimony of three plaintiffs during depositions establishing these facts, which I did not have at the time of the first application. After these plaintiff's confirmed pieces to this puzzle, this application was actually raised in the most reasonable amount of time. Without a full set of transcripts, I brought the issue to the Court's attention because I believe such topic is ripe now.[3]

11.    Stalling or delaying would be to sit on this information and wait until a later date, one closer to trial being scheduled for me to raise this issue again and make such application. With that said, I raise this issue because to be a zealous advocate for my clients, and to allow the discretion of this Court to determine how to best proceed in this matter.[4]

---

[3] It is acknowledged that disqualification motions are generally disfavored in the Second Circuit because of the potential and likelihood that such will cause unnecessary delay and are often used by lawyers for tactical advantage. The party seeking disqualification "must meet a high standard of proof." However, when the moving party "has made a substantial showing that a conflict of interest exists and cannot be adequately remedied, the Court must resolve any doubts in favor of disqualification." *Cheng v. GAF Corp.,* 631 F.2d 1052 (2d Cir., 1980); *Red Ball Interior Demolition Corp. v. Palmadessa,* 908 F. Supp. 1226 (S.D.N.Y. 1996).

[4] I have consulted attorneys and staff in proceeding with the instant application, and considered the severity of this application and the effect to these proceedings, and can confidently proceed in good faith, and not for another purpose such as delaying or to accomplish a personal attack. As briefly explained above – the last four-five months I have been suffering with a substantial medical

12.    As this Court may recall – at our November 1, 2024 conference, I asked that co-defense counsel Daniel Bibb be able to opine if I was off base and should reconsider my applications during that conference. The response from attorney Bibb I recall is my request for leave to file a summary judgment motion under rule 56 was premature;[5] but, based on attorney Bibb's observations of the depositions it is clear that plaintiff's counsel has a "substantial financial interest in the outcome of this case".

13.    Attorney Bibb even stated that he intends to notice plaintiff's counsel for a deposition because it is that clear that he has material information regarding the money invested in and collected by plaintiff in this joint venture.

---

issue, so severe that all of my work has been delayed. I have explained my situation to acknowledge and let the parties know that my health has created delay in-and-of itself. Even during the preparation of this application, I became ill for the entirety of four days. Simply put, I am at an unfortunate part of my life where I do not need an excuse to delay. My medical delays are apparent enough where I have two options: one continue to work everyday, as much as I can; or two make a request to withdraw.

[5] As will be further explored in great detail subsequent to this application, Defendant Sethna's November 1, 2024 *request for leave to file* a summary judgment motion will be renewed because: (1) no Plaintiff ever spoke to a single client of the joint venture, (2) Plaintiffs have failed to present a scintilla of proof regarding a single dollar being wrongfully transferred to Defendant Sethna or a company that he owns or controls, and (3) Plaintiffs showing of damages literally fails to establish a single dollar in damages – without speculation and guesswork that clients "had to have continued to pay" after the joint venture dissolved or broke down.

14.    The substantial financial interest raised herein consists of counsel's investment in the joint venture, and the Plaintiff's desire to ensure that money is recovered from such investment.

### III.    DEPOSITIONS ESTABLISH PLAINTIFF'S COUNSEL IS ONE-OF-FIVE INVESTORS IN CAPITAL 7, EQUATING TO A SPECIFIC PERCENTAGE IN CAPITAL 7'S FIFTY PERCENT (50%) INTEREST IN THE JOINT VENTURE AT ISSUE HERE.

15.    In this matter, depositions reveal that not only was Plaintiff's counsel presented throughout the formation and length of the joint venture, but he also invested hundreds of thousands of dollars in the joint venture. Based on his investment, counsel has a specific percentage of Capitol 7, which has a 50 percent interest in the joint venture.

16.    The easiest way to set up depositions for this matter was to schedule four for Plaintiffs, which is all the defense knew about; and four Defendants since four people were named individually.

### A.    *Defendants Have Limited to No Knowledge of Joint Venture – "Throw in Defendants".*

17.    The first three individual defendants did not know much about the structure of Capital 7, including but not limited to, knowing who the clients were, what role the main people played in the business; and more importantly, these

defendants were not privy to the financial components of Capital 7, and how such was invested into the joint venture.

18.    Defendants Laljie, Rabito, and Wagenheim did not even know how much money was invested into the joint venture, and if such company became profitable – how the income would be distributed. For example, defendant Laljie indicated that he "did have communications with people from Capital 7" while the joint venture was formed and being operated. (*See* Laljie Deposition at p. 42, ¶ 15-21 attached as **Exhibit D**).

19.    Laljie was then asked "[d]o you remember who was there with relationship to being a part of Capital 7?" (*Id.* at ¶ 22-24).

20.    Laljie's responded "Yes. The gentleman Farid", and "[s]ome of their last names, they're on the paperwork. But I don't remember them offhand. Farid, Radion" and then paused. (*See* Laljie Deposition at p. 43, ¶ 2-4 attached as **Exhibit D**).   He continued "A gentleman named Laser. Gary Tsirelman was there, as well. A gentleman named -- I forgot his name. It was Farid's brother or brother-in-law was there. And I forget his name." (*See* Laljie Deposition at p. 43, ¶ 5-8 attached as **Exhibit D**).

21.    Laljie's observations about the Capital 7 side of the business – on a daily basis – consisted of there being "some people on IT, but they weren't really

necessarily partners", and the following: (1) Laser, (2) Gary Tsirelman, (3) Farid, (4) "A gentleman named -- I forgot his name. It was Farid's brother." (*See* Laljie Deposition at p. 44, ¶ 2- 15 attached as **Exhibit D**).

22.    Laljie explained it as "while he was there", Gary "was there"; but, Laljie did not observe a specific time when Gary "make any decisions on behalf of the companies, [or] order people around. . .". (*See* Laljie Deposition at p. 54, ¶ 18- 24 attached as **Exhibit D**).

23.    In sum, Laljie was not privy to the business details of the joint venture. He did not put in money, was not agreed to make money under any profit sharing agreement, and essentially played a minor role. He did not know the details surrounding Capital 7 or Wingfield. Of course he falls on the Wingfield side of the two companies, but was not a crucial or even knowledgeable figure.

24.    Two other Defendants, Joseph Rabito and Heath Wagenheim were barely at the joint venture office, so they couldn't even testify about observations they had with Capital 7. Mr. Wagenheim recounted going to the office for a few hours at most during the entire time of this joint venture. Mr. Rabito was the landlord, and did not even discuss the aspects of Wingfield and the decision to enter into a joint venture called 3 Leaf. (*See* Rabito Deposition at p. 30, ¶ 2-24 attached as **Exhibit E**).

**B.** *How and Who Generated the Company Capital 7 Funding, "the Five"*

25.    Plaintiff Farid Peysakhov explained how Capital 7 consisted of five people, and not seven (7) as I had expected based on the name.[6] According to Farid, the five individuals were explained as Farid, Radian, Lazar, Gary, and Yan. (*See* Farid Peysakhov at p. 8, ¶ 20 – 24 attached as **Exhibit A**).

26.    Yan Moshe confirmed the same five players. Yan was asked, "Is there anyone else that was part of Capital 7, other than the five of you?"; to which he responded, "I don't think so." (*See* Yan Moshe at p. 32, ¶ 2 – 4 attached as **Exhibit C**).

27.    Farid explained that the group had more than one business as follows:

Q.    Okay. So Capital 7, how many businesses would you say Capital 7 exists that you know of?
A.    How many businesses?

Q.    Yes. How many different Capital 7 businesses are there?
A.    So I'm just affiliated, I invested into, I was a partner in Capital 7 Cash Funding.

Q.    Just that one?
A.    Correct, yes.

Q.    How much did you invest into that company.
A.    Initially it was about, I would say about 2 to 300,000.

Q.    Okay. I know that was initially. Did you invest more money?

---

[6] *See* Radion Aminov Deposition at p. 10, ¶ 3 – 6 attached as **Exhibit B** (responding "We just call it that way. I don't remember" when being asked "[w]here did the name Capital 7 come from?).

A.    No, overall.

Q.    Okay. And who else was a part of Capital 7?
A.    So it was Radian, Lazar, Gary, Yan and myself.

Q.    So Radian, Lazar, who was the third one?
A.    Gary.

Q.    Okay.
A.    Yan.

Q.    And there's you. I feel like you said another person that started with an R.
A.    No.

Q.    So the five of you?
A.    And Radian.

. . . .

Q.    Was there anyone else besides the five of you?
A.    No.

Q.    Why was it called Capital 7, any idea?
A.    Just pure luck, Capital 7.

Q.    Did you know of any other Capital 7 or any other corporations that started with Capital 7 besides this one?
A.    I believe maybe the team had a company.

(*See* Farid Peysakhov at p. 8, ¶ 5 – p.10, ¶ 4 attached as **Exhibit A**).

28.    Radion confirmed "the Five" when asked numerous times there was "you, Laser, Yan, Gary, Farid, that is five." (hereafter "the Five") (*See* Radion Aminov Deposition at p. 11, ¶ 2 – 14 attached as **Exhibit B**).

29.    Radion described there were numerous businesses the Five would put money in and operate, and his role at those and the joint venture was a manager. He "did pre-settlement funding, Capital 7 Claim Funding. I manage Capital 7 RE Funding and I manage MD Funding, RE Funding and RE, three companies I manage." (*See* Radion Aminov Deposition at p. 13, ¶ 2 – 5 attached as **Exhibit B**).

30.    In explaining he testified that "For each company I was putting separate money. For example for Medical 300,000; for example for Claim I put four, $500,000; for Seth we put 1.5 million I remember." (*See* Radion Aminov Deposition at p. 19, ¶ 12 – 16 attached as **Exhibit B**).

31.    Radion recounted not being 100 percent involved in the joint venture, cash advance business and rather described, "I was involved maybe one or two percent"; and it was "Laser and Farid [who] w[ere]s involved in the cash advance." (*See* Radion Aminov Deposition at p. 42, ¶ 10 – 15 attached as **Exhibit B**).

32.    Farid claimed to be "involved full time" in the joint venture because he was an "operational person". (*See* Farid Peysakhov at p. 40, ¶ 13 – 16 attached as

**Exhibit A**). As the operational person he was "running the day-to-day operations, you see what's going on and so on and so forth." (*See* **Exhibit A** at p. 40, ¶ 13 – 21).

33.    Overall, when asked "whose idea was Capital 7", Yan answered "All of ours".   (*See* Yan Moshe Deposition at p. 35, ¶ 19 – 21 attached as **Exhibit C**).

**C.** *__Relationships between the Plaintiffs in Capital 7__*

34.    Farid recounted how he met Radian and Lazar at a family gather approximately 20 years, and they have all been friends since such time. Further, Radian and Lazar are brothers-in-law. Farid explained:

Q.    Let's talk about your relationship with these people.
      How do you know Radian?
A.    Yeah, so Radian and I met through like an event for family, friends, event like 20 years ago.

Q.    Okay. Do you remember what kind of event?
A.    I can't remember. Maybe like a family gathering, I can't remember.

Q.    Okay. And at that event you guys started speaking, or describe that how you guys met?
A.    Yes, we started speaking and that's how we became friends.

Q.    How about Lazar?
A.    The same thing.
Q.    The same event?
A.    Same event, they're brother-in-laws, so they were together.

Q.    Okay, and what about Gary?
A.    Gary is Radian's friend and Lazer's friend. Basically I met Gary and Yan though Lazar and Radian.

> Q.    Do you remember when you met Gary?
> A.    Also a while back, over 10 years for sure. The same thing with Yan, 10 years. I can't remember exactly when.
> Q.    Do you remember if it was like a family function, a gathering?
> A.    Yeah, it was a family function maybe in a restaurant.
> Q.    The same thing with Yan?
> A.    Yes.

(*See* Farid Peysakhov at p. 12, ¶ 8 – p.13, ¶ 17 attached as **Exhibit A**).

35.    Yan explained that he lived in Queens in 1994[7], and Radion lived across the street from him.  (*See* Yan Moshe at p. 32, ¶ 5 – 16 attached as **Exhibit C**).  The two remained friends, and became involved in business "Around Capital 7 time." (*Id.* at p. 33, ¶ 2-8).

36.    Yan also stated that he met Farid and Gary around the time that "Capital 7 was formed", which was spoken about being in 2014-2015. (*Id.* at p. 49, ¶ 3-7). When ask who Yan is the closest to right now, and who he would talk to, Lazar, Radion, Farid or Gary, Yan acknowledged knowing Radion personally, and then answered "it wasn't like with one person; everyone would talk." (*Id.* at p. 50, ¶ 20-15).

---

[7] Radion introduced Lazar to Yan in the later 1990s. (*See* Moshe Depo at p. 48, ¶ 2-5).

37.    Yan admitted to investing in at least one Capital 7 business, without knowing when the joint venture was formed, how many businesses use the Capital 7 name, and when the Capital 7 at issue here was formed. (*Id.* at p. 35, ¶ 8-11).

**D.    *Purpose and Vision of Capital 7 Entering into this Joint Venture***

38.    With regards to the joint venture, members of Capital 7 met with members of Wingfield. In the beginning, Radion would meet with Laser, and then "Farid gets involved in these meetings". (*See* Radion Aminov Deposition at p. 37, ¶ 2 – 5 attached as **Exhibit B**). Once Capital 7 "decide to work with them, with Seth, then I guess Laser told him that we work with Gary, Yan." (*See* Radion Aminov Deposition at p. 38, ¶ 13 – 16 attached as **Exhibit B**).

39.    Overall, Radion admitted that he did not look into Wingfield before he and his four partners put up over a million dollars on a joint venture. Radion stated "I think Farid check him out" and "Farid knows about him. Farid did all of the diligence." (*See* Radion Aminov Deposition at p. 39, ¶ 22 – 24 attached as **Exhibit B**).  Radion's explanation was "Listen, when you come to older guy you know he is sitting in a nice office, nice conference, you know, and I guess Laser find out from people that he is a nice guy. But it was all a lie. That is how we met him." (*See* Radion Aminov Deposition at p. 39, ¶ 2 – 10 attached as **Exhibit B**).

40.    In addition to "the Five", there was an individual named Paul, who would show up "to learn the business"; and Capital 7 had a "girl" who was "helping with like underwriting. I think she was sitting in that office." ." (*Id. a*t p. 46, ¶ 2 – 5). In setting up the floor for the joint venture, Radion had "an office, Farid has an office, Laser has an office and this girl has an office". (*Id. a*t p. 46, ¶ 6 – 10).

41.    First, according to Farid, "Capital 7 Cash Funding is basically the purpose of this was to start a business to help out small businesses after the financial crisis, because I come from the finance industry and we became friends, as family friends." (*See* Farid Peysakhov at p. 13, ¶ 20 – 25 attached as **Exhibit A**).

42.    Farid continued, "So the goal was to help out companies and fund them like alternative funding, and so the purpose of this was to start funding small businesses and grow the company from there. Apparently I didn't have that specific experience, nor any of us." (*See* Farid Peysakhov at p. 14, ¶ 9 – 14 attached as **Exhibit A**).

43.    Second, Radion stated "Between you and me I don't remember exactly the business model. I remember it was giving out money to businesses, all kind of different businesses, and they were paying you like every week, every day, all kind of different structure in the cash advance business. They were paying you $10,000, they owe you $14,000 in four, five, six months. It was divided by days and paying

every week or every day, every business day. It is how I remember it." (*See* Radion Aminov Deposition at p. 42, ¶ 19 – p. 43, ¶ 6 attached as **Exhibit B**).

44.    Third, Yan's understanding that Capital 7 was "going to finance and lend to legitimate people that would pay back that money." (*See* Yan Moshe at p. 36, ¶ 2 – 3 attached as **Exhibit C**).

**E.    *Finances, Investment, and Start-up Money for Capital 7***

45.    Radion admitted to having his own money investigated into this joint venture, and that such could also be considered his "family's money". (*See* Radion Aminov Deposition at p. 40, ¶ 2 – 8 attached as **Exhibit B**). "Capital 7 put approximately, I don't know exact, I would say approximate because I didn't check the books, about 1.5 [million dollars]". (*See* Radion Aminov Deposition at p. 45, ¶ 19 – 22 attached as **Exhibit B**). Radion claims that he invested $200,000.00 (Two Hundred Thousand Dollars), and the rest of Capital 7 money came from "My group, Farid, Gary, Yan, Laser." (*Id.* at p. 46, ¶ 19 – p. 47, ¶ 3).

46.    Farid explained it further, in that:

Q.    Okay. So you invested anywhere from 200 to 300,000 into this?
A.    Correct.

Q.    Do you have any idea how much money Radian invested?
A.    I can't recall exactly, maybe plus or minus around the same.

Q.    What about Lazar?

A.     The same thing.

Q.     What about Gary?
A.     Similar, everybody is similar.

Q.     Yan as well?
A.     Correct.

Q.     So that's about a million dollars between the five of you?
A.     So I had the smallest share of the pie and that's all I could invest. So they probably invested close to 300. I invested on the lower end of 200.

(*See* Farid Peysakhov at p. 10, ¶ 12 – p.11, ¶ 5 attached as **Exhibit A**).

47.     After going through the joint venture with Farid as best as possible the number Capital 7 invested into the joint venture became higher, and approximately 1.5 million (One Million Five Hundred Thousand Dollars). (*See* Farid Peysakhov at p. 139, ¶ 1 – 13 attached as **Exhibit A**).   Despite the increase, Farid stated his investment was $200,000.00; whereas, Radian, Yan, Gary, and Lazar all each put in $300,000.00.  (*See* Farid Peysakhov at p. 139, ¶ 14– 20 attached as **Exhibit A**). In sum he was asked:

Q.     So those four put in 300 and you put in 200?
A.     Yeah.
Q.     That puts us at about 1.4 give or take?
A.     Yes.

(*See* Farid Peysakhov at p. 140, ¶ 4– 9 attached as **Exhibit A**).

48.    Yan Moshe shed a different light of the investments into Capital 7 amongst the Five.  Yan indicated that he invested more than three million dollars in Capital 7, and with that he had more than a forty percent interest or ownership in the company. (*See* Yan Moshe at p. 42, ¶ 2 – 24 attached as **Exhibit C**).  Yan knew that his accountant had more than 3 million invested into Capital 7, and that he was not a majority owner. Yan also knew that the percentages of ownership in the company coincided with the amount of money invested. (*See* Yan Moshe Deposition at p. 44, ¶ 10 – 25 attached as **Exhibit C**)(explaining "I don't know how much Lazar has in terms of percentage, but everyone had to put in their percentage.").

49.    So basic math indicates that a percentage of Capital 7 is based on an amount more to six million dollars and potentially closer to seven million.

50.    What we do know is that Yan invested anywhere from 3 million to 3.5 million dollars in Capital 7, and has slightly less than a fifty percent ownership right. Regarding the Capital 7 joint venture with Wingfield, two of the "five" invested claim that approximately 1.5 million dollars was invested in 3 Leaf, and it is noted in operating agreement that the initial contribution was 2.5 million. (*See* 3 Leaf Operating Agreement at p. 16-17 attached as **Exhibit F**). Radion and Farid could have specifically just testified about Capital 7 money that went into 3 Leaf, whereas Yan testified about all Capital 7 ventures.

51.    Lastly, in order to make up for the other 50 percent ownership in Capital 7, there must have been more than 3.5 million invested between the four others, Radion, Farid, Lazar, and Gary. (*See* Yan Moshe Deposition at p. 43, ¶ 22 – 25 attached as **Exhibit C**)(understanding that in addition to him, those invested in Capital 7 "was Lazar, Gary, Radion, and Farid.").

52.    To this point specifically, Yan was asked: "So, that means, let's just say, . . . that you did have 50 percent with 3.5 million; that means that the other 50 percent would have had to included 3.5 million as well, and you don't know where that money would have came from, but the numbers would have been the same?", about which, Yan answered "According to your assumption, I would say yes.". (*See* Yan Moshe Depo at p. 45, ¶ 2 – 12 attached as **Exhibit C**).

## IV.    <u>STATEMENT OF LAW</u>

As stated above, it is undisputed that disqualification motions are viewed "with disfavor in this Circuit," thus requiring a "'high standard of proof'" before granting a disqualification motion. *See Gorbaty v. Wells Fargo Bank, N.A., et. al.*, 2011 WL 318090 (E.D.N.Y. February 1, 2011) (*citing Finkel v. Frattarelli Bros., Inc.*, 740 F. Supp. 2d 368 (E.D.N.Y. Sept. 15, 2010); *See also In re Estate of Myers*, 130 P.3d 1023, 1025 (Colo. 2006)(making "clear that disqualification is a severe remedy that should be avoided whenever possible.").

Nonetheless, disqualification of counsel "is a matter committed to the sound discretion of the district court." *Finkel*, 740 F.Supp. at 372 (*quoting Cresswell v. Sullivan & Cromwell*, 922 F.2d 60, 72 (2d Cir.1990)).

Such power derives from the Court's "inherent power to 'preserve the integrity of the adversary process'." *Id.* (*quoting Hempstead Video, Inc. v. Village of Valley Stream*, 409 F.3d 127, 132 (2d Cir. 2005) (*quoting Board of Education of the City of New York v. Nyquist*, 590 F.2d 1241, 1246 (2d Cir. 1979)).

Exercising such power is appropriate where allowing the representation to continue would pose a "significant risk of trial taint." *Id.* (*quoting Glueck v. Jonathan Logan, Inc.*, 653 F.2d 746, 748 (2d Cir.1981)[8]. This circuit will look for "general guidance" to the American Bar Association (hereafter "ABA") and state disciplinary rules, including the New York's Rules of Professional Conduct. N.Y. Comp.Codes R. Regs. tit. 22, § 1200.0; *Murray v. Metro. Life Ins. Co.*, 583 F.3d 173, 178 (2d Cir. 2009).

Sethna Defendants here contend that under Rule 3.7(a) of the New York Rules of Professional Conduct disqualification is proper under New York's witness

---

[8] *People v. Palomo*, 31 P.3d 879, 882 (Colo. 2001)(explaining the question a court must ask when deciding a disqualification motion is whether the litigation can be conducted in fairness to all parties.).

advocate rule. Rule 3.7 provides that a lawyer "shall not act as advocate before a tribunal in a matter in which the lawyer is likely to be a witness on a significant issue of fact". The does encompass five exceptions that can apply.[9] *See Gorbaty v. Wells Fargo Bank, et. al*., 10-cv-3291 (NGG) at ECF Doc. 36 (February 1, 2011)(*citing* N.Y. Comp.Codes R. Regs. tit. 22, § 1200.0). When deciding a disqualification motion, a court should consider the necessity and weight of the attorney's purported testimony, taking into account the significance of the issue with respect to which the attorney is a witness and the availability of other evidence of the same facts. *S&S Hotel Ventures Ltd. Partnership v. 777 S.H. Corp.*, 69 N.Y.2d 437, 446 (1987).

## V. ARGUMENTS IN SUPPORT OF INVOKING RULE 3.7 BECAUSE THE POTENTIAL PREJUDICIAL EFFECT AND THE "NECESSITY" OF SUCH TESTIMONY REQUIRES SUCH FINDING OF DISQUALIFICATION

A lawyer may find themselves in various forms of conflicts of interest which can arise from *their* own personal interests – separate and distinct from the case at issue. For example, lawyers have their own financial interests (e.g., running a small, separate, business), or other legal obligations[10] (e.g., those arising from the lawyer's

---

[9] The five exceptions under Rule 3.7 are if: (1) the testimony relates solely to an uncontested issue; (2) the testimony relates solely to the nature and value of legal services rendered in the matter; (3) disqualification of the lawyer would work substantial hardship on the client; (4) the testimony will relate solely to a matter of formality, and there is no reason to believe that substantial evidence will be offered in opposition to the testimony; or (5) the testimony is authorized by the tribunal.

[10] *Cf. In re Mortg. & Realty Trust*, 195 B.R. 740, 745 (Bankr. C.D. Cal. 1996) (disqualifying both lawyer and his law firm because the lawyer was a former member of the debtor's board of trustees,

work on other matters). *See* RESTATEMENT (THIRD) OF LAW GOVERNING LAWYERS § 125 (2000); RESTATEMENT (THIRD) OF LAW GOVERNING LAWYERS § 125 (2000).

When those interests or obligations conflict with a current representation, disqualification battles are waged.[11] Personal interest conflicts, especially those involving personal finances, are infrequently raise in disqualification applications. *People v. Harlan*, 54 P.3d 871, 876 (Colo. 2002) (*quoting Taylor v. Grogan*, 900 P.2d 60, 63 (Colo. 1995)).

---

where the Court found "that the fiduciary duty of loyalty of the trustee continues after his resignation from the board . . . these duties conflict with those owing by the trustee's law firm as counsel for the defendant").

[11] *Aleynu, Inc., v. Universal Prop. Dev. & Acquisition Corp*., 564 F. Supp. 2d 751, 754, 759 (E.D. Mich. 2008); *Schmidt v. Magnetic Head Corp*., 101 A.D.2d 268, 276, 476 N.Y.S.2d 151, 156 (N.Y. App. Div. 1984) (affirming disqualification of plaintiff's attorney and his firm because he attempted to become a buyer for the defendant corporation and thereby **acquire a personal and proprietary interest in the subject of the derivative litigation**); *Mickens v. Taylor*, 535 U.S. 162, 174 (2002), noting that the circuit courts have found conflicts when:

    (1)   *United States v. Hearst*, 638 F.2d 1190, 1193 (C.A.9 1980)(representing defendant somehow implicates counsel's personal or financial interests, including a book deal);

    (2)   *Garcia v. Bunnell*, 33 F.3d 1193, 1194–1195, 1198, n.4 (C.A.9 1994)(implicating counselor's prospective job with the prosecutor's office),

    (3)   *United States v. Michaud*, 925 F.2d 37, 40–42 (C.A.1 1991)(implicating counselor's ability to teach classes to Internal Revenue Service agents); and

    (4)   *Summerlin v. Stewart*, 267 F.3d 926, 935–941 (C.A.9 2001)(involving a romantic "entanglement" with the prosecutor).

A.    ___Personal Interest Conflicts may Lead to Attorney Disqualification___

Disqualification, however, is proper when it appears reasonably necessary to ensure the integrity of the fact-finding process or the appearance of fairness at trial. *People v. Harlan*, at 877 (Colo. 2002).

Generally, lawyers cannot be both an advocate and a witness in the same proceeding. Lawyers, of course, often bear witness to many relevant facts about both their clients and their clients' causes.

Not only can the individual lawyer be disqualified, but the disqualification can be imputed to the entire law firm. *See* Rule 1.10; Rule 3.7(b)(providing a lawyer "may not act as an advocate" if another attorney in the law firm "is likely to be called as a witness on a significant issue" and if "it is apparent that the testimony may be prejudicial or the lawyer is precluded from doing so" under Rule 1.7 or Rule 1.9.).

Here, none of the Rule 3.7 exceptions apply. Rule 3.7(a), also known as the advocate-witness rule, which states "A lawyer shall not act as advocate before a tribunal in a matter in which the lawyer is likely to be a witness on a significant issue of fact unless": (1) the testimony relates solely to an uncontested issue; (2) the testimony relates solely to the nature and value of legal services rendered in the matter; (3) disqualification of the lawyer would work substantial hardship on the client; (4) the testimony will relate solely to a matter of formality, and there is no

reason to believe that substantial evidence will be offered in opposition to the testimony; or (5) the testimony is authorized by the tribunal.

First, the testimony defendants seek to illicit is highly contested. The investments and returns made by each company are highly disputed facts that Plaintiffs put at issue in this case. Plaintiff continues to argue that Defendants did not put up as much money as Plaintiffs, and ultimately continue to raise the issue that when Defendants did put up funds – such funds were always late and insufficent. The amount of investment is the foundation of this case. For example, if returns or profits were to be made, then distributions are argued to have been paid back based on a calculation of customer funds received. Again, the two focal issues in this litigation are (1) investments, which goes towards percentage in the joint venture, and then ultimately determines (2) the amount of returns to the companies respectfully. Therefore, exception one does not apply because, without getting into more, two main issues remain heavily disputed.

Second, "the testimony relates solely to the nature and value of legal services rendered in the matter" is not the issue raised herein. Standard attorney fees, whether on an a hourly or fixed rate, or a contingency basis is not of concern. Rather the issue raised herein is plaintiff counsel invested money in the joint venture prior to this litigation even coming to fruition. Thus, exception two does not apply because

personal money, and a personal financial conflict are at issue rather than the nature of standard legal services.

Third, substantial hardship on Plaintiffs is substantially outweighed when there is such an appearance of impropriety, and counsel is one of the five plaintiffs. Further, plaintiff counsel is one of "the Five" and essentially is just as much of a plaintiff as the four other plaintiffs. Therefore, counsel should not be able to circumvent the facts that he actually is a plaintiff, and for this litigation solely play the role as Plaintiff's counsel. If counsel did not bring on these circumstances to other Plaintiffs and their company, then the analysis would differ. Therefore, exception three does not apply because plaintiff counsel should be precluded from arguing prejudice that he caused to Capital 7 and its business partners/members. Counsel placed himself in the center of this litigation and should be a party and not an advocate going forward.

Fourth, the exception pertaining to the likelihood "in opposition to the testimony" is substantial because thus far each of the plaintiffs has a different account of the facts. Further, each plaintiff has a selective memory when it comes to which facts he wishes to testify about, therefore contradictions if not in counsel's testimony but in all the other partners/plaintiffs will be in abundance. Overall, this exception does not apply because counsel's testimony will be used for impeachment

purposes regarding all of the partners, and to oppose virtually every element of every cause of action in this matter.

Fifth, the last exception remains in the sound discretion of the Court where an order can allow counsel to remain in his current role in this litigation, as a advocate and not a party with the other four plaintiffs. We defer to the Court on this exception and whether its appropriate under the circumstances.

**B.    *The Likelihood of Prejudice Occurring Under the Advocate-Witness Rule is Substantial.***

Not only can the individual lawyer be disqualified, but the disqualification can be imputed to the entire law firm. *See* Rule 3.7(b)(providing a lawyer "may not act as an advocate" if another attorney in the law firm "is likely to be called as a witness on a significant issue" and if "it is apparent that the testimony may be prejudicial or the lawyer is precluded from doing so" under Rule 1.7 or Rule 1.9.).

Testimony is prejudicial if it is "sufficiently adverse to the factual assertions" or account for the events at issue. *Lamborn v. Dittmer*, 873 F.2d 522, 531 (2d Cir. 1989). The standard is based on the facts, not the law, and focuses on whether the parties "have an interest in the lawyer's independence in discrediting that testimony." *Id.* at 531.

Despite there being various nuisances in the facts, such as a six percent fee to Wingfield as an ISO, the two companies were to invest an equal amount of money. Capital 7's investment remains at around $1,500,000.00 (1.5 million dollars), but there are discrepancies about Yan three million dollar investment, and the amounts Wingfield contributed to the joint venture. Radion stated, "Overall Wingfield put seven or $600,000, I don't remember. Maybe $800,000. Farid knows all of the details. I don't know those numbers." (*See* Radion Aminov Deposition at p. 46, ¶ 5 – 8 attached as **Exhibit B**).

And then the next big dispute is the return from the customers, or profit sharing.

During Radion's deposition it was explained:

> Q.    So I want to go back to this contribution. 2.5 was the plan to be invested, right?
> A.    Yes, yes.
>
> Q.    It didn't get to that point because you guys had a breakdown before you got to that point; is that fair to say?
> A.    Yes.
>
> Q.    And of that money what is your understanding of how much money you got back?
> A.    I think we got back like 500,000 approximately.
>
> Q.    That is it?
> A.    That is what I am thinking. Like I said, I wasn't -- I wasn't running the business, so I don't know the exact numbers. I am sorry.

(*See* Radion Aminov Deposition at p. 51, ¶ 13 – p. 52, ¶ 8 attached as **Exhibit B**).

After not knowing answers to basically any question it was ask of Radion:

> Q.    So you just threw your money in the pot, your family's money in the pot, you were there every day and you didn't focus on any of these details?
> A.    No, sir.
> Q.    You just told Laser and Farid do whatever you want?
> A.    Yes. I trust them.

(*See* Radion Aminov Deposition at p. 61, ¶ 13 – 20 attached as **Exhibit B**).

So Farid, Lazor, and Radion conducted the initial meetings with Wingfield. Farid and Lazor made the final recommendation, with Lazor looking into Wingfield and its operation. Then "the Five" pooled between 1.4 and 1.5 million dollars to invest in the joint venture. All of the Five were basically at the office for the joint venture everyday, but as Radion recalls his percentage – he was involved in one or two percent of the joint venture.

"Correct" was Yan's answer when asked "Your understanding is Gary also invested into Capital 7, right?". (*See* Yan Moshe Depo at p. 96, ¶ 23 – p. 97, ¶ 2 attached as **Exhibit C**).  When further asked about percentages in Capital 7, this colloquy took place:

> Q.    Do you know of anyone else, what their percentage is in Capital 7?
> A.    No, I know that the whole group represents the rest of the shares.

> Q.   And you do know that there was an actual written agreement that
>      documented how much you put in and your percentage?
> A.   Yes, the same goes for everyone.
>
> Q.   And there also is paperwork that exists that ultimately go towards
>      the filing of this company as an LLC or as a corporation, right?
> A.   Correct.

(*See* Yan Moshe Depo at p. 97, ¶ 6-18 attached as **Exhibit C**).

Overall, two big issues surround this case, both of which plaintiff's counsel is deeply involved. The two issues boil down to: (1) the amounts invested, and (2) the amount of customer returns. Because plaintiff's counsel has a substantial financial interest in this joint venture, it stands to reason that the process is tainted because of personal motivations to ensure the highest return despite the facts in this case for Capital 7 because some of that percentage is personally his – and not in the sense of a typical legal fee such as a contingency fee.

The advocate-witness rule under Rule 3.7 acknowledges several important considerations, most if not all of which are in favor of disqualification. In determining prejudice, various factors must be stressed in addition to whether the exceptions under Rule 3.7 apply. Here, first, the issues remaining for plaintiff's counsel are not indirect, and essentially go to all the necessary elements that must be established before jury. Second, because this matter will proceed to a jury the

danger of Gary remaining plaintiff's counsel is heightened. *United States v. Dyess*, 231 F. Supp. 2d 493, 496 (S.D. W. Va. 2002).

Third, plaintiff's counsel remaining in this case heightens the possibility that counsel may not be a fully objective witness or may be perceived by the trier of fact as distorting the truth for the sake of his client. *Id.; See also Ramey v. Dist. 141, Int'l Ass'n of Machinists & Aerospace Workers*, 378 F.3d 269, 283 (2d Cir.2004) (highlighting "when one individual assumes the role of both advocate and witness it '[may] so blur [ ] the line between argument and evidence that the jury's ability to find facts is undermined.' ") (*quoting United States v. Arrington*, 867 F.2d 122, 126 (2d Cir.1989)); *MacArthur v. Bank of N.Y.*, 524 F. Supp. 1205, 1208 (S.D.N.Y.1981) (emphasizing that "[a] jury may view an attorney as possessing special knowledge of a case and therefore accord a testifying attorney's arguments undue weight.").

Fourth, plaintiffs are not prejudiced because if their case was as strong as they somehow believe it is, then other comparable attorneys would be able to grasp the legal issues involved. A new firm would have available the record and the parties input and records. Financial hardship should not even be entertained because I reviewed hundred of thousands of dollars in legal fees billed to defendants, and that was years ago and before I even entered the case.

In furtherance of fairness and the possibility of tainting a trial, Plaintiffs counsel's knowledge is substantially unique because of his relationship with the other plaintiffs, coupled with the information he learned about the defendants during the joint venture between the two companies. Plaintiff's counsel can essentially capitalize on the information he obtained from both sides of the fence, and from individuals involved with both companies. The prejudicial effect of counsel's testimony is now he has to be consistent and aligned with the other plaintiff's because an adverse answer is prejudicial to Plaintiffs. The same can be said about lies, and its prejudicial effect on the other plaintiffs.

It is respectfully submitted that the prejudicial effect on the Defendants should also be considered based on plaintiff counsel's unique role. Obligations to former clients does not specifically apply under Rule 1.7, and in an effort to not further confuse the issues, Sethna Defendants elected to not brief the rights and confidences that goes with legal consultations and with potential clients.  What remains clear here, is crucial information was obtained based on counsel's position in the joint venture, that dual role as a member of Capital 7 and as a New York State lawyer. At the time the joint venture was created, defendants had no reason to know that Plaintiff's counsel would eventually invoke a hostile position adverse to Defendants.

To the contrary, plaintiff's counselor was seen as an advantage and an asset, where a lawyer enriched in the joint venture meant a successful lawyer was available at the drop of a dime, and always in the office if a legal issue arose. Counsel's role was seen as an asset to the joint venture, an asset who could even collect from customers when all other collection efforts failed. With that relationship, even if not what Plaintiffs intended, a reasonable person in the joint venture would see an attorney involved in the joint venture otherwise. The perspective is that such lawyer was showing up to the office daily because he was also a lawyer looking out for the best interest of the joint venture.

In the role as a lawyer or as a partner in Capital 7, plaintiff's counsel stood in a position to obtain unfettered access to information. To date, defendants have not pinpointed a specific meeting held in confidence, but the fact remains that plaintiff counsel's dual role, with dual parties highly prejudices the defendants.[12] Here, Defendant Sethna has been called everything under the sun, such as a thief and crook, who not only committed fraud but also set up an "enterprise" that participated in "racketeering". Plaintiff thus far, arguably cannot establish a prima facia case, or

---

[12] Defendant Sethna alleges that as the joint venture winded down that various plaintiffs physically assaulted and threaten Seth in the office space. After the assaults its claimed that Gary was called and spoke with all the parties about such actions not happening again. One plaintiff recalled one instance where the police were called, but these assaults remain heavily disputed.

establish any damages; and similarly, plaintiff's counsel obtained virtually zero information from the "throw-in defendants" about the elements of these causes of actions or the damages sustained. The point being, to overcome summary judgment the kitchen sink will have to be thrown at Defendants, where the only hope is a credibility attack. Plaintiffs now have to prove something, and the only inferences or conjecture remains has to be based on information counsel obtained during the course of the joint venture.

For all these reasons and more, it is appropriate under these circumstances to invoke Rule 3.7 in favor of disqualification.

**C.** ***The Necessity of Plaintiff Counsel's Testimony Invokes Rule 3.7 and <u>Renders Disqualification Appropriate</u>.***

The inquiry does not stop there, where the testimony of counsel must be deemed "necessary." When considering the necessity of testimony, "[a] court should examine factors such as the significance of the matters, weight of the testimony, and availability of other evidence." *Id.* at 373; (*quoting Kubin v. Miller*, 801 F.Supp. 1101, 1113 (S.D.N.Y.1992)).

Here, both defense attorneys expect and intend to call plaintiff's counsel as a witness with knowledge of material and necessary facts pertaining to this matter. After reviewing other Plaintiff's testimony, plaintiff counsel's testimony is necessary

if for none other than he had the same role as other plaintiffs, and its virtually impossible for him to provide less details and information than the other four Plaintiffs in this case. This testimony is factually material and goes directly to discrediting the motives, intentions, and alleged facts the other plaintiffs testified about in this matter. Plaintiff's counsel can both establish or clarify the missing facts, while discrediting other facts alleged and already testified about. A list of the material facts that can be elicited from plaintiff's counsel, although not exclusive, are for example:

(1)    there is testimony from two plaintiff's that Gary (plaintiff's counsel) – personally – invested $300,000.00 in the joint venture, so the accuracy of such investment is material;

(2)    Capital 7 and its partners – plaintiff's counsel included – potentially have a fifty percent (50 %) interest in the joint venture, where there are additional side deals or arrangements such as ISO that can change that percentage yet no other Plaintiff seems to know the answer or details to the specific percentage Plaintiff alleges in the joint venture;

(3)    if Capital 7 invested 1.5 million in the joint venture, then did plaintiff's counsel invest twenty percent (20%) of the overall amount;

(4)    if plaintiff's counsel has a 20% interest in 50% of the joint venture, did plaintiff's counsel personally

obtain approximately 10% of the overall joint venture;

(5)    ownership percentages in Capital 7 based on the amount of investment seems to be information only plaintiff's counsel obtains, and what is counsel's percentage or amount of shares in Capital 7; and

(6)    with an overall percentage in Capital 7, Plaintiff Moshe testified that dividend payments were made monthly or quarterly, and the question becomes whether counsel was receiving such payment throughout the course of the joint venture, or whether such funds have been recouped since the joint venture dissolved.

These parties (plaintiff and defendant) began a business relationship as two separate companies that joined together to create a joint venture. Everyone had the same goal at the time, to generate the highest return on investment. To accomplish such goal required looking out for the best interest of the joint venture. Now lines have been drawn in the sand, and plaintiff's counsel continues to have an unfair advantage based on all the information he obtained about both companies during the joint venture. His testimony as its pertains to all the testimony elicited in this matter already, and to the underlying main facts highlighted above, render such testimony necessary. Stated otherwise, the testimony is necessary to disprove all the elements,

and theories alleged in this case, as well as challenged the weight of the evidence presented.

## VI.  **CONCLUSION**

For the foregoing reasons, Sethna Defendants respectfully requests that this Court grant their Motion to Disqualify in its entirety and enter an Order disqualifying the law firm representing Plaintiffs, pursuant to:

    (1)    Rule 3.7(b)(1) and (2) of the New York Rules of Professional Conduct, and individual attorneys with Plaintiff's counsels law firm pursuant to Rile 3.7(a) of the New York Rules of Professional Conduct;

    (2)    the discretionary power of this Court to order disqualification; and

    (3)    for any other relief which this Court may deem just and proper.

Dated: November 17, 2024        Respectfully Submitted,

                    /s/ ***Steven Metcalf*** _____
                    STEVEN A. METCALF II, ESQ.
                    **Metcalf & Metcalf, P.C.**
                    99 Park Avenue, Suite 810
                    New York, NY 10016
                    *Phone* 646.253.0514
                    *Fax* 646.219.2012
                    metcalflawnyc@gmail.com

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a copy of the foregoing has been served today, November 18, 2024, upon all counsel for all parties to this proceeding through the court's electronic filing system ("ECF").

/s/

_____
STEVEN A. METCALF II
*Attorney for Sethna Defendants*

Dated: 11/18/2024